UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

           v.

RONALD MITCHELL,

           Defendant.

                                    17-CR-159-EAW

                              SENTENCING MEMORANDUM

## I.      INTRODUCTION

Ronald Mitchell is a 37 year-old man with a history of mental health issues and long-standing struggles with substance abuse.  PSR ¶¶ 77 to 87, Docket No. 205.  Over the past three years, Ronald has engaged in extraordinary post-offense rehabilitation as demonstrated by the letters and certificates attached hereto as **Exhibits A - E**.  Admittedly, Mr. Mitchell has a significant criminal history, and as a result, he unfortunately qualifies for the career offender enhancement under the advisory sentencing guidelines.  The basis for the application of the career offender enhancement in this case is Ronald's prior federal drug conviction wherein his relevant conduct was small in comparison to the quantities involved in the overall drug conspiracy PSR ¶ 47, Docket No. 205; and an Attempted Robbery conviction sustained almost 20 years ago when Mr. Mitchell was only 17 years old, PSR ¶ 41, Docket No. 205.  By no means is Ronald a drug kingpin, and in this particular case, he sold less than 200 grams of cocaine at the retail level on two occasions in a three week period of time in May 2016.  His instant offense conduct is consistent with his low-level drug distribution history.  Given these circumstances, a

sentence at  the low end of the sentencing advisory guideline range of 151 months with a recommendation that, if eligible, he be allowed to participate in the 500-hour Residential Drug Abuse Treatment Program (RDAP), and the Occupational Education Program is **more** than sufficient to fulfill the congressionally established goals of sentencing pursuant to 18 U.S.C. §3553(a).

This Sentencing Memorandum is being submitted for the Court's consideration Ronald Mitchell's request for a low-end guideline sentence of 151 months in the above action, pursuant to Title 18, United States Code, Section 3553(a)(1).  As set forth below, the seriousness of Ronald Mitchell's offense in this case is mitigated by his long-standing mental health and substance abuse issues; his emotional distress over his conduct; and his extraordinary post-offense rehabilitation.  These factors fully support the requested low-end advisory guideline sentence of 151 months, followed by a period of supervised release.  This Sentencing Memorandum, as set forth below, and the attached exhibits, addresses the specific Section 3553(a) factors applicable to this case.

## II.    PROCEDURAL HISTORY AND ADVISORY GUIDELINE CALCULATION

On April 5, 2019, Mr. Mitchell appeared before U.S. District Judge Elizabeth A. Wolford and pled guilty to Count 11 of a 19-count Indictment charging him with Possession with Intent to Distribute, and to Distribute, Cocaine, which occurred on or about June 7, 2016, in violation of 21 U.S.C. § 841(a)(l) and 21 U.S.C. § 841(b)(l)(C). Counts 1, 9, and 10 remain pending.  Mr. Mitchell was not charged in the remaining counts. Pursuant to the Plea Agreement ¶ 9, Docket

No. 189, it is the understanding of the parties that the defendant is a career offender § 4Bl.l(b)(3). As a result, the defendant's base offense level is 32. The parties agree that once all the adjustments are applied, the total offense level will be 29, and the Criminal History Category is VI, resulting in a range of imprisonment of 151 to 188 months, a fine of $30,000 to $1,000,000, and a period of supervised release of 3 years. A Pre-sentence Report (hereinafter "PSR") (Docket No. 205) was prepared on June 3, 2019 and mirrors these calculations. At sentencing, the Government will move to dismiss the open counts in Indictment No. 17-CR-159 pending against Mr. Mitchell. Mr. Mitchell has been detained since his initial arrest on for a violation of supervised released which was subsequently dismissed. Accordingly, Mr. Mitchell has been in federal custody since June 7, 2016. PSR ¶ 47, Docket No. 205.

Absent the career offender classification, Mr. Mitchell's base offense level in this case would have been a 13.[1] The combination of this offense level and a Criminal History Category VI, would have produced an advisory guideline range of 33 to 41 months. Therefore, the Career Offender enhancement more than quadruples Ronald's sentencing range.

Sentencing in this matter is presently scheduled for September 25, 2019.

### III.    SENTENCING PROCEDURE

In a series of cases beginning with *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the mandatory nature

---

[1] Pursuant to paragraph 5(b) of the plea agreement (Docket No. 189), the amount of cocaine sold by Mr. Mitchell is at least 100 grams, but not more than 200 grams. Under 2D1.1 the base offense level for that amount would be a level 16, deducting three (3) levels for Acceptance of Responsibility the Total Offense Level would be 13.

of the United States Sentencing Guidelines violated the Sixth Amendment and that moving forward, the Guidelines were to be treated as "advisory." While a sentencing court must still correctly calculate the Guidelines range in each case, it may not treat that range as mandatory. *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, the Guideline range is merely "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

In rendering a sentence, a court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall*, 552 U.S. at 49-50, 53-60. A court's "overarching" duty is to "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing." *Kimbrough*; 552 U.S. at 101; *United States v. Pepper*, 131 S. Ct. 1229, 1242-43, 179 L.Ed.2d 196 (2011). These goals are retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2).

A critical Supreme Court directive designed to ensure that the Guidelines are truly advisory is the authority of this Court to disagree with a particular guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations")); *see also Spears v. United States*, 555 U.S. 261, 266-67 (2009).

After determining the advisory Guidelines range as a "starting point" and "initial benchmark," *Gall,* 128 S. Ct. at 596, the sentencing court must then consider any applicable Guidelines departure.  The Supreme Court in *Gall* rejected the "rigid use of a mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." 552 U.S. at 47.   A "departure" is a downward adjustment to the final sentencing range specifically sanctioned by the Guidelines themselves.  It is frequently triggered by a prosecutor's request to reward cooperation or by other factors that take the case "outside the heartland" of cases or defendants contemplated by the Sentencing Commission.   Although the Sentencing Guidelines are now advisory, the Court in its initial guideline calculation is still required to look at permissible downward departures when calculating a sentence. *See, e.g*., *United States v. Galante*, 111 F.3d 1029, 1036 (2d Cir. 1997); *United States v. Ekhator*, 17 F.3d 53 (2d Cir. 1994); *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992).

One such applicable departure which the Court is directed by the Second Circuit to consider in career offender cases is a horizontal departure from Criminal History Category VI to V. When a defendant qualifies as a career offender, he is automatically placed in a Criminal History Category VI, and his base offense level is calculated by reference to the offense statutory maximum.  The Sentencing Guidelines explicitly acknowledge that over-representation of the seriousness of a defendant's criminal history is an appropriate consideration for downward departure. *See* U.S.S.G. § 4A1.3 (policy statement).  In accordance with the Plea Agreement, the Defendant has agreed not to recommend any departure outside the Guidelines.  Neither party will "advocate or recommend the application of any other Guideline, or move for any Guideline departure, or move for, or recommend a sentence outside the Guidelines."   Nonetheless, the

defense realizes that the Court will be considering each and every sentencing option within or without the sentencing Guidelines. The defense also realizes there are many factors the Court will consider in making its decision. Pursuant to *United States v. Preacely*, 628 F3d. 72 (2nd. Cir. 2010), and *United States v. Ingram*, 721 F.3d 35, (2nd Cir., 2013), this Court is free to consider a horizontal departure, from CHC VI to CHC V, should it determine that CHC VI over-represents the seriousness of Mr. Mitchell's criminal history. As observed in *United States v. Preacely*, such a result may be achieved by "a horizontal departure" from the Career Offender Guideline by which the sentencing Court adopts a lower criminal history. This departure is appropriate where the present Guidelines significantly over-represent the seriousness of the offender's criminal history or the likelihood that he will commit further crimes. *See* Guideline § 4A1.3(b)(1) and *United States v. Mishoe*, 241 F3d. 214 (2nd. Cir. 2001).

Lastly, although the plea agreement precludes Mr. Mitchell from advocating a varianc, this Court still may consider all of the 18 U.S.C. § 3553(a) factors to determine whether a variance – a sentence outside the advisory guideline system – is warranted. A "variance" occurs when a judge imposes a sentence above or below the otherwise properly calculated sentencing range based upon the application of the other statutory factors in 18 U.S.C. §3553(a). While district courts must continue to base departures on guideline factors, "many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court—with greater latitude—under section 3553(a)."

## IV.    18 U.S.C. § 3553 (a) FACTORS

As noted above, after the Court calculates the advisory Guidelines range and any grounds for a Guidelines departure are considered, the Court must ultimately impose a sentence that is

consistent with 18 U.S.C. § 3553(a). 18 U.S.C. § 3553(a) mandates the court to impose a sentence that is "sufficient, but not greater than necessary" to meet the purposes of sentencing, a directive commonly referred to as the "parsimony clause." *United States v. Williams*, 475 F.3d 468, 476 (2d Cir. 2007).  The parsimony clause requires a sentencing court to impose the lower of two sentences when either of the two potential sentences would properly serve the statutory purposes of retribution, deterrence, incapacitation or rehabilitation. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).  The § 3553(a) factors to be considered when imposing a sentence are as follows:

> (1)　the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)　the need for the sentence imposed -
>
> > (A)　to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B)　to afford adequate deterrence to criminal conduct;
> >
> > (C)　to protect the public from further crimes of the defendant; and
> >
> > (D)　to provide the defendant with the needed . . . training or . . . treatment in the most effective manner;
>
> (3)　the kinds of sentences available;
>
> (4)　the kinds of sentence and the sentencing range established for
>
> > (A)　the applicable category of offenses committed by the applicable category of defendant as set forth in the Guidelines . . .;
>
> (5)　any pertinent policy statement . . .[issued by the Sentencing Commission];

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

Under §3553(a), the sentencing judge is permitted to find any relevant facts appropriate for determining a sentence, whether or not that sentence is within or outside the advisory Guidelines range.

For the reasons set forth below, a low-end Guideline sentence of 151 months with a recommendation that, if eligible, Mr. Mitchell be allowed to participate in the 500-hour Residential Drug Abuse Treatment Program (RDAP), and the Occupational Education Program followed by a period of Supervised Release is appropriate.  Such a sentence is **more** than sufficient to serve the purposes of 18 U.S.C. § 3553(a)(2).  The lowest appropriate advisory Guideline sentence would not only severely punish Mr. Mitchell, but would also properly reflect Mr. Mitchell's meaningful acceptance of responsibility, his extraordinary post-offense rehabilitation, his lifelong struggle with mental health and substance abuse issues, as well as his genuine request for continued treatment and rehabilitation.  Such a sentence is more than sufficient given the nature and circumstances of Mr. Mitchell's participation in this criminal offense; but also viewed in the context of his history and characteristics as set forth below.  *See* 18 U.S.C. § 3553(a)(1).  Accordingly, Mr. Mitchell respectfully requests a low-end Guideline sentence as a sentence that is warranted based on the circumstances set forth herein in order to serve the goals of retribution, deterrence, incapacitation, and rehabilitation.  18 U.S.C. § 3553(a)(2).

## V.    ARGUMENT

## A.  THE HISTORY AND CHARACTERISTICS OF RONALD MITCHELL

The following sections analyze the § 3553 factors against the factual backdrop of Mr. Mitchell's case.  Mr. Mitchell recognizes the seriousness of his crime.  Nevertheless, there are significant mitigating factors regarding his conduct.  Consistent with his conduct in the instant case, Ronald is a non-violent, low-level drug offender. The Government, as well as the United States Probation Office, agrees that Mr. Mitchell is a "street-level" dealer who played a minor role in the offense.  PSR ¶ 11.  Mr. Mitchell's instant offense involves two sales of small quantities of cocaine: 3.5 grams on May 12, 2016, and 1 gram on May 25, 2016, and the discovery of 32.9 grams cocaine upon a traffic stop on June 7, 2016.  Plea Agreement 5 (a) and PSR ¶¶ 13, 14.  The two prior offenses that qualify Mr. Mitchell as a career offender are set forth in paragraphs 41 and 47 of the PSR, Docket No. 205.  Clearly, Mr. Mitchell's offense conduct was limited in scope and occurred over a period of three (3) weeks.   Furthermore, Ronald participated in this criminal event to satisfy his own drug habit and a poor attempt to make some additional money to support himself.  PSR ¶¶ 22, 23.

### i.    Ronald Mitchell's Long-Standing Mental Health Issues &  Substance Abuse

Mr. Mitchell has a long and well-documented history of mental health and substance abuse issues.  Mr. Mitchell knows that his substance abuse and mental health issue do not excuse his conduct. See Exhibit A. (PSR at ¶¶ 77-87).   Ronald has consumed alcohol from the age of 11. While under supervised release (from February 2016 to June 2016) he consumed ½ a bottle of liquor approximately five (5) times per week.  Ronald's daily marijuana addiction began at the

age of 12, spending up to $100 daily on the drug. Ronald's use of powder cocaine ebbed and flowed from 2009 until 2010 when he used two (2) "8 balls" of cocaine five (5) times weekly. While under supervised release (from February 2016 to June 2016) Ronald used powder cocaine twice weekly, and he tested positive for cocaine on April 25, 2016. Ronald also self-medicated with Valium from 2008 to 2010. PSR ¶¶ 80-86.

Ronald fully understands how he made his situation worse by using alcohol and cocaine and not seeking proper treatment. See Exhibit A. While his mental health and substance abuse issues are not an excuse, it contributes to his poor decision making and resorting to drug dealing as a means to support himself. Ronald captures the affect that drugs had upon his life in his poem, "Hi, I'm Drug" attached hereto as **Exhibit B**. In the poem, Ronald describes the allure that drugs had for him, the falsity of the euphoria he experienced when using drugs and the destruction that his drug use inflicted upon his life. Ronald candidly bears witness in this poem to the struggles he has had with drugs throughout his life. Likewise, the certificates of completion attached at **Exhibit C** substantiate Ronald's dedication to remain clean and sober when this case is behind him.

The impact of Ronald's long-standing substance abuse problems on his decision-making cannot be overstated. While drug addiction has often been viewed as the result of a lack of willpower and character in the addict, experts generally agree that narcotic dependence is a form of mental illness. *See* Nat. Instit. Of Drug Abuse, "Comorbidity: Addiction and Other Mental Illnesses" (Sept. 2010). Addiction is "a complex brain disease characterized by compulsive, at

times uncontrollable drug craving, seeking, and use despite devastating consequences –

behaviors that stem from drug-induced changes in brain structure and function." *See id*. at 1.1

Notably, Mr. Mitchell's struggles with alcohol and drugs did not occur in a vacuum. Indeed, Ronald's early drug use is the expected result of an abusive and chaotic childhood Ronald endured. *See* **Exhibit A**, and  PSR at ¶ 70.  At the age of 6, Ronald was removed from his parents' home because he and his siblings were left home alone.  From the ages of 6 to 9, he resided with his maternal aunt and endured physical abuse, including being hit with belts, switches, and being tied to a pole.  He was then placed into foster care for a few months and finally resided with his father from the ages of 9 to 13.  Ronald's parents separated when he was approximately 9-years-old, and the court granted joint custody to his paternal grandmother and father due to his mother's substance abuse issues and his father not having a permanent residence. Thus, the blueprint for Mr. Mitchell's drug abuse was written years before he committed his crimes.

Regardless of its genesis, Mr. Mitchell's continued involvement in the criminal justice system and in particular drug-related offenses was based on a lack of judgment resulting from his significant daily drug habit.  Although such addiction does not excuse Mr. Mitchell's culpability for his offense, it does mitigate his blameworthiness for his actions.  Finally, a lamentable, if not tragic aspect of Mr. Mitchell's life, is that his childhood was not only impacted by his early exposure to drugs, but also affected by his experience of neglect and abuse. See **Exhibit A**.

Accordingly, the defense respectfully requests that the Court impose a sentence of 151 months with a recommendation that, if eligible, he be allowed to participate in the 500-hour Residential Drug Abuse Treatment Program (RDAP), and the Occupational Education Program. Such a sentence is more than sufficient to serve the purposes of 18 U.S.C. § 3553(a)(2).  The lowest appropriate Guideline sentence would not only substantially punish Mr. Mitchell, but would also properly reflect Ronald's meaningful acceptance of responsibility, his lifelong struggle with substance abuse issues, as well as his genuine request for continued treatment and rehabilitation.  A low-end Guidelines sentence is a very significant punishment.  If sentenced to 151 months, Mr. Mitchell will be approximately 50-years-old when he is released from prison. Additionally, he will need to comply with strict conditions of supervision to ensure that he is taking his participation in mental health and substance abuse treatment.  Such a sentence is more than sufficient to serve the purposes of 18 U.S.C. § 3553(a)(2).

### ii.    Mr. Mitchell's Post-Offense Extraordinary Rehabilitation

Over the past three years, Mr. Mitchell has engaged in significant rehabilitation efforts. While incarcerated at the Cattaraugus County Jail, Ronald has attended substance abuse support groups including Alcoholics Anonymous, Narcotics Anonymous, and Houses of Healing (a substance abuse group) in 2018 and 2019.  *See* **Exhibit C.**  Ronald has completed 14 programs in the past three years.  He has completed several fatherhood programs, as well as educational and vocational programs.  He has also been a mentor to other inmates.  *See* **Exhibit A.** As Pastor Daniel Butcher poignantly expresses in his letter to the Court, many people have been profoundly impacted by their relationship with Ronald.  *See* **Exhibit D.**  Pastor Butcher speaks of how much Ronald's has grown over the past three years.  He reflects on how Ronald first came to the group

shy and insecure, but has bloomed into an amazing man.  He also discusses how many of the inmates turn to Ronald for guidance and support. Pastor Dan is confident that Ronald can turn his mess into his message given the proper guidance and rehabilitation.

Likewise, Pastor Steven Beattie shares with the Court his observations of Ronald and the extraordinary nature of his rehabilitative efforts.  *See* **Exhibit E**.  Pastor Beattie speaks about witnessing a significant change in Ronald over the past two and half years.  He shares with the court Ronald's progress in his faith based addiction and substance abuse ministry.  The following quote captures the essence of Ronald's extraordinary rehabilitation:

> "He is actually the mentor for the other inmates, and I have heard others give credit to Ronald for helping them get through their depression, anger and anxiety. Ronald has always displayed a humble and teachable spirit and he has always shown respect and because of this trait, he has not only a good reputation with other inmates, but also with the corrections officers. Ronald has said so many times how much our class has helped him become a better man!"

Extraordinary post- offense rehabilitation has long been a factor Courts have considered. *See United States v. Maier,* 975 F.2d 944, 948-49 (2d Cir.1992), which approved a downward departure to probation in light of a heroin defendant's extraordinary efforts in overcoming her addiction, only after the district court had: Conscientiously examined all the pertinent circumstances, including the nature of the defendant's addiction, the characteristics of the program she had entered, the progress she had made, objective indications of her determination to rehabilitate herself, and her therapist's assessment of her progress towards rehabilitation and the hazards of interrupting that progress. *See also United States  v. Williams*, 65 F.3d 301, 306 (2d Cir. 1995) (when a defendant who has been in federal custody since his arrest has had no opportunity to pursue any rehabilitation, when he had been admitted to a selective and intensive

inmate drug treatment program and a guideline sentence would deprive him of his only

opportunity rehabilitate himself, departure from 130 months to 60 months is reasonable if

additional conditions attached to supervised release term); *United States v. Maier*, 975 F.2d 944,

945 (2d Cir.1992) (affirming departure where defendant's "efforts toward rehabilitation followed

an uneven course, not a surprising result for someone with a fourteen- year history of

addiction").

Therefore, Mr. Mitchell's three (3) year post offense rehabilitation is extraordinary and is

a significant factor which further supports the requested low-end Guideline sentence.

**B.      The Need for the Sentence Imposed**

In imposing just punishment to reflect the seriousness of the offense, it is important to

consider that "[l]ow-level, non-violent drug addicts who participate in the drug trade to support

their habits are hardly the kind of individuals Congress had in when it directed the Sentencing

Commission to promulgate the Career Offender guideline." See United States v. Newhouse, 919

F. Supp. 2d. 955, 974 (N.D. Iowa 2013).  Thus, sentencing Mr. Mitchell to the same penalties that

were designed for significantly more serious offenders does not constitute just punishment. In

addition, a one-size-fits-all scheme that imposes lengthy sentences indiscriminately on offenders,

regardless of their culpability, does not promote respect for the law.

Furthermore, in imposing "just punishment" for an offense, a sentencing court should not

disregard the additional penalties and hardships that will accompany Mr. Mitchell while on a

lengthy term of supervised release. Mr. Mitchell will face an overwhelming number of collateral

consequences. Indeed, [m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.' *Id*. (citing Michelle Alexander, *The New Jim Crow* (2010)).

Therefore, the lowest appropriate Guideline sentence would not only substantially punish Mr. Mitchell, but would also properly reflect Mr. Mitchell's meaningful acceptance of responsibility, his lifelong struggle with mental health and substance abuse issues, as well as his genuine request for continued treatment and rehabilitation.

**C. The Need To Afford Adequate Deterrence to Criminal Conduct**

A consideration of this factor compels an analysis of the principles of both general and specific deterrence.

**i. General Deterrence**

The principle of general deterrence is based on the absurd premise that prison sentences deter crime. This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder *et al.*, *What Caused the Crime Decline?*, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www. brennancenter. org/publication/whatcaused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck 13 and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

(*Id.* at 1031). The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, Five Things About Deterrence (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id.*.

### ii. Specific Deterrence

As discussed at length herein Ronald Mitchell is a 37 year-old man with a history of mental health issues and long- standing struggles with substance abuse. Over the past three years, Ronald has engaged in extraordinary post-offense rehabilitation as demonstrated by the letters and certificates attached hereto as Exhibits A - E.  Given these circumstances, a sentence at  the low end of the sentencing advisory guideline range of 151 months with a recommendation that, if eligible, he be allowed to participate in the 500-hour Residential Drug Abuse Treatment Program (RDAP), and the Occupational Education Program is more than sufficient to fulfill the specific

deterrent considerations of the congressionally established goals of sentencing pursuant to 18 U.S.C. §3553(a).

### D.   The Need To protect the Public from Further Crimes of  Mr. Mitchell

As a preliminary matter, increasing Mr. Mitchell's term of imprisonment will not have a positive impact on his risk of recidivism. That is, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); see also Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that 14 such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").  In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Moreover, the career offender guideline fails to promote the goal of specific deterrence since it overstates the "seriousness of a defendant's record and the risk of his reoffending, particularly when the defendant is a low-level, non-violent drug offender." *Newhouse*, 919 F.Supp.2d at 975. The United States Sentencing Commission also recognizes that the Guideline

distorts the actual likelihood of recidivism on the part of defendants who qualify on the basis of prior drug convictions.  *See* **Exhibit F.**

> **E.** **The Need To Provide Mr. Mitchell With Needed Educational Or Vocational Training, Medical Care, Or Other Correctional Treatment In The Most Effective Manner**

While Mr. Mitchell does not require medical treatment while in the Bureau of Prisons, he does need drug treatment, as well as mental health counseling and vocational training. Notably, Mr. Mitchell's participation in a drug treatment program will significantly reduce his risk of recidivism.  Given these circumstances, a sentence at  the low end of the sentencing advisory Guideline range of 151 months with a recommendation that, if eligible, he be allowed to participate in the 500-hour Residential Drug Abuse Treatment Program (RDAP), and the Occupational Education Program is more than sufficient to fulfill the congressionally established goals of sentencing pursuant to 18 U.S.C. §3553(a).

> **F.** **The Kinds of Sentences Available**

Although Mr. Mitchell may not advocate for it, this Court may vary from the advisory Guideline range. The impact of the advisory guidelines on a court's sentencing discretion has been discussed in Section I and VI, and the critical question in Mr. Mitchell's case is the exact weight this Court should give to the guidelines. As recognized in *Gall,* district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49, 128 S. Ct. at 597. Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases are now potentially relevant in every case.

G.      **The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**

As noted above, because of the essential problems with the Guidelines, career offender sentences reflect a widespread judicial disagreement with the Guidelines. Indeed, courts have only found the advisory Guideline range to be appropriate in approximately 24% of career offender. Moreover, rather than promoting unwarranted disparity, the application of the career offender Guidelines "has the strong potential to lead to . . . unwarranted sentencing uniformity." *Newhouse*, 919 F.Supp.2d, at 977-978. *See also Dixon,* Case 2016-cr-16-MHT, WL 4492843, at *3; *Vasquez*, 796 F.Supp.2d at 1371.

Mr. Mitchell's case illustrates that the danger of sentencing uniformity may pose a greater risk than the danger of sentencing disparity. By advising a sentence for Mr. Mitchell according to the same penalties that apply to a drug kingpin, the career offender Guideline blithely achieves not only the irrational, but the absurd. Finally, in order to avoid unwarranted disparity in this case, the Court should take into consideration the other sentences imposed in this case and the relative degrees of culpability. Specifically, the other co-defendant's who have already been sentenced in this case received the following sentences:

**Melvin Ingram (002)**:  Pled guilty to Conspiracy to Possess with Intent to Distribute, and to Distribute, 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 84l(a)(l) and 21 U.S.C. § 84l(b)(l)(B), all in violation of 21 U.S.C. § 846. 11/14/2018: Sentenced to 70 months imprisonment and 4 years supervised release.

**Robert Boyd, a/k/a Bobby (003):**  Pled guilty to Conspiracy to Possess with Intent to Distribute, and to Distribute, 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 841(a)(l) and 21 U.S.C. § 841(b)(l)(B), all in violation of 21 U.S.C. § 846. 05/08/2018: Sentenced to 60 months imprisonment and 4 years supervised release.

**Jason Siafakas (005):**        Pled guilty to Conspiracy to Possess with Intent to Distribute, and to Distribute, 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. § 841(a)(l) and 21 U.S.C. § 841(b)(l)(B), all in violation of 21 U.S.C. § 846. 05/09/2019: Sentenced to time-served and 3 years supervised release.

### H.        The Need to Provide Restitution to Any Victims of the Offense.

Pursuant to paragraph 20 of the PSR, there are no identifiable victims in this case.

## VI.        THE CAREER OFFENDER GUIDELINE PRODUCES PUNISHMENT THAT IS GREATER THAN NECESSARY TO SATISFY ANY PURPOSE OF SENTENCING

### i.        Career Offender Guideline Enhancement is not empirically based

Sentences recommended by the career offender guideline are among the most severe and least likely to promote sentencing purposes in the United States Sentencing Guidelines Manual. See *USSC, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 133-34 (2004).[2] One problem is that the guideline range is keyed to the statutory maximum, the result of a congressional directive to the United States Sentencing Commission. Another problem, created by the Commission itself, is that the class of career offenders is defined much more broadly than the statute requires. As a result, the typical "career offender" is a low-level, non-violent drug offender with prior state convictions for minor drug offenses or "crimes of violence" involving no actual violence, for which they received little or no jail time. Neither the severity of the guideline nor its breadth was the product of careful study, empirical research, or national experience. *See generally* Amy Baron-Evans *et al.*, *Deconstructing the Career Offender Guideline*, 2 Charlotte L. Rev. 39 (2010). Under the advisory guideline system in place today, judges frequently decline to follow

---

[2] This report, cited hereinafter as "Fifteen Year Review," is available at http://www.ussc.gov/15_year/15year.htm.

the career offender guideline, and the rate of within-guideline sentences for career offenders has decreased to just 30.2% in fiscal year 2012. *See* U.S. Sent'g Comm'n, Quick Facts – *Career Offenders* (2013), www.ussc.gov/Quick_Facts.

As a low-level and non-violent drug addict, Mr. Mitchell is not truly the type of defendant that the career offender Guideline was meant to address. *See United States v. Newhouse*, 919 F.Supp. 2d. 955, 959 (N.D. Iowa 2013)(imposing significant variance in case involving street-level offender based on the conclusion that career offender Guideline does not achieve just sentencing in such cases). Rather, Mr. Mitchell is the typical "low-hanging fruit" that is often captured in the War on Drugs – a war whose primary success has been filling federal prisons beyond capacity. *See id.* at 958; *see also United States v. Vasquez*, No. 09-cr-259 (JG), 2010 WL 1257359, at *3 (E.D.N.Y. Mar. 30, 2010)(stating that in "the war on drugs" "prosecutors can decide that street-level defendants like Vasquez-the low hanging fruit for law enforcement-must receive the harsh sentences that Congress intended for kingpins and managers, no matter how many factors weigh in favor of less severe sentences.").

Mr. Mitchell's classification as a career offender quadruples his advisory sentencing exposure for the offense conduct in this case and accordingly, anything above a low end guideline sentence is a sentence that is "greater than necessary" to achieve the goals of sentencing established by Congress. 18 U.S.C. § 3553(a).  As discussed in depth above, the classification of Mr. Mitchell as a career offender is based upon two offenses one of which occurred 20 years ago when he was a teenager.  When Mr. Mitchell committed that first offense, he was seventeen (17) years old. PSR ¶ 41. Were it not for the career offender classification, Mr. Mitchell's advisory Guideline range for this offenses would be a sentencing range of 33 to 41 months. The net effect is that the career

offender classification adds almost 10 years to the lower end of the advisory Guideline range. The career offender Guideline, however, fails to consider the fact that Mr. Mitchell predicate offenses involve small quantities of cocaine, that he was a teenager at the time of the first prior offense, and that offense occurred twenty years ago. A 151 month Guideline range is one that would be the same had he committed the prior offenses within the last five years as a mature adult and had the prior offenses involved significant quantities of controlled substances. Many courts have recognized that the wide net cast by the career offender provision ensnares the street-level dealer along with drug king pins. *See United States v. Moreland*, 437 F.3d 424, 435(4th Cir. 2006) ("[T]he career offender Guideline covers a broad range of offenders, encompassing the street-level dealer who handles only small quantities of drugs and the drug king pin or the recidivist with a history of violence.") Given the disparity in the circumstances of those classified as career offenders, many courts have thought it appropriate to impose sentences below the advisory range established by the career offender Guideline. *United States v. Williams*, 435 F.3d 1350, 1351.

When a particular Guideline does not "exemplify the Commission's exercise of its characteristic institutional role," it is not an abuse of discretion for a sentencing court to conclude that the Guideline yields a sentence that is greater than necessary.[3] *United States v. Dorvee*, 616 F.3d 174, 188, 188 (2d Cir.2010), citing *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

---

[3] *See United States v. Gray*, 577 F.3d 947, 950 (8th Cir. 2009); *United States v. Michael*, 576 F.3d 323, 327-28 (6th Cir. 2009); *United States v. McLean*, 331 Fed. Appx. 151 (3d Cir. June 22, 2009); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 88-96 (1st Cir. 2008); United States v. Sanchez, 517 F.3d 651, 662-65 (2d Cir. 2008); cf. *United States v. Friedman*, 554 F.3d 1301, 1311-1312 & n.13 (10th Cir. 2009) (recognizing court's authority to disagree with career offender guideline, but concluding that district court's sentence was not based on that disagreement).

When a Court disagrees with a Guideline based solely on a policy disagreement with it, the Court is free to vary from that guideline, "even where that disagreement applies to a wide class of offenders or offenses." *Dorvee* at 188, quoting *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir.2008). The Commission was not acting in its characteristic role when it created the career offender Guideline; the Guideline was simply the result of a congressional directive to the Commission to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized." *See* 28 U.S.C. § 994(h). Like the original crack cocaine Guideline and the child pornography Guidelines, the career offender Guideline was not based on empirical evidence. When the crack/cocaine Guidelines were first promulgated, the ranges were driven by the statutory minimums.

Likewise, the child pornography Guidelines were not based upon empirical data, but rather, were promulgated by the Commission in response to Congressional directives. Similarly, the career offender Guideline was not created to reflect empirical research or careful analysis of past and current trends in sentencings, but rather, was a response to a Congressional directive to establish Guidelines for career offenders by keying the Guidelines to the statutory maximum. *See* 28 U.S.C. § 994(h). The Courts are not bound by 28 U.S.C. § 994(h); that is, the statute mandating the Sentencing Commission to establish guidelines "at or near the maximum term" was a directive to the Commission and not the sentencing Court." Section 994(h), however, by its terms, is a direction to the Sentencing Commission, not to the Courts, and it finds no express analog in Title 18, or Title 21. While 21 U.S.C. § 841(b) expressly establishes the minimum and maximum prison terms that the Court is allowed to impose for violations of § 841(a), there is no statutory provision

instructing the court to sentence a career offender at or near the statutory maximum." *United States v. Sanchez*, 517 F.3d 651, 663 (2d Cir. 2008).

A recent Sentencing Commission report on the career offender Guideline supports an argument that the Guideline is not a product of Sentencing Commission research and expertise, and so not deserving of any deference for that reason. The full report is attached hereto as **Exhibit F**.

First, the report makes clear that the basic career offender Guideline is not the product of the Commission's own study. The report confirms that the Guideline is the product of the statutory directive I pointed to in the deconstruction post – 28 U.S.C. § 994(h). (*See* pages 12 to 14 of the report.) The report then goes even further; it expresses the Commission's view that the statutory directive required it to create the career offender guideline and major modifications would require Congressional action. As expressed by the Commission at page 13 of the report:

> Congress created the Commission "to establish sentencing policies and practices for the federal criminal justice system" that implement the purposes of sentencing enumerated at 18 U.S.C. § 3553(a)(2). Pursuant to this directive, Congress delegated to the Commission "significant discretion in formulating guidelines." The Commission's authority and discretion in this area is nevertheless limited in some ways. Congress retains, for example, the authority to influence federal sentencing policy by enacting directives to the Commission, including the career offender directive at section 994(h).

(Footnotes omitted.)

Second, the Commission report raises further doubts about the wisdom of the Guideline. It notes that three-quarters of career offenders are drug defendants, and the Guideline has the greatest impact on those defendants' sentences, while the Guideline's purpose seems least applicable to those offenders. (*See* pages 2 to 3 of the Executive Summary in the report, as well

as the more detailed discussion in later pages.)  The Guideline has the greatest impact on those defendants because (a) drug offenses tend to carry higher statutory maximums which in turn produce higher career offender offense levels under § 4B1.1 (*see* pages 3 and 31 to 32 of the report) and (b) drug defendants are less likely to already have the criminal history category of VI which the career offender Guideline requires (*see* page 32 of the report).  Recidivism studies show that drug trafficking career offenders are the least likely to recidivate, however; indeed, their recidivism rate is comparable to that of non-career offenders.  (*See* pages 2 to 3 and 40 of the report.)  This is a particularly significant consideration in evaluating the career offender Guideline, because its main purpose is to incapacitate those who are likely to re-offend.  As expressed by Senator Kennedy, who proposed the bill that led to the underlying statutory directive in 28 U.S.C. § 994(h), "[s]hrinking law enforcement resources must be targeted on incapacitating the tiny minority of criminals responsible for the overwhelming majority of violent crimes."  128 Cong. Rec. 26518 (1982) (remarks of Sen. Kennedy).  *See also United States v. Lawrence*, 916 F.2d 553, 554 n.4 (9th Cir. 1990) (quoting portion of same comments and describing Senator Kennedy as sponsor of statutory provision).

Third, the report establishes that sentencing courts are "voting with their feet," or at least voting with their judgments and commitments, even more strongly as time goes on.  The percentage of career offenders sentenced within the career offender Guideline range has decreased from 43.3 percent in 2005 to just 27.5 percent in 2014.  (*See* pages 2 and 22 of the report.)  And it's not only the courts; government-sponsored below Guideline sentences, for reasons other than cooperation, have increased from 33.9 percent to 45.6 percent over the same period.  (*See* the same pages of the report.)  This rejection of the Guideline is particularly dramatic for career offenders

with only drug trafficking offenses; those defendants receive, on average, sentences which are almost identical to the Guideline range which would apply without the career offender Guideline. (*See* pages 3 and 27 of the report.)

The Commission then joins in our attack on the Guideline – by affirmatively recommending Congress amend the statutory directive in § 994(h).  While it does not recommend complete elimination of the directive, it does recommend that it be limited to just those defendants who have at least one crime of violence conviction.  (*See* pages 3, 4, and 44 of the report.) Defendants who qualify as career offenders based solely on drug offenses should be completely removed from the directive in the Commission's view.

In accordance with the Plea Agreement, the Defendant has agreed not to recommend any departure outside the Guidelines.  Neither party will "advocate or recommend the application of any other Guideline, or move for any Guideline departure, or move for, or recommend a sentence outside the Guidelines."  Nonetheless, the defense realizes that the Court will be considering each and every sentencing option within or without the sentencing Guidelines.  The defense also realizes there are many factors the Court will consider in making its decision.

As such, it is respectfully submitted that the Court impose the requested sentence as a sentence that is sufficient, but not greater than necessary.  Without the Career Low End Guideline Offender enhancement, Mr. Mitchell's total offense level would be calculated at 13, with a Criminal History Category VI pursuant to U.S.S.G. § 4A1 and Ch. 5, Pt. A, and he would be facing an advisory Guideline range of 33 to 41 months. The "PSR"  however, applied the "career

offender" Guideline at U.S.S.G. § 4B1.1., PSR ¶31, which resulted in calculating the Base Offense Level at 32, Criminal History Category VI, with adjustments of responsibility the Total Offense Level is 29, Criminal History VI, Mr. Mitchell  is now facing an advisory Sentencing Guideline Range of 151 to 188 months.  By application of the career offender Guideline, Mr. Mitchell's recommended Guidelines sentence increased four-fold the sentence he would otherwise be facing. Based upon the specific facts and circumstances in the instant case, as well as the general sentencing considerations codified at 18 U.S.C. § 3553(a), the defense maintains that any other sentence beyond the low end of the career offender advisory sentencing range is excessive. Certainly, the proposed sentence of 151 months is more than sufficient to deter Mr. Mitchell from future criminal activity and to meet all the required purposes of sentencing.  If sentenced to 151 months, Mr. Mitchell will be approximately 50-years-old when he is released from prison. Additionally, he will need to comply with strict conditions of supervision to ensure that he is participating in mental health and substance abuse treatment.

## VII.  CONCLUSION

Even when the Sentencing Guidelines were mandatory, sentencing courts were to treat those before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

The Supreme Court's decision in *Booker* and the command of the statute to impose a sentence that is "sufficient, but not greater than necessary," has given sentencing courts greater latitude to impose a sentence that fits the crime and the person before the court.  Given the length of time that has passed since his two qualifying convictions, his age at the time he committed one of those  offenses, and the relatively minor nature of the instant offense, Mr. Mitchell respectfully request a low-end Guideline sentence of 151 months with a recommendation that, if eligible, he be allowed to participate in the 500-hour Residential Drug Abuse Treatment Program (RDAP), and the Occupational Education Program, in this case that would not be  greater than necessary, to satisfy the purposes of sentencing.  Such a sentence would be of such sufficient length to more than fulfill the requirements and purpose of sentencing pursuant to 18 U.S.C. § 3553(a).

**DATED:**  Buffalo, New York, August 20, 2019.

Respectfully submitted,

**/s/Fonda Dawn Kubiak**
Fonda Dawn Kubiak
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York   14202
(716) 551-3341; fax 551-3346
fonda_kubiak@fd.org
*Counsel for Defendant Ronald Mitchell*

**TO:**    Joel L. Violanti
Assistant United States Attorney

Lisa B. Ferraro
United States Probation Officer