# <u>UNITED STATES v. RONALD MITCHELL</u>
## 17-CR-159-EAW

# DEFENDANT'S EXHIBIT A

DEFENDANT'S
EXHIBIT A

To: Judge Elizabeth A. Wolford

Hi and good day. My name is Ronald D. Mitchell and I'm scheduled to be sentenced by you on Aug. 27th. To begin, if you've decided to read this letter through, thank you for your time. It's my wish this letter assist your part in GOD's will for my life. Your Honor, this letter isn't an attempt to sway your judgement toward my character, my case, or my criminal record. This letter isn't me asking you for a sentence less than I deserve. To do so, to me, is just as criminal as committ -ing the crimes I have. Your Honor this letter isn't me making excuses for my past criminal conduct. Richard Bach said " If it's never my fault, I can never take responsibilty for it, and if I can't take responsibility for it, I'll always be a victim of it". As you'll see throughout this letter, I'm done being a victim and victimizing. Your Honor, this letter is a testimony of the transformation I've experienced since being incarcerated. This letter is me asking you to examine the man who committed those past crimes detailed in my PSI, with the man you'll learn through this letter I am today. This letter is me asking for your words of wisdom to help me further cement my decision to respect the laws that govern our country. Your Honor, I've been arrested several times for breaking the law, but Jun. 7th, 2016 is the one arrest day I regard the most. It's the day I found myself at a dead end in my soul yet on a road of redemp -tion. It's the day I stopped hating GOD's when, where, how, and speed. That decision caused me to give up on everything I believed about myself, my values, my ambitions, and my life. I became vulnerable in the sense of being willing to be corrected and informed. I became desperate to relearn how to love others and myself in the same breath, same thought, same step. Your Honor, I'm very remorseful toward the affect/effect my crimes and drug use has had on the any number of lives and livelihoods threatened by me. Today I understand I'm responsible not only for the victims of my crimes and drug use, but also for how far the affect/effect of those behaviors stretches. I have no idea how many lives I've damaged because of my crimes and drug use, and for that, I know I deserve whatever prison sentence you give me. Your Honor I first wrote you an 18 page letter. Most of it describing in detail the abuse I suffered as a child. Then I rewrote your letter feeling anything longer than a summary of the abuse I endured, is me trying to effect pity. Your Honor my sisters and I had an emotionally, mentally, physically, and spiritually, abusive childhood. Probably no worst than any guy incarcerated could relate to I imagine. The programs I've attend -ed here at the jail encouraged me to visit my childhood in -

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 3 of 132

efforts of breaking the bond to my then responses to what I went through as a child. Today, because of those efforts, I under-stand it's not what others did/said and do/say to me that harms me yet how I respond to such. That understanding motivated me to thoroughly examine myself and excavate any response to life indicative of blaming others, as well as those liberating me yet damaging to others. It motivated me to employ a design for living respecting the laws governing our country, and the growth of another as well as my own. Your Honor, understanding my response to life is the make or break, helped me to forgive my childhood and the people of it. It helped me forgive myself while accepting blame. It also broadened my awareness of my responsibility as a recovered addict/alcoholic and one accus-tomed to criminal thinking to keep those mental and spiritual illnesses exposed, from victimizing others and myself, and proven wrong before they're manifested. Your Honor, I co-moderate a 12 week program here at the jail called Houses Of Healings. In the first week we show a you tube video of a guy named Mark Lundholm who uses comedy to expose addiction, alcoholism, and criminal thinking. One of the many things Mr. Lundholm said striking my heart is " If we get out of jail and or a bad situation and not help someone else do so, then we're theives. When I heard that I instantly felt guilt, passion, and understood I have a duty. My past suddenly became my strength. In that moment I decided to dedicate a piece of my heart to helping people prevent or escape child abuse, addiction, alcoholism, and criminal thinking. Your Honor, to conclude this letter, I ensure you I'm done running from GOD's position for my life. I'm done putting the responsibility of raising my daughter in others hands. I'm done making the world responsibile for my discomfort and happiness. I'm done looking for what life can give me or what I can get out of life. I'm done breaking the laws of our cities, counties, and our country. Your Honor, as Mr. Lundhlom meant it, I'm done being a thief.

Sincerely
Ronald D. Mitchell

08/20/2019 10:20AM FAX 7169386235    CATTARAUGUS COUNTY JAIL

# UNITED STATES v. RONALD MITCHELL

## 17-CR-159-EAW

# DEFENDANT'S EXHIBIT B

**DEFENDANT'S EXHIBIT B**

# Hi, I'm Drugs ☺

It's very nice to meet you!

Here's a little about myself

I can be your best friend but only if you feel you can't be a friend to anyone else

I can make you very happy but only if you'll be unhappy about who you are

I will give you smiles but only if you'll ignore the sad faces of others

I can help you win but only if you'll lose respect for yourself and others

I will give you peace but only if you ignore responsibilities and the will to become the best you can be

I can make you smart but only if you'll believe everyone else is dumb

I can make you honest but only if you'll call everyone else a liar

I can ease your pain but only if you'll ignore when others are hurting

I will give you energy to go out but only if you'll bypass the opportunity to love

I can make you never feel like a victim but only if you'll become a user and abuser

I will give you self-confidence but only if you'll expect nothing of yourself

I can make you feel alive but only if you'll walk in the way of death

I'll stop there ☺

I only have one deal breaker, and that's,

If you leave, our friendship is over!

Thanks for letting me express myself, and if after my intro you still wanna be my friend, then this is the start of an inevitably ugly end. ☺

**By Ronald Mitchell, ex-friend of drugs!**

# UNITED STATES v. RONALD MITCHELL

## 17-CR-159-EAW

# DEFENDANT'S EXHIBIT C

## National Fatherhood Initiative®

DEFENDANT'S EXHIBIT C

# *Certificate of Completion*

This certifies that

## Ronald Mitchell

has successfully completed the

## (>24:7 **DAD** A.M.

## Program

Conducted on _____ May 14th, 2018 _____

in _____ Little Valley, NY _____

Christopher A. Brown
President
NATIONAL FATHERHOOD INITIATIVE®

Facilitator's Name/Signature



Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 8 of 132

# *The Fatherhood Connection*

# CERTIFICATE of GRADUATION

THIS CERTIFICATE IS PRESENTED IN RECOGNITION OF

## Ronald Mitchell

UPON THE COMPLETION OF THE FATHERHOOD CONNECTION
THE GRADUATE COMPLETED 26 HOURS OF THE 13 WEEK PROGRAM

## PRESENTED BY CATTARAGUS COMMUNITY ACTION
## D.A.D.S. PROGRAM

x *Joey Skinner*

x *Scott Waterman*

x *Dan Butcher*

SEPTEMBER 11, 2017

COMMUNITY
*action*
*Cattaraugus Community Action, Inc.*

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 9 of 132

# CO action UNITY

Cattaraugus Community Action, Inc.

# CERTIFICATE *of* GRADUATION

Presented to

## Ronald Mitchell

UPON THE SUCCESSFUL COMPLETION OF THE

**CATTARAUGUS COMMUNITY ACTION D.A.D.S.**
**FATHERHOOD CONNECTIONS GROUP**

Signed: _____
Joey Skinner, Fatherhood Facilitator

Signed: _____
Scott Waterman, Fatherhood Facilitator

Signed: _____
Dan Butcher, Fatherhood Facilitator

JANUARY, 8TH
**2018**

**DADS**
**ALWAYS**
**DETERMINED**
**TO**
**SUCCEED**

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 10 of 132

**CA BOCES**

Essential Partner

THIS CERTIFIES THAT

## Ronald D. Mitchell

has successfully completed the Houses of Healing course and is therefore awarded this
Certificate
Given this Twenty fifth day of May, 2017

_____
Lieutenant

_____
Instructor

_____
Team Leader

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 11 of 132

CA BOCES

Essential Partner

THIS CERTIFIES THAT

# Ronald Mitchell

has successfully completed Houses of Healing course and is therefore awarded this

# CERTIFICATE OF COMPLETION

Given this 27th day of November, 2017

_____
Moderator

_Valentino Shine Sr_
Co-moderator

_____
Lieutenant

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 12 of 132







# CA BOCES

*E*ssential *Partner*

THIS CERTIFIES THAT

## Ronald D. Mitchell

has co-moderated the Houses of Healing course and is therefore awarded this

# CERTIFICATE OF APPRECIATION

Given this 26th day of April, Two thousand eighteen

_____
Moderator

*Ronald Mitchell*
Co-moderator

_____
Lieutenant

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 13 of 132



CA BOCES

Essential Partner

THIS CERTIFIES THAT

Ronald Mitchell

has co-moderated the Houses of Healing course and is therefore awarded this

# CERTIFICATE OF APPRECIATION

Given this 27th day of December, Two thousand eighteen

_____
Moderator

_____
Co-moderator

_____
Lieutenant

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 14 of 132



THIS CERTIFIES THAT

## Ronald Mitchell

has successfully completed the Houses of Healing course and is therefore awarded this

# CERTIFICATE

Given this twenty-eighth day of March, Two thousand nineteen

_____
Lieutenant

_____
Moderator

_____
Co-moderator



CA BOCES

*ssential Partner*

THIS CERTIFIES THAT

## Ronald D. Mitchell

has co-moderated the Houses of Healing course and is therefore awarded this

# CERTIFICATE OF APPRECIATION

Given this 26th day of April, Two thousand eighteen

| Moderator | Co-moderator | Lieutenant |

Case 1:17-cr-00159-EAW-JJM   Document 218-1   Filed 08/20/19   Page 16 of 132

# CA BOCES

**E**ssential Partner

THIS CERTIFIES THAT

## Ronald D. Mitchell

has co-moderated the Houses of Healing course and is therefore awarded this

# CERTIFICATE OF APPRECIATION

Given this 26th day of April, Two thousand eighteen

_____
Moderator

_____
Co-moderator

_____
Lieutenant



**CO**action**MUNITY**

Cattaraugus Community Action, Inc.

# CERTIFICATE *of* GRADUATION

Presented to

## Ronald Mitchell

UPON THE SUCCESSFUL COMPLETION OF THE

**CATTARAUGUS COMMUNITY ACTION 24:7 DAD A.M. (24 HOURS) & MONEY SMARTS (6 HOURS) PROGRAMS**

Signed: _____
Dan Butcher, Fatherhood Facilitator

Signed: _____
Joey Skinner, Fatherhood Facilitator

Signed: _____
Shane Bowser, Fatherhood Facilitator

JANUARY 8TH
2019

**DADS ALWAYS DETERMINED TO SUCCEED**

NATIONAL FATHERHOOD INITIATIVE

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 19 of 132

**CO**action**MUNITY**
Cattaraugus Community Action, Inc.

# CERTIFICATE *of* GRADUATION

Presented to

## Ronald Mitchell

UPON THE SUCCESSFUL COMPLETION OF THE

**CATTARAUGUS COMMUNITY ACTION 24:7 DAD A.M.
& MONEY SMARTS PROGRAMS**

Signed: _____
Joey Skinner, Fatherhood Facilitator
Signed: _____
Dan Butcher
Signed: _____
Shane Bowser, Fatherhood Facilitator

AUGUST, 20TH
2018

**DADS
ALWAYS
DETERMINED
TO
SUCCEED**

NATIONAL FATHERHOOD INITIATIVE

# UNITED STATES v. RONALD MITCHELL

## 17-CR-159-EAW

# DEFENDANT'S EXHIBIT D

I am writing this on the behalf on Ronald Mitchell, to show you the man that I see. First let me introduce myself, I am Pastor Daniel W. Butcher of the Little Valley Wesleyan Church. I am 42 years old and have been married for 13 years, and have 4 children, I am also employed by the Cattaraugus Community Action in three different roles. They are as a 24/7 Dad's facilitator, a Fatherhood Connections Facilitator, and a Safe Harbor (CSEC) trainer. I have seen many guys come and go through our system over the last 3-4 years who have simply been forced to come to our program, but this has been totally different with Ron. I have had Ron in the Jail group for the past two years and have seen him grow tremendously. He came to our group shy and insecure of himself or his thoughts, now fast forward a couple years and we now use Ron as a co-facilitator. Ron was introduced to the system at a young age and never had anyone to show him how to live, he bounced from place to place never understanding how to function in society, other than to take care of himself. But now looking at the man he has become has amazed me to no end. He has become the voice of reason for the men that meet him daily. The guys in our group continually talk about how Ron was the man that they went to in times of need, or just need a word of encouragement. Now for me with the limited access to him can tell that at 37 years old he is tired of his past lifestyle that has caused him nothing but hardship, such as losing contact with his daughter, and basically his entire family. He is I feel ready to begin a new chapter in his life, which I can say without question that he is looking forward to new opportunities that will come with a change of heart. I feel Ron has a real gift for telling his story to those that need to hear it, and I have offered my services to attempt to bring him into that new direction. I get that it seems weird for a complete opposite of Ron to grab onto his heart as I have, but I can see the potential in this man. If he is given a shot at a new life, I will be there step by step with him along the way. Holding him accountable and honest about his actions, and purpose in the community. After knowing him and developing a heart connection with him, my family has decided to open their hearts to this man as well. They have tried to show him the love that he never really received in his years of formation and they refuse to let him just be swallowed up in the system. He has responded in kind, not looking for anything or taking anything for granted.

I do understand the continuous nature of his crimes and lifestyle, but I see a real change in Ron and given the opportunity I will stand up and take a stand on my belief in his heart. So, few men have made an impact on my life as Ron has, he has become an example to my 4 kid's and wife that a real man can admit mistakes and truly learn and change from them. I am currently building a team of men and women called Rebuilt, and this will be a group dedicated to telling their story so that many young people may hear and look to something different, and don't fall into the life that Ron has led. I am planning for Ron to be one of the top men in this endeavor, if he is just given a small amount of Grace so that he may help change futures. If given any leniency I will stand next to Ron and become accountable for him and hold him accountable. So, I am asking to please show some Grace, mercy or leniency whatever the name to Ronald Mitchell so that he can show his daughter, and mine that he has changed, and now can lead a productive life in society as a father, mentor, and friend. It is through Grace and love of the difficult ones to give such to, that we can really see the impact of our gift to them. We both have an opportunity now to show that, and I personally thank you for taking the time to read this letter from a simple man about a simple man to someone in your Honorable position.

Sincerely,

Pastor Daniel W. Butcher    (716)225-4606    Pastordan7676@gmail.com

DEFENDANT'S
EXHIBIT D

# UNITED STATES v. RONALD MITCHELL

## 17-CR-159-EAW

# DEFENDANT'S EXHIBIT E

DEFENDANT'S
EXHIBIT E

# The Pentecostals of Olean, New York

7-2-19

Honorable Elizabeth A. Wolford

U.S. District Court Judge

Hello, my name is Pastor Steven Beattie and I am writing in behalf of Ronald Mitchell.

I have been the Pastor of the United Pentecostal church in Olean, N.Y. since 1983 when my wife and I moved here from Amarillo Texas as a Missionary to start this church. I am pleased to say that in the past 36 plus years we have seen many lives that had been ravaged by sin and addictions completely changed!

I met Ronald approximately 2-1/2 years ago when we started our Faith based addiction and substance abuse ministry in the Cattaraugus County Jail.

We have been teaching classes in the jail every Saturday with 2 sessions, one for the men, and one for the women being one hour each.

Ronald attended the very first class and has attended nearly all of them since. I and the others on our ministry team have noticed a significant change in Ronald's overall attitude and we are quite impressed with his positive interaction in the class! He actually is a mentor for the other inmates and I have heard others give credit to Ronald for helping them get thru their depression, anger, and anxiety. Ronald has always displayed a humble and teachable spirit and he has always shown respect and because of these traits he has not only a good reputation with the other inmates but also with the correction officers. Ronald has said so many times how much our class has helped him become a better man!

There is one thing that stands out that Ronald talks about frequently, and that is before his incarceration he was just all about him, self centered and doing only what pleased Ronald, but now he sees that life is all about helping others.

In closing, I believe that Ronald Mitchell has made giant leaps of progress and I have even told him that he has a gift from God to possibly one day be a counselor to help others. I do hope his sentencing will be fair and lenient as I believe Ronald deserves another chance! If possible, I do plan on being present at his sentencing on July 24th at 2:30.

I have enclosed a type of a Poem that Ronald wrote in which we read in the class at jail.

Sincerely,

Pastor Steven Beattie

1100 Homer Street

716-373-7456-Church

716-307-7926-Bishop Steven Beattie

716-244-7480-Pastor Shawn Morris

revswb@yahoo.com-Email

# Hi, I'm Drugs ☺

It's very nice to meet you!

Here's a little about myself

I can be your best friend but only if you feel you can't be a friend to anyone else

I can make you very happy but only if you'll be unhappy about who you are

I will give you smiles but only if you'll ignore the sad faces of others

I can help you win but only if you'll lose respect for yourself and others

I will give you peace but only if you ignore responsibilities and the will to become the best you can be

I can make you smart but only if you'll believe everyone else is dumb

I can make you honest but only if you'll call everyone else a liar

I can ease your pain but only if you'll ignore when others are hurting

I will give you energy to go out but only if you'll bypass the opportunity to love

I can make you never feel like a victim but only if you'll become a user and abuser

I will give you self-confidence but only if you'll expect nothing of yourself

I can make you feel alive but only if you'll walk in the way of death

I'll stop there ☺

I only have one deal breaker, and that's,

If you leave, our friendship is over!

Thanks for letting me express myself, and if after my intro you still wanna be my friend, then this is the start of an inevitably ugly end. ☺

**By Ronald Mitchell, ex-friend of drugs!**

# UNITED STATES v. RONALD MITCHELL

## 17-CR-159-EAW

# DEFENDANT'S EXHIBIT F

DEFENDANT'S
EXHIBIT F







# REPORT TO THE CONGRESS:
# CAREER OFFENDER SENTENCING ENHANCEMENTS

# United States Sentencing Commission



**Patti B. Saris**
*Chair*
**Charles R. Breyer**
*Vice Chair*
**Dabney L. Friedrich**
*Commissioner*
**Rachel E. Barkow**
*Commissioner*
**William H. Pryor, Jr.**
*Commissioner*
**Michelle Morales**
*Ex Officio*
**J. Patricia Wilson Smoot**
*Ex Officio*

**Kenneth P. Cohen**
*Staff Director*

# August 2016

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ..................................................... 1

INTRODUCTION ........................................................... 5

GENESIS OF THE CAREER OFFENDER GUIDELINE .......... 11

   *The Career Offender Directive* ................................... 12

   *The Career Offender Directive in Context* ................................. 13

   *The Career Offender Guideline* ..................................... 14

WHO ARE CAREER OFFENDERS AND HOW ARE THEY SENTENCED? ........................................................... 17

   *Offender Demographics and Offense Characteristics* ............... 19

   *Impact of Career Offender Status* .............................. 21

   *Sentences Relative to the Guideline Range* ............................... 22

   *Punishment* ............................................................... 24

RECOMMENDATION: THE CAREER OFFENDER GUIDELINE SHOULD FOCUS ON VIOLENT OFFENDERS .............................. 25

   *The Commission's Multi-Year Study* ............................... 26

   *Pathways to Career Offender Status* ............................... 26

   *Current Sentencing Practices* ..................................... 27

   *Recidivism Rates* ............................................... 38

   *Takeaways and Recommendations* ..................................... 43

   *Statutory Proposal* ............................................... 45

RECOMMENDATION: CONGRESS SHOULD ENACT A UNIFORM DEFINITION OF "CRIME OF VIOLENCE" FOR FEDERAL CRIMINAL LAW APPLICATIONS ................................................ 47

   *Federal Statutes Presently Contain Multiple Definitions* .................. 48

   *The Need to Reform Recidivist Enhancement Definitions* ................. 49

   *The Commission's Crime of Violence Definition* .............................. 52

   *Takeaways and Recommendations* ..................................... 55

ENDNOTES ............................................................... 57

*Appendix A: History of the Career Offender Guideline*

*Appendix B: Current Sentencing Practices: Data Collection and Analysis Process*

*Appendix C: Recidivism: Data Collection and Analysis Process*

*Appendix D: Statutory Definitions*

# EXECUTIVE SUMMARY

Pursuant to its general authority under 28 U.S.C. §§ 994 and 995, the United States Sentencing Commission ("the Commission") has undertaken a multi-year study of statutory and guideline definitions relating to the nature of a defendant's prior conviction and the impact of such definitions on the relevant statutory and guideline provisions. The Commission analyzed the application and impact of the career offender guideline found at section 4B1.1 (Career Offender) of the *Guidelines Manual*, which implements a Congressional directive instructing the Commission to set the guideline range for offenders with specified instant and prior convictions *at or near the statutory maximum*. Tracking the statutory criteria, a defendant qualifies as a career offender if (1) the defendant was at least eighteen years old at the time he or she committed the instant offense of conviction; (2) the instant offense is a felony that is a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. Where these criteria are met, the directive, and therefore §4B1.1, provides for a guideline range "at or near the maximum [term of imprisonment] authorized" — typically resulting in a guidelines range significantly greater than would otherwise apply.

**During the course of its study, the Commission found that:**

■ **Career offenders are primarily convicted of drug trafficking offenses – nearly three-quarters (74.1%) of career offenders in fiscal year 2014 were convicted of a drug trafficking offense and would have been sentenced pursuant to §2D1.1 (Offenses involving drugs and narco-terrorism).**

■ **Career offenders are sentenced to long terms of incarceration, receiving an average sentence of more than 12 years (147 months).**

■ **As a result of these lengthy sentences, career offenders now account for more than 11 percent of the total BOP population.**

■ **Even though they continue to receive lengthy sentences, career offenders are increasingly receiving sentences below the guideline range, often at the request of the government. During the past ten years, the proportion of career offenders sentenced within the applicable guideline range has decreased from 43.3 percent in fiscal year 2005 to 27.5 percent in fiscal year 2014, while government sponsored departures have steadily increased from 33.9 percent to 45.6 percent.**

These findings prompted the Commission to explore concerns that the career offender directive fails to meaningfully distinguish among career offenders with different types of criminal records and has resulted in overly severe penalties for some offenders.

The Commission conducted a detailed analysis of career offenders' prior criminal history and recidivism after release from federal prison. This allowed for distinctions to be made among career offenders based on the nature of their prior offenses. Specifically, the Commission assigned each career offender in the study to one of three categories based on the types of offenses in their record potentially relevant to career offender status: drug trafficking only, violent only, and mixed. The Commission found clear and notable differences between these distinct pathways to career offender status:

■ **Career offenders who have committed a violent instant offense or a violent prior offense generally have a more serious and extensive criminal history, recidivate at a higher rate than drug trafficking only career offenders,**

2

and are more likely to commit another violent offense in the future.

- The career offender directive has the greatest impact on federal drug trafficking offenders because of the higher statutory maximum penalties for those offenders (offenders convicted under the primary drug trafficking statute at 21 U.S.C. § 841 face statutory maximum penalties up to life imprisonment).

- Drug trafficking only career offenders were most likely to receive a sentence below the guideline range (often at the request of the government), receiving an average sentence (134 months) that is nearly identical to the average guideline minimum (131 months) that would have applied to those offenders through the normal operation of the guidelines.

Consistent with these findings, the Commission has concluded that the career offender directive is best focused on those offenders who have committed at least one "crime of violence." The Commission recommends that Congress amend the directive to reflect this principle by no longer including those who currently qualify as career offenders based solely on drug trafficking offenses. These reforms would help ensure that federal sentences better account for the severity of the offenders' prior records, protect the public, and avoid undue severity for certain less culpable offenders.

As part of its study, the Commission also observed the overall complexity of applying the career offender guideline and other similar recidivist enhancements. Federal statutes and the sentencing guidelines currently contain a patchwork of definitions attempting to specify which prior offenses are crimes of violence or violent felonies for purposes of recidivist enhancements. These definitions and the complex legal tests (most notably the "categorical approach") have resulted in confusion and inefficient use of resources on the part of both litigants and courts. Congress should act to address the inconsistency and complexity that persists by adopting a single, uniform definition of "crime of violence" for all federal criminal law purposes.

## CONCLUSIONS

- The career offender directive should be amended to differentiate between career offenders with different types of criminal records, and is best focused on those offenders who have committed at least one "crime of violence."

- Career offenders who have committed a violent instant offense or a violent prior offense generally have a more serious and extensive criminal history, recidivate at a higher rate than drug trafficking only career offenders, and are more likely to commit another violent offense in the future.

- Drug trafficking only career offenders are not meaningfully different from other federal drug trafficking offenders and should not categorically be subject to the significant increases in penalties required by the career offender directive.

- A single definition of the term "crime of violence" in the guidelines and other federal recidivist provisions is necessary to address increasing complexity and to avoid unnecessary confusion and inefficient use of court resources.

4

## SECTION I

---

### INTRODUCTION

*This report provides a broad overview of several key findings of the United States Sentencing Commission's multi-year study of statutory and guideline definitions relating to the nature of a defendant's prior conviction (e.g., "crime of violence," "violent felony," "drug trafficking offense," and "felony drug offense") and the impact of such definitions on the relevant statutory and guideline provisions (e.g., the career offender guideline and the Armed Career Criminal Act). The report begins by providing background on the career offender directive and the resulting career offender guideline. It also provides sentencing and recidivism data concerning career offenders, including data demonstrating the substantial impact the directive and the career offender guideline have on the resulting sentencing range. The report concludes by recommending statutory changes, including changes that would better tailor the significantly enhanced penalties required for career offenders. A more targeted approach in this area would account for differences among current career offenders and would result in sentences that are more proportional.*

Over the past three decades, Congress has indicated that the number and nature of a federal offender's prior convictions are important considerations in deciding a federal sentence. This policy determination is reflected in numerous statutory recidivist provisions proscribing increased statutory minimum and maximum punishments for defendants with specified prior convictions. Congress further codified this approach with the passage of the Sentencing Reform Act of 1984 (SRA)[1] in which it instructed federal courts to consider, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant.[2] The SRA specifically included criminal history as a factor that courts must consider in imposing a sentence,[3] and it instructed the Commission to consider criminal history in formulating the guidelines.[4]

Since the first guidelines were promulgated in 1987, the United States Sentencing Commission[5] has also recognized the importance of an offender's criminal history and has acted in a manner consistent with Congress's legislative actions by specifically incorporating the number and nature of prior convictions in an offender's background into the offender's guideline determination. For example, an offender's criminal history is considered in the calculation of the offender's guideline range such that repeat offenders with more extensive or serious prior offenses receive longer sentences than first-time offenders. In addition, the Commission independently decided to increase sentences for certain kinds of offenses, such as drug trafficking, firearms and sex offenses, if the offender committed drug trafficking, violent crimes or other sex offenses, respectively, in the past. The guidelines consideration of criminal history, particularly as used in Chapter Four of the sentencing guidelines, is reflective of increased culpability and has proven to be a good measure of the risk of future recidivism.[6]

While continuing to support the notion that an offender with a long and serious criminal history should receive a more severe penalty than one without such a history, the Commission has observed that, in practice, determining which

6

prior convictions should result in substantially increased sentences raises complex policy issues. First, the current structure of some recidivist enhancements has resulted in overly severe penalties for certain offenders, which has, in turn, led to increased departures and variances from the guidelines. Second, variations in the meaning of similar terms, such as "crime of violence" and "violent felony," have resulted in unnecessary confusion and inefficient use of resources on the part of both litigants and courts.

Prompted by these observations and growing criticisms regarding the scope and impact of certain recidivist statutes and guideline provisions, the Commission undertook a multi-year study of statutory and guideline definitions relating to the nature of a defendant's prior conviction (*e.g.*, "crime of violence," "violent felony," "drug trafficking offense," and "felony drug offense") and the impact of such definitions on the relevant statutory and guideline provisions (*e.g.*, the career offender and illegal reentry guidelines, and the Armed Career Criminal Act). As a focal point of this study, the Commission analyzed the application and impact of the career offender guideline, which is found at §4B1.1 (Career Offender) of the *Guidelines Manual*. This provision implements a congressional directive instructing the Commission to set the guideline range for offenders with specified instant and prior convictions *at or near the statutory maximum.*[7]

The Commission considered feedback from judges, practitioners, probation officers, academics, and other interest groups, including conducting a roundtable discussion on crimes of violence and the "categorical approach,"[8] and studied case law interpreting these statutory and guideline definitions. The Commission has received extensive public comment, and is aware of numerous court opinions, expressing the view that having multiple definitions of the terms "crime of violence" and "violent felony" leads to complexity and a lack of clarity. The categorical approach, devised by the Supreme Court as the method of interpreting these terms, has added more complexity over time. The Commission also analyzed sentencing data, including a study of sentences relative to the guideline ranges for career offenders.[9] As discussed in more detail below, this analysis demonstrates a decreasing rate of within range sentences (27.5% in fiscal year 2014), coupled with increasing rates of government sponsored (45.6%) and non-government sponsored below range sentences (25.9%) for career offenders.[10]

One result of the Commission's study was a January 2016 amendment to the definition of "crime of violence" at §4B1.2 (Definitions of Terms Used in Section 4B1.1). While this was an important and positive step, the Commission did not adopt this recent amendment with the view that it had accomplished all that should be done in this area. A number of concerns remain, including:

(1) the overall severity of the enhancements for many offenders under the career offender guideline;

(2) a failure to meaningfully distinguish among career offenders with different types of criminal records; and

(3) the overall complexity of applying the career offender guideline and other similar recidivist enhancements.

More far-reaching changes are needed to address these concerns and achieve the goal of a fairer and more rational career offender sentencing regime. The changes should ensure that sentences for repeat offenders are not unduly severe and that they more proportionally take into account the severity of the offenders' prior record so that individuals with different criminal histories are not automatically sentenced in the same manner. To achieve these goals, the Commission makes two recommendations for statutory changes.

First, the Commission recommends that Congress amend the career offender directive at 28 U.S.C. § 994(h) to permit the Commission to more effectively differentiate between career offenders with different types of criminal records. Sentencing data demonstrates clear and notable differences between career offenders who have committed a violent offense and those who are deemed career offenders based solely on drug trafficking offenses. The differences are seen both in the nature and extent of the offenders' criminal history at the time of sentencing, as well as the likelihood of recidivism after release — recidivism rates for offenders with violence in their past are higher than those for offenders without a history of violent conduct. Contrary to what might be expected, the career offender directive has a significantly greater sentencing impact on career offenders who have committed an instant federal drug trafficking offense because such offenders often face much higher statutory maximum penalties than offenders convicted of a violent federal offense (e.g., offenders convicted under the primary drug trafficking statute at 21 U.S.C. § 841 face statutory maximum penalties up to life imprisonment, while the federal offense of robbery found at 18 U.S.C. § 1951 has a statutory maximum penalty of 20 years imprisonment).

Consistent with these findings, courts and the government generally perceive career offenders with a violent felony in their past differently from other career offenders. This perception is reflected in current sentencing practices, with violent career offenders receiving fewer and lesser departures or variances from the guidelines. Thus, while certain recidivist offenders should be punished more severely, the Commission has concluded that the career offender directive, and the guideline based on that directive, is best focused on those offenders who have committed at least one "crime of violence." The career offender directive at 18 U.S.C. § 994(h) should be amended to reflect this principle.

Second, the Commission recommends that Congress adopt a single, uniform definition of "crime of violence" for all federal criminal law purposes. The definition should include a requirement that the prior offense have as an element the use, threatened use, or attempted use of physical force against the person of another, and the definition should include a short list of enumerated offenses targeting the most serious predicate offenses without regard to whether it includes a use-of-force element. While the Commission recently amended the career offender guideline's definition of "crime of violence," inconsistency and complexity persist in other statutory provisions. Stakeholders universally have urged the Commission and Congress to replace the existing recidivist definitions with a single definition for use in all federal criminal contexts.

In establishing a uniform definition, Congress should consider adopting the revised definition of "crime of violence" promulgated by the Commission in January 2016 to replace the existing "violent felony" provision of the Armed Career

Criminal Act and the definitions of "crime of violence" in 18 U.S.C. § 16 (at least to the extent applicable to criminal law) and 18 U.S.C. § 924(c). The Commission adopted its revised definition after a multi-year study of the categorical approach and predicate offense definitions. This study included extensive feedback from stakeholders and experts, such as a roundtable discussion about potential new approaches and a public hearing on the amendment. The Commission also conducted an exhaustive analysis of the available data about the career offender population and the relative risks and seriousness of possible predicate offenses.[11] That feedback and analysis resulted in a revised definition that responds to legal and practical concerns about the former definition, such as the need for courts to formulate "contemporary, generic" meanings for enumerated offenses. Adoption of this single definition across the various federal statutes would reduce confusion, maximize the efficient use of judicial resources, and focus on those offenders with the most serious violent criminal backgrounds.

9

10

# SECTION II

## GENESIS OF THE CAREER OFFENDER GUIDELINE

11

To understand the scope of the Commission's recent changes and recommended areas for future changes, it is helpful to understand the evolution of the career offender sentencing regime starting from its origination in the Sentencing Reform Act of 1984. The background set forth below demonstrates the long-standing work that both Congress and the Commission have done in this area. The Commission seeks to continue the collaborative process by working with Congress to craft a career offender sentencing regime that ensures public safety and just punishment for recidivist offenders, while also recognizing the important differences among federal offenders with different types of convictions.

## The Career Offender Directive

The genesis of the career offender directive set forth at 28 U.S.C. § 994(h) was an amendment by Senator Edward M. Kennedy to the Violent Crime and Drug Enforcement Improvement Act of 1982 mandating that courts sentence "career criminals" to "the maximum or approximately the maximum penalty for the current offense."[12] The Kennedy amendment included proposed language in the career offender mandate that was not a directive to the Commission, but rather a mandate to the sentencing court.

The core of the Kennedy amendment was ultimately made part of the Comprehensive Crime Control Act of 1983 as 28 U.S.C. § 994(h). There, however, Congress changed the original provision to include a statutory directive to the Commission, rather than as a requirement for sentencing judges, as previously contemplated. The Senate Report described the rationale for the change, as follows:

Subsection (h) was added in the 98th Congress to replace a provision proposed by Senator Kennedy enacted in S. 2572, as part of proposed 18 U.S.C. 3581, that would have mandated a sentencing judge to impose a sentence at or near the statutory maximum for repeat violent offenders and repeat drug offenders. The Committee believes that such a directive to the Sentencing Commission will be more effective; the guidelines development process can assure consistent and rational implementation of the Committee's view that substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers.[13]

A subsequent bill included the following proposed language for section 994(h): "The Commission shall assure that the guidelines will specify a sentence to a term of imprisonment at or near the maximum term authorized by Section 3581(b) of Title 18, United States Code."[14] This language was the origin of the final text for section 994(h), promulgated in the SRA,[15] which provides:

The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—

(1) has been convicted of a felony that is—

(A) a crime of violence; or

(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46; and

(2) has previously been convicted of two or more prior felonies, each of which is—

(A) a crime of violence; or
(B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.[16]

## The Career Offender Directive in Context

Congress created the Commission "to establish sentencing policies and practices for the federal criminal justice system" that implement the purposes of sentencing enumerated at 18 U.S.C. § 3553(a)(2).[17] Pursuant to this directive, Congress delegated to the Commission "significant discretion in formulating guidelines."[18] The Commission's authority and discretion in this area is nevertheless limited in some ways. Congress retains, for example, the authority to influence federal sentencing policy by enacting directives to the Commission, including the career offender directive at section 994(h).

The interplay between the Commission's general authority and congressional directives, such as the career offender directive at section 994(h), was ultimately considered by the Supreme Court in *United States v. LaBonte*.[19] In *LaBonte*, the Department of Justice (DOJ) challenged the validity of an amendment to the career offender guideline that precluded consideration of certain statutory enhancements in calculating the "offense statutory maximum."[20] In that amendment, the Commission defined the phrase "offense statutory maximum" as "the maximum term of imprisonment authorized for the offense of conviction that is a crime of violence or controlled substance offense, not including any increase in that maximum term under a sentencing enhancement provision that applies because of the defendant's prior criminal record...."[21]

The DOJ argued that this amendment conflicted with the Commission's obligation under the career offender directive to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of [career offenders]." The Court agreed, concluding that the amendment conflicted with the plain, unambiguous language of section 994(h) and that the Commission therefore lacked authority to promulgate it.[22] Although the Court acknowledged that "Congress has delegated to the Commission 'significant discretion in formulating guidelines' for sentencing convicted federal offenders," it emphasized that such discretion "must bow to the specific directives of Congress."[23]

*13*

The Court acknowledged that the career offender directive does give the Commission some discretion in promulgating guidelines for career offenders. However, the Court noted that "[section] 994(h) is designed to cabin the Commission's discretion in the promulgation of guidelines for career offenders . . . ,"[24] and held that "[w]hatever latitude section 994(h) affords the Commission in deciding how close a sentence must come to the maximum to be 'near' it, the statute does not license the Commission to select as the relevant 'maximum term' a sentence that is different from the congressionally authorized maximum term."[25]

Consistent with the Supreme Court's interpretation in *LaBonte*, the Commission remains cognizant of the limitations on its authority to change the career offender guideline. While the Commission has made several changes to the definition of a career offender in the years since the guidelines were first promulgated, it has relied on its broader statutory authority to do so while continuing to ensure that the career offender guideline conforms to the directive's overarching requirement that sentences for such offenders be at or near the statutory maximum. The background commentary to §4B1.1 explains:

> [I]n accord with its general guideline promulgation authority under 28 U.S.C. § 994(a)-(f), and its amendment authority under 28 U.S.C. § 994(o) and (p), the Commission has modified [the career offender] definition in several respects to focus more precisely on the class of recidivist offenders for whom a lengthy term of imprisonment is appropriate and to avoid "unwarranted sentencing disparities among defendants with similar records who have been

found guilty of similar criminal conduct . . . ." 28 U.S.C. § 991(b)(1)(B). [26]

The commentary further explains:

> The Commission's refinement of this definition over time is consistent with Congress's choice of a directive to the Commission rather than a mandatory minimum sentencing statute ("The [Senate Judiciary] Committee believes that such a directive to the Commission will be more effective; the guidelines development process can assure consistent and rational implementation for the Committee's view that substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers." S. Rep. No. .225, 98th Cong., 1st Sess. 175 (1983)). [27]

Thus, while the Commission has "significant discretion in formulating guidelines," Congress has specifically retained the authority to influence federal sentencing policy relating to "career offenders" by requiring that the guidelines assign a sentencing range at or near the maximum authorized term when certain criteria are met. The Commission and Congress, therefore, must work together in order to implement the statutory changes proposed in this report.

## The Career Offender Guideline

Tracking the statutory criteria set forth in section 994(h), the Commission implemented Congress's directive by identifying a defendant as a career offender if (1) the defendant

*14*

was at least eighteen years old at the time he or she committed the instant offense of conviction; (2) the instant offense is a felony that is a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. Where these criteria are met, the directive at section 994(h), and therefore §4B1.1, provide for a guideline range "at or near the maximum [term of imprisonment] authorized" — typically resulting in a guidelines range significantly greater than would otherwise apply. The guidelines accomplish this through two potential adjustments to the guidelines calculations.

First, the guideline provides for a potentially increased final offense level (FOL) for the offender's instant offense. A table at §4B1.1(b) provides a range of applicable final offense levels based on the statutory maximum penalties[28] for an offender's instant federal statute of conviction. As set forth in the following table, these adjusted offense levels range from 12 to 37 depending on the underlying offense statutory maximum:

| Offense Statutory Maximum | Offense Level | Guideline Range with CHC VI |
|---|---|---|
| Life | 37 | 360-life |
| 25 years or more | 34 | 262-327 |
| 20 years or more, but less than 25 years | 32 | 210-262 |
| 15 years or more, but less than 20 years | 29 | 151-188 |
| 10 years or more, but less than 15 years | 24 | 100-125 |
| 5 years or more, but less than 10 years | 17 | 51-63 |
| More than 1 year, but less than 5 years | 12 | 30-37 |

The guideline provides that the applicable offense level from this table should be applied only where it produces a higher offense level than the offense level that would apply if the defendant had not qualified as a career offender (*i.e.*, the Chapter Two offense level is higher than the level in the career offender table). As noted in the table, these offense levels produce significant sentencing ranges under the guidelines.

In addition to potentially increasing the applicable offense level, the career offender guideline also assigns all offenders to Criminal History Category (CHC) VI, regardless of the criminal history points assigned in Chapter Four of the guidelines.

The terms "crime of violence" and "controlled substance offense" are defined in §4B1.2. As set forth more fully in Appendix A, the Commission has made several changes to these definitions in the years since the guidelines were first promulgated. As revised by the Commission in January 2016,[29] that section defines "crime of violence" as: "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that — (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c)." The section defines "controlled substance offense" as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense."

*16*

SECTION III

WHO ARE CAREER OFFENDERS AND HOW ARE THEY SENTENCED?

There were 75,836 federal criminal cases reported to the Commission during fiscal year 2014.[30]  Of the 67,672 cases in which the Commission received complete guideline application information, 2,269 (3.4%) offenders were sentenced as career offenders.  As demonstrated in the chart below, offenders sentenced under the career offender guidelines over the past ten years have consistently accounted for about three percent of federal offenders sentenced each year.

## KEY FINDINGS

- Career offenders are sentenced to long terms of incarceration, receiving an average sentence of more than 12 years (147 months).

- As a result of the lengthy sentences imposed, career offenders now account for over 11 percent of the total BOP population.

- Career offenders are increasingly receiving sentences below the guideline range, often at the request of the government.



**Figure 1.**

**Trend in Application of Career Offender Guideline (§4B1.1)**
*Fiscal Years 2005-2014*

Career offenders have consistently accounted for about three percent of the total federal offender population sentenced each year over the past ten years.

| | 2005 (n=1,981) | 2006 (n=2,124) | 2007 (n=2,290) | 2008 (n=2,321) | 2009 (n=2,392) | 2010 (n=2,314) | 2011 (n=2,257) | 2012 (n=2,232) | 2013 (n=2,268) | 2014 (n=2,269) |
|---|---|---|---|---|---|---|---|---|---|---|
| Percent | 3.2 | 3.3 | 3.6 | 3.4 | 3.4 | 3.2 | 3.0 | 3.0 | 3.2 | 3.4 |

SOURCE: U.S. Sentencing Commission 2005-2014 Datafiles, USSCFY05-USSCFY14. Only cases with complete guideline application information and sentenced under USSG §4B1.1 were included.

## Offender Demographics & Offense Characteristics

In fiscal year 2014, Black offenders accounted for more than half (59.7%) of offenders sentenced under the career offender guideline, followed by White (21.6 %), Hispanic (16.0%), and Other races (2.7%). Nearly all offenders sentenced under the career offender guideline were male (97.5%) and U.S. citizens (97.7%). Their average age at sentencing was 38 years.

In order to better understand the different types of career offenders, the Commission first analyzed the nature of the instant federal offense of conviction by identifying the primary Chapter Two sentencing guideline that would have applied in the absence of the career offender designation.

In 2014, nearly three-quarters (74.1%) of career offenders were convicted of a drug trafficking offense and would have been sentenced pursuant to §2D1.1. The remaining offenders would have been sentenced for robbery (11.6%), unlawful receipt, possession, or transportation of firearms (5.4%), aggravated assault (1.6%), and drug offenses occurring near a protected location (1.6%). Other offense types constituted the remaining 5.8 percent.[31]



**Figure 2.**

**Demographic and Offense Characteristics of Career Offenders**
*Fiscal Year 2014*

In 2014, nearly three-quarters of career offenders were convicted of a drug trafficking offense and would have been sentenced pursuant to §2D1.1 in the absence of the career offender designation.

SOURCE: U.S. Sentencing Commission 2014 Datafile, USSCFY14. Only cases with complete guideline application information and sentenced under USSG §4B1.1 were included. Cases missing information for any variables were excluded from the analysis for that variable. A total of 13 cases were excluded from the pie chart due to missing information on primary sentencing guideline.

The Commission also examined the distribution of career offenders across the six criminal history categories provided for by the guidelines. This analysis considered where the offender would have been placed in the absence of the career offender designation of CHC VI. The overwhelming majority of offenders (88.8%) were in the three highest CHCs prior to application of the career offender guideline. The largest proportion of offenders, 40.9 percent, had sufficient criminal history points to qualify for CHC VI prior to application of the career offender guideline. Combined, less than 12 percent of offenders would have otherwise been in CHC III (10.8%), CHC II (0.5%), and CHC I (0.0%).



**Figure 3.**

**Criminal History Category Prior to Application of Career Offender Guideline (§4B1.1)**
*Fiscal Year 2014*

In 2014, the majority of career offenders (88.8%) were in the three highest criminal history categories (CHCs) prior to application of the career offender guideline.

SOURCE: U.S. Sentencing Commission 2014 Datafile, USSCFY14. Only cases with complete guideline application information and sentenced under USSG §4B1.1 were included. A total of two cases were excluded due to missing information on criminal history points assigned.

*20*

## Impact of Career Offender Status

The career offender guideline provides two mechanisms to ensure that a career offender is subject to a guideline range "at or near the maximum [term of imprisonment] authorized": (1) a potentially increased offense level based on the statutory maximum of the instant offense, and (2) a requirement that the offender be placed in the highest criminal history category.

In fiscal year 2014, the career offender designation affected the final guideline range for the majority (91.3%) of offenders sentenced under §4B1.1. For such offenders, the application of the career offender guideline resulted in an increase in the otherwise applicable offense level, criminal history category, or both. As shown in Figure 4, almost half (46.3%) had an increase in both final offense level and CHC as a result of application of the career offender guideline. An additional one-third (32.6%) had an increase in final offense level, but were already in CHC VI. An additional 12.4 percent had an increase in CHC, but no change in final offense level. Finally, 8.7 percent of offenders had no change in either final offense level or CHC as a result of application of the career offender guideline.

Some of the most significant sentencing impacts apply to those offenders who had the least extensive criminal history scores under Chapter Four of the guidelines. Over three-quarters (76.6%) of the 254 offenders[32] who would have been placed in CHC II and III in the absence of the career offender designation of CHC VI had an increase in both final offense level and CHC. As a result of these increases, the average guideline minimum for these 254 offenders was 211 months, an increase of 84 months over their average guideline

minimum (127 months) before application of the career offender guideline.



**Figure 4.**

**Impact of Career Offender Guideline (§4B1.1) on Final Offense Level and Criminal History Category**
*Fiscal Year 2014*

In fiscal year 2014, the career offender designation affected the final guideline range for the majority of offenders sentenced under §4B1.1.

No Impact
8.7%

CHC-Increase
FOL-No Impact
12.4%

FOL and CHC
Increase
46.3%

FOL-Increase
CHC-No
Impact
32.6%

SOURCE: U.S. Sentencing Commission 2014 Datafile, USSCFY14. Only cases with complete guideline application information and sentenced under USSG §4B1.1 were included. Of the 2,269 cases, 13 were excluded in which the Armed Career Criminal (USSG §4B1.4) guideline also was applied and application of the provisions of that guideline determined the sentence. An additional 131 cases were excluded that had §4B1.1(c) applied or that were missing information on primary sentencing guideline.

21

## Sentences Relative to the Guideline Range

During the past ten years, the proportion of career offenders sentenced within the applicable guideline range has decreased from 43.3 percent in fiscal year 2005 to 27.5 percent in fiscal year 2014. The within range rate is even lower, at 15 percent, for those offenders who had the least extensive criminal history scores under Chapter Four of the *Guidelines Manual* and would have been placed in CHC II and III in the absence of the career offender designation.[33]

The overall decrease in within range sentences primarily resulted from a steady increase in government sponsored departures from 33.9 percent to 45.6 percent during the same time period. While approximately one-quarter of career offenders received a government sponsored below range sentence based on substantial assistance during this time period,[34] a growing proportion of career offenders received a below range sentence sponsored by the government for reasons other than substantial assistance. In fact, the rate of other government sponsored below range sentences has increased four-fold in the past ten years, from 5.6 percent in fiscal year 2005 to 21.0 percent in fiscal year 2014. These offenders received an average reduction in their sentence of 40.3 percent in fiscal year 2014.

The rate of non-government sponsored below range sentences has fluctuated over time. While increasing slightly from 22.2 percent to 25.9 percent over the same ten-year period, non-government sponsored below range sentences are currently on a downswing.[35] The rate of sentences above the guideline range has remained consistent at about one percent.



**Figure 5.**

**Sentences Relative to the Guideline Range for Career Offenders**
*Fiscal Years 2005-2014*

During the past ten years, the proportion of career offenders sentenced within the applicable guideline range has decreased from 43.3 percent in fiscal year 2005 to 27.5 percent in fiscal year 2014.

This decrease primarily resulted from a steady increase in government sponsored departures and variances, including a four-fold increase in other government sponsored below range sentences.

SOURCE: U.S. Sentencing Commission 2005-2014 Datafiles, USSCFY05-USSCFY14. Only cases with complete guideline application information and sentenced under USSG §4B1.1 were included. A total of 417 cases were excluded due to missing information on sentence relative to the guideline range.

22

A comparison of the average sentence imposed and average guideline minimum during the same time period also illustrates the trend in sentences relative to the guideline range. From 2005 to 2014, both the average sentence imposed and average guideline minimum decreased for offenders sentenced under the career offender guideline. In 2005, the average sentence imposed was 182 months of imprisonment, 19.1 percent lower than the average guideline minimum of 225 months.

However, the average sentence imposed decreased at a greater rate than the average guideline minimum — the average sentence imposed of 147 months in 2014 was 29.0 percent lower than the average guideline minimum of 207 months. Thus, the anchoring effect of the guidelines for career offenders appears to be diminishing.



**Figure 6.**

**Average Guideline Minimum and Average Sentence Imposed for Career Offenders**
*Fiscal Years 2005-2014*

From 2005 to 2014, both the average sentence imposed and average guideline minimum decreased for offenders sentenced under the career offender guideline. However, the average sentence imposed decreased at a greater rate than the average guideline minimum.

SOURCE: U.S. Sentencing Commission 2005-2014 Datafiles, USSCFY05-USSCFY14. Only cases with complete guideline application information and sentenced under USSG §4B1.1 were included. Cases missing information for any variables were excluded from the analysis for that variable.

*23*

## Punishment

For fiscal year 2014, virtually all career offenders were sentenced to terms of imprisonment (99.5%) with an average sentence imposed of 147 months. As demonstrated in Figure 7, approximately half of career offenders were sentenced to between ten and 20 years of imprisonment (50.9%), while 13.8 percent were sentenced to 20 years or more. Only 10.3 percent received sentences of less than five years, while 25 percent received sentences between five and ten years.

Consistent with the data regarding the length of sentences imposed on career offenders, the current application of the career offender guideline has a sizeable impact on the overall prison population. Although career offenders consistently represent only a small portion of federal offenders sentenced each year (3.4% in fiscal year 2014), 20,329 offenders in Federal Bureau of Prisons (BOP) custody as of December 27, 2014 were sentenced using the career offender guideline. This represented 11.4 percent of the total BOP population serving a sentence for a federal conviction at that time.[36]



**Figure 7.**

**Comparison of Career Offenders Sentenced Annually to Career Offenders in Federal Bureau of Prisons Population**

Sentence Length of Career Offenders Sentenced in FY14

Career Offenders Sentenced in FY14

Career Offenders in the Bureau of Prisons (as of Dec. 27, 2014)

SOURCE: U.S. Sentencing Commission 2014 Datafile, USSCFY14. Only cases with complete guideline application information sentenced under USSG §4B1.1 were included. Of the 210,567 offenders in the custody of the Federal Bureau of Prisons on December 27, 2014, 185,644 offenders were serving a sentence for a federal conviction, while the other 24,923 offenders in BOP custody are pre-trial offenders, offenders sentenced in the courts of the District of Columbia, or military offenders. Of the 185,644 offenders, Commission records could be matched to 178,911 of those offenders and were

24

# SECTION IV

## RECOMMENDATION:

### *THE CAREER OFFENDER GUIDELINE SHOULD FOCUS ON VIOLENT OFFENDERS*

*25*

## The Commission's Multi-Year Study

During the course of its ongoing multi-year study of statutory and guideline definitions relating to the nature of a defendant's prior conviction, the Commission received input from numerous stakeholders, including judges, practitioners, probation officers, academics, and other interest groups, relating to the application and impact of the career offender guidelines. The three primary concerns are: (1) the overall severity of the enhancements for many offenders sentenced under the career offender guideline resulting from the tie to the statutory maximum penalty of the instant offense of conviction; (2) a lack of distinction between offenders with differing types of qualifying instant offenses of conviction or differing types of predicate convictions; and (3) the overall complexity of applying the career offender guideline and other similar recidivist enhancements.

This section considers the first two issues, focusing specifically on criticisms that the career offender guideline is overbroad and too harsh in its treatment of some offenders, particularly those offenders who qualify as career offenders on the basis of drug offenses alone.

## Pathways to Career Offender Status

The career offender guideline specifies, in part, that an offender qualifies for application of the guideline if both the instant offense of conviction and at least two prior felony convictions are a crime of violence or a controlled substance offense. In order to explore concerns related to the severity of the career offender guideline for some offenders, the

Commission undertook an analysis to distinguish among those individuals designated as career offenders. More specifically, the Commission assigned each career offender in the study to one of three categories based on the potential combinations of instant and prior offenses provided for in the guidelines: drug trafficking only, violent only, and mixed.

Using these three distinct pathways to career offender status, the Commission explored whether there were differences in the ultimate sentence imposed. This analysis considered the impact of the career offender guideline on these different types of career offenders, including the impact of the final offense levels and criminal history categories on guideline ranges, and examined data relating to how different career offenders in the pathways were sentenced by the courts relative to their career offender guideline ranges. The Commission conducted a similar analysis to explore the recidivism rates of the different groups of career offenders who were released from custody in calendar years 2004 through 2006.[37]

**The Commission made several overarching findings:**

- **There are clear and notable differences between drug trafficking only career offenders and those career offenders who have committed a violent offense.**

- **Career offenders who have committed a violent instant offense or a violent prior offense generally have a more serious and extensive criminal history, recidivate at a higher rate than drug trafficking only career offenders, and are more likely to commit another violent offense in the future.**

- **Courts and the government generally perceive violent only career offenders differently from other career offenders. This perception is reflected in current sentencing practices, with violent only career offenders receiving fewer and less extensive departures or variances from the guidelines.**

- **On the other hand, drug trafficking only career offenders are more likely to receive a sentence below the career offender guideline range. In fact, the average sentence imposed in the cases involving drug traficking only career offenders (134 months) is nearly identical to the average guideline minimum (131 months) before application of the career offender guideline.**

In light of these findings, the Commission concludes that drug trafficking only career offenders are not meaningfully different than other federal drug trafficking offenders and therefore do not categorically warrant the significant increases in penalties provided for under the career offender guideline. Moreover, drug trafficking only offenders generally do not warrant similar (or at times greater) penalties than those career offenders who have committed a violent offense. Accordingly, it would be appropriate to restructure the statutory directive and the resulting career offender guideline to distinguish those offenders who are sentenced based solely on an instant drug trafficking offense and two drug trafficking predicates. Given section 994(h)'s clear prescriptions, however, the Commission cannot effectuate such an amendment to the career offender guideline absent Congressional action to amend the directive.

## Current Sentencing Practices

*Methodology*

In order to complete the analysis in this section, the Commission divided career offenders into three distinct categories. These categories are based on the potential combinations of instant and prior offenses provided for in the guidelines.[38] The "drug trafficking only" category includes offenders with a drug trafficking instant offense, two or more prior drug trafficking convictions, and no prior violent offenses. The "violent only" category includes career offenders with a violent instant offense of conviction, two or more prior violent convictions, and no prior drug trafficking offenses. Finally, the "mixed category" encompasses all other career offenders who have either a drug trafficking or violent instant offense of conviction and any combination of violent and/or drug trafficking prior offenses.

The Commission first examined all prior adult criminal history events for a representative, random 20 percent sample of the 2,269 career offenders sentenced during fiscal year 2014. As part of this project, the Commission collected information on the number and types of offenses that constitute the prior adult criminal history events for each offender.[39] The Commission then categorized each of these criminal history events into standardized offense codes using a widely accepted standardization scheme pioneered by the independent research organization NORC at the University of Chicago[40] and used in other studies, including the Commission's 2016 report, *Recidivism by Federal Offenders Placed on Probation or Released from Prison in 2005.*

27

Using the standardized classifications, the Commission next identified certain categories as "violent" for purposes of placing the offender into one of the three career offender pathways described above. In making these classifications, the Commission identified those offenses that are generally accepted as involving some level of violence, including many of those offenses that courts have found to qualify as "crimes of violence" under the career offender guideline.[41] In terms of categorizing which career offenders had a violent instant offense, the Commission considered each career offender's underlying Chapter Two guideline to isolate those who had been sentenced under a drug-related guideline. Career offenders who were not sentenced under a drug trafficking guideline were deemed to have an instant federal conviction for a crime of violence.[42]

Using the above methodology, the Commission then assigned each of the offenders in the career offender sample to one of the three pathway categories — drug trafficking only, violent only, or mixed.[43]

*Overview*

As set forth in Figure 8, 26.7 percent of the study group had only drug trafficking convictions among their instant and prior offenses. More than half (60.6%) of the study group were in the mixed category, meaning that they had a combination of drug trafficking and violent offenses as their instant and prior convictions. The remaining 12.7 percent had only violent offenses among their instant and prior offenses.

Drug trafficking predominated as the instant offense for offenders in the mixed offense category. The majority (80.9%) of offenders in the mixed offense category had drug trafficking as the instant offense, compared to 19.1 percent with a violent instant offense.



**Figure 8.**

**Career Offender Pathways**
*Fiscal Year 2014 Career Offender Sample*

| Instant Offense for Career Offenders with Mixed Pathways | | |
| --- | --- | --- |
| Total | 272 | 100.0% |
| Violent | 52 | 19.1% |
| Drug Trafficking | 220 | 80.9% |

*Offender Demographics*

      As set forth in Figure 9, the demographics among the three pathways were very similar with the exception of race. Approximately half (52.6%) of the offenders in the violent only category were Black, compared to about 60 percent in the drug trafficking only and mixed categories. Hispanic offenders account for a higher proportion of the drug trafficking only (17.5%) and mixed categories (15.1%), as compared to the violent only category (8.8%).



**Figure 9.**

**Demographic Characteristics of Career Offenders**
*Fiscal Year 2014 Career Offender Sample*

Black and Hispanic offenders account for a higher proportion of the drug trafficking only and mixed categories, as compared to the violent only category.

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior offenses did not meet the definitions used for this analysis. The mixed category includes 11 drug trafficking offenders whose instant offenses include a conviction under 18 U.S.C. § 924(c).

29

*Nature and Extent of Criminal History*

The existence of violence in an offender's instant offense or prior convictions correlates with a more serious and extensive criminal history score overall. Offenders in the mixed and violent only categories have more serious criminal histories in terms of criminal history points assigned prior to application of the career offender guideline. Close to half (44.5%) of offenders in the mixed and violent only (42.1%) categories were in CHC VI prior to application of the career offender guideline. On the other hand, half as many offenders in the drug trafficking only category (23.3%) were in CHC VI prior to application of the career offender provisions. Instead, offenders in the drug trafficking only category were distributed to a greater extent across CHC III through VI.

The Commission also analyzed more closely the prior offenses for offenders in each of the three pathways to identify the single most serious prior offense that was most prominent among offenders in each group. For this analysis, the prior offenses were not limited to violent offenses and were not necessarily predicate offenses under the career offender guideline. Almost all offenders in the drug trafficking only group had drug trafficking as the most serious, common prior offense. On the other hand, career offenders in the other two groups were more likely to have previously committed a violent offense. Robbery was the most serious, common prior offense among offenders in the violent only category, with 56.1 percent of those offenders having robbery as their most serious prior conviction. In the mixed category, assault was the most serious, common prior offense, with 42.9 percent of offenders



**Figure 10.**

**Criminal History Category Prior to Application of Career Offender Guideline by Career Offender Pathway**
*Fiscal Year 2014 Career Offender Sample*

More than twice as many offenders in the mixed and violent only categories were already in Criminal History Category VI before application of the career offender guideline, as compared with offenders in the drug trafficking only category.

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior offenses did not meet the definitions used for this analysis. The mixed category includes 11 drug trafficking offenders whose instant offenses include a conviction under 18 U.S.C. § 924(c).

30

having been convicted of assault as their most serious prior conviction.

*Impact of the Career Offender Guideline*

Despite the more significant criminal history for violent only and mixed career offenders, the career offender guideline has the greatest impact on the offenders in the drug trafficking only category. This is, in large part, attributed to the fact that federal drug trafficking offenders often face much higher statutory maximum penalties than those offenders convicted of a violent federal offense. For example, offenders convicted under the primary drug trafficking statute at 21 U.S.C. § 841 face statutory maximum penalties up to life imprisonment.[44] In contrast, the federal offense of robbery found at 18 U.S.C. § 1951 (Interference with commerce by threats or violence), commonly known as the Hobbs Act, has a statutory maximum penalty of 20 years imprisonment.

These statutory maximum penalties directly impact a career offender's final offense level under the guidelines. As previously discussed, the career offender guideline provides a range of applicable final offense levels based on the statutory maximum penalties for an offender's statute of conviction that, if greater, supersede the otherwise applicable offense level. The table in §4B1.1 provides the following offenses levels depending on statutory maximum for instant federal offenses:

| Offense Statutory Maximum | Offense Level | Guideline Range with CHC VI |
|---|---|---|
| Life | 37 | 360-life |
| 25 years or more | 34 | 262-327 |
| 20 years or more, but less than 25 years | 32 | 210-262 |
| 15 years or more, but less than 20 years | 29 | 151-188 |
| 10 years or more, but less than 15 years | 24 | 100-125 |
| 5 years or more, but less than 10 years | 17 | 51-63 |
| More than 1 year, but less than 5 years | 12 | 30-37 |

Figure 11 shows the frequency with which each of these offense levels was applied, comparing each of the three career offender pathways. The overwhelming majority (90.0%) of drug trafficking only offenders were subject to offense levels of 32, 34, or 37 pursuant to the career offender table, which corresponds to instant offenses with statutory maximums of 20 years or more, 25 years or more, or life, respectively. Drug trafficking only offenders had the highest percentage (31.7%) of cases involving statutory maximum penalties of up to life imprisonment. This is consistent with the fact that offenders convicted under the primary drug trafficking statute at 21 U.S.C. § 841 face statutory maximum penalties of up to life imprisonment.[45] A similar trend is also seen for offenders in the mixed category, which is consistent with the fact that the majority of those offenders had drug trafficking as the instant offense.

*31*

Conversely, the majority (79.0%) of violent only career offenders faced statutory maximums of less than 25 years, with more than half (57.9%) having statutory maximums of 20 years or more, but less than 25 years.

The fact that drug trafficking offenders as a whole often face higher statutory maximum penalties means the drug trafficking only career offenders are often impacted more substantially by the career offender guideline. This impact is further increased by the fact that drug trafficking offenders are less likely to have otherwise fallen into Criminal History Category VI absent application of the career offender guidelines. As noted in the previous section, about half as many offenders in the drug trafficking only category, as compared to the mixed and violent groups, would have already been in CHC VI.



**Figure 11.**

**Career Offender Offense Level and Underlying Statutory Maximum by Career Offender Pathway**
*Fiscal Year 2014 Career Offender Sample*

Because they often have higher statutory maximum penalties, the career offender guideline impacts offenders in the drug trafficking only category to a greater extent than those career offenders in the violent only and mixed categories.

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior drug or violent offenses did not meet the definitions used for this analysis. The mixed category includes 11 drug trafficking offenders whose instant offenses include a conviction under 18 U.S.C. § 924(c).

More than half (57.5%) of offenders in the drug trafficking only category had both an increased final offense level and CHC as a result of application of the career offender guideline, as compared to approximately 40 percent for each of the other two categories. Whereas about one-third each of offenders in the mixed categories and violent only (33.8% and 31.6%, respectively) received an increase in final offense level, but not CHC, as a result of application of the career offender guideline, that rate was about half (17.5%) for offenders in the drug trafficking only category.

Similar proportions of offenders in each of the three categories had an increase in CHC, but no increase in the final offense level, as a result of the application of the guideline (ranging from about 13% to about 19%). Finally, slightly fewer offenders in the drug trafficking only category (5.8%) had neither an increase in final offense level or CHC, compared to offenders in the mixed (10.7%) and violent only (10.5%) categories.



**Figure 12.**

**Impact of Career Offender Guideline on Final Offense Level and Criminal History Category by Career Offender Pathway**
*Fiscal Year 2014 Career Offender Sample*

Offenders in the drug trafficking only category were more likely to have both an increased final offense level and criminal history category as a result of application of the career offender guideline.

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior offenses did not meet the definitions used for this analysis. The mixed category includes 11 drug trafficking offenders whose instant offenses include a conviction under 18 U.S.C. § 924(c).

*33*

*Sentences Imposed and Relative to the Guideline Range*

The Commission also observed significant differences in how courts sentence career offenders that fall within the violent only career offender pathway. As demonstrated in Figure 13, the average guideline minimum for offenders in the three categories are similar at 207 months for the drug trafficking only category, 212 months for the mixed category, and 209 months for the violent only category.

Nonetheless, courts ultimately sentenced career offenders in the violent only category more severely compared to career offenders in the other two categories. The average sentence imposed for offenders in the violent only category was 179 months, an average of 9.9 percent lower than the guideline minimum. In contrast, the average sentences for offenders in the drug trafficking only and mixed categories of 134 months and 145 months, respectively, were an average of 32.7 percent and 29.6 percent lower than their respective average guideline minimums.

| (Average) | Drug Trafficking Only Career Offenders | Mixed Career Offenders | Violent Only Career Offenders |
|---|---|---|---|
| Guideline Minimum | 207 months | 212 months | 209 months |
| Sentence Imposed | 134 months | 145 months | 179 months |
| Months Difference | 67 months | 63 months | 26 months |
| Percent Difference | 32.7% | 29.6% | 9.9% |

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior drug or violent offenses did not meet the definitions used for this analysis. The mixed category includes 11 drug trafficking offenders whose instant offenses include a conviction under 18 U.S.C. § 924(c).

**Figure 13.**

**Average Guideline Minimum and Average Sentence Imposed by Career Offender Pathway**
*Fiscal Year 2014 Career Offender Sample*

Despite relatively similar starting points, drug trafficking only career offenders were ultimately sentenced least severely and with the great extent of departure or variance.

The average sentence in the cases involving drug traficking only career offenders (134 months) is nearly identical to the average guideline minimum (131 months) before application of the career offender guideline. This data may suggest that courts, and increasingly the government, view the career offender enhancement as overly severe for this group of career offenders, and that, instead, a sentence that is consistent with other non-career offender drug trafficking offenders is more appropriate.

Offenders in the violent only category are also sentenced to below range sentences less frequently than offenders in the drug trafficking only and mixed categories. Nearly half (47.4%) of offenders in the violent only category were sentenced within the applicable guideline range. This compares to 23.5 percent of offenders in the mixed category. The offenders in the drug trafficking only category had the lowest proportion of within range sentences at 22.5 percent.

While offenders in the mixed category had higher rates of substantial assistance departures compared to the drug trafficking only offenders, 32.4 percent compared to 25.8 percent, the reverse was true for other government sponsored below ranges sentences with drug trafficking only offenders at 19.2 percent compared to mixed offenders with 16.9 percent. Similarly, drug trafficking offenders had the highest rate of non-government sponsored below range sentences at 31.7 percent compared to mixed offenders with 26.5 percent and violent offenders with 22.8 percent.



**Figure 14.** Average Guideline Minimum Before Impact and Average Sentence Imposed by Career Offender Pathway
*Fiscal Year 2014 Career Offender Sample*

**Figure 15.** Sentences Relative to the Guideline Range by Career Offender Pathway
*Fiscal Year 2014 Career Offender Sample*

*35*

As demonstrated in Figure 16, further analysis of the within range rates for drug trafficking only career offenders provides additional evidence that courts and the government consider the significant impact of the career offender guideline. Those drug trafficking only offenders most severely impacted by the application of the career offender guideline were generally less likely to receive a within range sentence. Those drug trafficking only offenders who had both an increased final offense level and CHC as a result of application of the career offender guideline were sentenced within the range only 17.4 percent of the time,[46] as compared to 27.5 percent for all career offenders and 46.0 percent for all federal offenders in fiscal year 2014.

By comparison, the within range rates for the drug trafficking only offenders for whom only the final offense level was affected was 33.3 percent. For those who only had their CHC affected, the within range rate was 26.1 percent. Finally, for those who had neither the final offense level nor the CHC affected, the rate was 28.6 percent. These higher rates of within range sentences suggest that courts and the government view offenders whose offense conduct and criminal history independently merited a higher guideline range as more deserving of such punishment than those who received such a range through the career offender guideline alone.



**Figure 16.**

**Impact of Career Offender Guideline on Final Offense Level and Criminal History Category for Offenders Sentenced Within the Guideline Range**
*Fiscal Year 2014 Career Offender Sample*

Those drug trafficking only offenders most severely impacted by the application of the career offender guideline were generally less likely to receive a within range sentence.

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior drug or violent offenses did not meet the definitions used for this analysis. Only the 120 offenders in the drug trafficking pathway category were included in the analysis.

*36*

Comparing the extent of below range sentences for the three groups of offenders further demonstrates the differences in sentencing among the different career offender pathways. Offenders in the drug trafficking only category benefited from the largest reductions for both other government sponsored and non-government sponsored below range sentences, with average sentences below the guideline range of 45.6 percent and 39.6 percent, respectively.

The extent of non-government below range sentences for offenders in the mixed category was more similar to offenders in the violent only category (average reduction of 33.2% for mixed compared to 30.0% for violent only). On the other hand, the average extent of other government sponsored departures (other than for substantial assistance) for offenders in the mixed category (43.9%) was more similar to that of the drug trafficking only offenders. Consistent with the other rates of below range sentences, the extent of departure for the mixed category fell between those of drug trafficking only (45.6%) and violent only (31.6%).

| | Drug Trafficking Only Career Offenders | | Mixed Career Offenders | | Violent Only Career Offenders | |
|---|---|---|---|---|---|---|
| | (Average) | | (Average) | | (Average) | |
| | Below Guideline Min | Percent Difference | Below Guideline Min | Percent Difference | Below Guideline Min | Percent Difference |
| §5K1.1 Departures | 116 months | 51.2% | 98 months | 46.3% | 148 months | 52.3% |
| Other Gov't Departures | 91 months | 45.6% | 91 months | 43.9% | 42 months | 31.6% |
| Non-Gov't Sponsored | 71 months | 39.6% | 73 months | 33.2% | 70 months | 30.0% |

SOURCE: U.S. Sentencing Commission 2014 Criminal History Policy Team Datafile. Only cases with complete guideline application information were included. The career offender sample consists of a 20% random sample of all 2,269 offenders sentenced under USSG §4B1.1. The offense categories on which the pathway categories were based were developed in conjunction with NORC from state-specific offenses from 25,000 criminal justice agencies. Of the 457 Career Offender cases, eight were excluded because the prior drug or violent offenses did not meet the definitions used for this analysis. The mixed category includes 11 drug trafficking offenders whose instant offenses include a conviction under 18 U.S.C. § 924(c).

Only cases with below range sentences were included in the table.

**Figure 17.**

**Average Extent of Below-Range Sentences by Career Offender Pathway**
*Fiscal Year 2014 Career Offender Sample*

Offenders in the drug trafficking only category benefited from the largest reductions for both other government sponsored and non-government sponsored below range sentences.

37

## Recidivism Rates

As explained in greater detail in the Commission's 2016 publication, *Recidivism Among Federal Offenders: A Comprehensive Overview*,[47] the Commission is conducting a multi-year study of recidivism by federal offenders that substantially expands on the scope of previous Commission recidivism projects. As part of that ongoing recidivism project, the Commission also collected and examined criminal history records for citizen offenders sentenced under §4B1.1 (Career Offenders) who reentered the community in calendar years 2004 through 2006. Although the main recidivism study group included only a single year (2005) of reentering offenders, the cohort was expanded for career offenders due to the smaller number of offenders in that single year. The purpose of expanding the initial study group in this way was to increase the number of career offenders available for study, providing the opportunity to develop statistically useful conclusions about this subgroup of federal offenders.

Using this recidivism data, the Commission conducted a similar pathways analysis of career offenders who reentered the community in calendar years 2004 through 2006. This analysis examined whether there were significant differences in recidivism rates of the three different types of career offenders.

*Methodology*

Using the same process to gather and analyze information as that used in its recent recidivism report, *Recidivism Among Federal Offenders: A Comprehensive Overview*,[48] the Commission identified and processed the criminal records of more than 35,000 offenders who had a valid FBI number in either Commission or Bureau of Prisons records and were released during the study period. The primary study cohort included all federal offenders who were either released from federal prison after serving a sentence of imprisonment or were placed on probation in 2005. In addition, criminal history records were also drawn for U.S. citizen offenders sentenced under §4B1.1 (Career Offenders) re-entering the community in calendar years 2004 and 2006 (in addition to those already included in the 2005 cohort).

As described in the Commission's recidivism report and Appendix C,[49] the criminal history information for those offenders over the eight-year study period was extracted, parsed, and standardized[50] in order to bring all records into a common framework. Following completion of that process, over thirty thousand (30,182) usable records were identified for analysis in the overall study group. Of these, the Commission identified 1,988 career offenders whose records are analyzed for this report.

The Commission separated these 1,988 career offenders into the three distinct categories of career offenders discussed above: drug trafficking only, violent only, and mixed. To be classified as drug trafficking only, the offender's instant offense of conviction had to be classified as drug trafficking, and the offender had to have two or more arrests for drug trafficking and no arrests for violent offenses. The mixed category includes offenders with at least one violent *and* one drug trafficking offense, either as the instant offense of conviction or one of the prior arrests. Finally, to be classified as violent only, the offender's instant offense of conviction had

*38*

to be classified as violent, and the offender had to have two or more arrests for violent offenses and no drug trafficking arrests.

The Commission assigned these pathways using the standardized coding used to classify each arrest and disposition of charges within each arrest and court cycle. Qualifying prior arrests[51] were classified in a manner that reflected whether they were a crime of violence or a drug trafficking offense. All *felony* crimes involving the Bureau of Justice Statistics categories of violence were included as crimes of violence for this analysis.[52] Violent crimes and drug trafficking offenses reported as misdemeanors were excluded. Finally, crimes with unknown felony/misdemeanor classification were only included for those crimes deemed the most serious, and therefore likely to be felonies.[53]

*Results*

Career offenders, as a group, tend to recidivate at a higher rate than non-career offenders. As set forth in Figure 18, as measured by the rate of rearrest,[54] almost two-thirds (66.2%) of career offenders released between 2004 and 2006 were rearrested for a new crime or for an alleged violation of the conditions of their supervision over the eight-year follow-up period. By comparison, nearly one-half (48.7%) of non-career offenders released in 2005 were rearrested for a new crime or for an alleged violation of the conditions of their supervision over the eight-year follow-up period.

|  | 2004-06 Career Offenders | Other Offenders |
|---|---|---|
| Any Recidivism | 66.2% | 48.7% |
| Median Time to Recidivism | 20 Months | 21 Months |
| Median Number of Recidivism Events | 2 | 2 |
| Most Serious Post-Release Event (%) | Assault (24.9%) | Assault (23.3%) |
| Median Age at Release | 41 years | 36 years |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, SUMMARY_UPDT. Of the 25,431 cases analyzed in the Comprehensive Overview, the Commission excluded cases from this analysis that were missing information necessary to perform analysis.

**Figure 18.**

**Recidivism of Career Offenders Compared to Other Offenders**
*2015 Cohort from USSC Recidivism Study*

Overall, career offenders were more likely to recidivate than non-career offenders.

The median time from release to rearrest for career offenders was 20 months, meaning that for one-half of the offenders who were rearrested, the first rearrest occurred less than two years following their initial release from prison or placement on probation. Among those who recidivated, the median number of rearrest events (events occurring on separate days) was two, but 21.6 percent of recidivist offenders were rearrested five times or more. For non-career offenders, the median time to rearrest was 21 months, and the median number of rearrest events was two.

Lastly, when considering only the "most serious" offense committed by those career offenders who were rearrested, the most frequent category (*i.e.*, the most serious event that was most prevalent) was assault. About one-fourth (24.9%) of those rearrested had an assault rearrest as their most

serious charge over the study period, which was the same for non-career offenders.

When analyzing the recidivism rates for each of the career offender pathways as compared to each other and to the overall rearrest rates for the larger cohort of offenders released in 2005, however, differences become apparent. As demonstrated in Figure 19, almost one-half (48.7%) of non-career offenders released in 2005 were rearrested for a new crime or for an alleged violation of the conditions of their supervision over the eight-year follow-up period. The recidivism rate for drug trafficking only career offenders was relatively similar at 54.4 percent. By comparison, however, offenders in the mixed and violent only categories were rearrested for a new crime or for an alleged violation of the conditions of their supervision over the eight-year follow-up



**Figure 19.**

**Projection of Time to First Rearrest by Career Offender Pathway**

When looking at the rate of rearrest during an eight-year follow-up period, drug trafficking only offenders recidivate at a rate that is more similar to non-career offenders than career offenders in the mixed or violent only categories.

**Rearrest Rate After Eight Years**
*Mixed Career Offenders: 69.4%*
*Violent Only Career Offenders: 69.0%*
*Drug Trafficking Only Career Offenders: 54.4%*
*Non-Career Offenders Released in 2005: 48.7%*

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, SUMMARY_UPDT. Of the 25,431 cases analyzed in the Comprehensive Overview, the Commission excluded cases from this analysis that were missing information necessary to perform analysis. For ease of comparison, trend lines for Drug Trafficking, Mixed, and Violent offenders are presented using a weighted average in order to present a smooth, consistent line. This was necessary because of the relatively small number of cases in these three groups. Because the data fluctuations are minor relative to the pronounced trend in each pathway, the weighted average accurately depicts the trends for the offenders in these three pathways. Statistical testing further revealed that the smoothed trend lines fit nearly perfectly to the actual observations in the dataset.

40

period at significantly higher rates — over two-thirds of offenders in the mixed and violent only categories were rearrested during the review period (69.4% and 69.0%, respectively).

The stark differences in these recidivism rates are notable when considering the median age of the different types of career offenders at release. Studies, including the Commission's recent recidivism report,[55] have repeatedly shown that older offenders are at lower risk for reoffending.

Given this consistent trend, it would be expected that the drug trafficking only career offenders, who were the youngest among the three categories, would have the highest rate of recidivism. As noted above, this was not the case with drug trafficking only offenders having the lowest rate of recidivism. These contrary findings again demonstrate an important difference between the drug trafficking only offenders and those career offenders who have committed a violent offense, and support the Commission's conclusion that drug trafficking only offenders should not be subjected to the same recidivist enhancements as the other career offenders.



**Figure 20.**

**Median Age at Release for Offenders in Each Career Offender Pathway**

Contrary to studies demonstrating the link between age and recidivism, offenders in the drug trafficking only category have the lowest rate of rearrest even though they are also the youngest among the three categories of career offenders.

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, SUMMARY_UPDT. Of the 1,988 cases within the Career Offender analysis, the Commission excluded cases from this analysis that were missing information necessary to perform analysis.

41

The Commission also observed several other differences. First, among those who recidivated, drug trafficking only offenders tended to take longer to do so after release with a median time to rearrest of 26 months, compared to 20 months for the mixed category and only 14 months for violent only career offenders. When considering only the "most serious" offense committed by those career offenders who were rearrested over the study period, the most frequent category for the drug trafficking only career offenders was a new drug trafficking offense.

About one-fourth (26.5%) of those drug trafficking only career offenders rearrested had a drug trafficking rearrest as their most frequent offense over the study period. Offenders in the other two pathways who were rearrested were more likely to have been rearrested for another violent offense — the most frequent offense was robbery (35.3%) for the violent only career offenders and assault (28.6%) for the mixed career offenders.

| | Drug Trafficking Only Career Offenders | Mixed Career Offenders | Violent Only Career Offenders |
|---|---|---|---|
| Any Recidivism | 54.4% | 69.4% | 69.0% |
| Median Time to Recidivism | 26 Months | 20 Months | 14 Months |
| Median Number of Recidivism Events | 2 | 3 | 3 |
| Most Serious Post-Release Event (%) | Drug Trafficking (26.5%) | Assault (28.6%) | Robbery (35.3%) |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, SUMMARY_UPDT. Of the 1,988 cases within the Career Offender analysis, the Commission excluded cases from this analysis that were missing information necessary to perform analysis.

**Figure 21.**

**Recidivism of Career Offenders**
*2015 Cohort from USSC Recidivism Study*

Unlike offenders in the drug trafficking only category, offenders in the other two pathways who were rearrested were more likely to have been rearrested for another violent offense.

**Mixed Offender Pathway**

*As reflected throughout this section, the offenders in the mixed pathway often align in between the two other career offender pathways. In some instances, such as the sentences relative to the guideline range and the rate and extent of departures, the mixed offenders look more like offenders in the drug trafficking only pathway. On the other hand, when considering the nature and extent of their criminal history and their rate of recidivism, the mixed offenders are more similar to the offenders in the violent only pathway.*

*While the recommendations set forth in this section focus on offenders in the drug trafficking only pathway, the sentencing outcomes for offenders in the mixed pathway may also support Congressional consideration of a more graduated approach for these career offenders.*

## Takeaways and Recommendations

As discussed in more detail in the Commission's recent recidivism study,[56] the relationship between prior criminal history and recidivism has been recognized by the Commission since its inception in the mid-1980s. In fact, the Commission relied heavily upon these studies assessing the correlation of recidivism with past criminal behavior in formulating the criminal history scoring system included in the guidelines calculation at Chapter Four of the *Guidelines Manual*.[57] The Commission's most recent recidivism study again confirmed that recidivism rates are most closely correlated with total criminal history points and, therefore, that Chapter Four's criminal history provisions are working as designed.[58]

Despite the continued reliability of the guideline's criminal history score in predicting recidivism, and the impact an offender's criminal history score has on increasing the offender's range of punishment under the guidelines, the Commission continues to believe that certain recidivist offenders should be punished more severely based on the nature of their prior offenses. However, in light of recent criticism, as well as sentencing data and recidivism research, a more tailored approach to determining who qualifies for career offender status is appropriate.

The Commission's analysis of career offenders has demonstrated some important differences among the three distinct pathways to career offender status, particularly when comparing those career offenders in the drug trafficking only category to those in the violent only category. The existence of a violent offense in an offender's instant offense or prior convictions appears to be associated with more serious and extensive criminal histories overall. Those offenders tend to fall within higher criminal history categories even before application of the career offender guideline, and tend to have committed more serious prior offenses as demonstrated by an analysis of the most serious, common prior offense for each of the three groups. The Commission's analysis also demonstrates key differences among the three pathways in terms of the rate and nature of their recidivism.

Despite these differences, the career offender guideline currently impacts offenders in the drug trafficking only category to a significantly greater extent than those in the

violent only and mixed categories. Drug trafficking only offenders receive increased final offense levels and/or criminal history categories as a result of the application of the career offender guideline at a higher rate than Drug trafficking only career offenders in the other two categories. This can largely be attributed to the fact that federal drug trafficking offenders often face much higher statutory maximum penalties than those offenders convicted of a violent federal offense.

Recent sentencing data also supports a policy decision to reserve career offender penalties for those offenders who have committed at least one "crime of violence." Despite relatively similar average guideline minimums, courts generally sentence violent only career offenders most severely among the three pathways. Violent only career offenders were significantly more likely to receive a sentence within the range (47.5%), as compared to offenders in the mixed and drug trafficking only pathways (23.5% and 22.5%, respectively). Additionally, violent only offenders had the smallest average extent of reduction. Conversely, courts were most likely to depart or vary when sentencing offenders in the drug trafficking only pathway, often at the request of the government. This is evidenced by both the rate of below range sentences, including the nearly five-fold increase in other government sponsored below range sentences over the past ten years, and the extent of reduction in cases involving a drug trafficking only career offender. Notably, the average sentence (134 months) for drug trafficking only career offenders is nearly identical to the average guideline minimum (131 months) that would have applied to those offenders through the normal operation of the guidelines.

In light of this data, the Commission concluded that the significant enhancements provided by the career offender directive, and the related career offender guideline, are most appropriately reserved for those offenders who have committed a felony "crime of violence." The normal operation of Chapter Four's criminal history provisions adequately accounts for likelihood of recidivism and future criminal behavior of those offenders who are currently deemed to be career offenders, but who have not committed an instant or prior offense that is a "crime of violence."

The Commission recommends that Congress amend the career offender directive at 28 U.S.C. § 994(h) to more effectively differentiate between career offenders with different types of criminal records by requiring that an offender have committed a felony "crime of violence" either as the instant offense of conviction or as one of the required predicate convictions.

44

## STATUTORY PROPOSAL

*The Commission recommends that Congress revise section 994(h) to provide as follows:*

(h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and—

(1) has been convicted of a felony that is a crime of violence, and has previously been convicted of two or more prior felonies, each of which is—
    (A) a crime of violence; or
    (B) a controlled substance offense; or

(2) has been convicted of a felony that is a controlled substance offense, and has previously been convicted of—
    (A) a felony that is a crime of violence; and
    (B) a second felony offense that is—
        (i)    a crime of violence; or
        (ii)   a controlled substance offense.

(3) As used in this subsection—
    (A) the term "controlled substance offense" means an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.
    (B) the term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
        (i)    has as an element the use, attempted use, or threatened use of physical force against the person of another; or
        (ii)   is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

*45*

*46*

## SECTION V

---

### RECOMMENDATION:

*CONGRESS SHOULD ENACT A UNIFORM DEFINITION OF "CRIME OF VIOLENCE" FOR FEDERAL CRIMINAL LAW APPLICATIONS*

47

Even before the Sentencing Reform Act era, the federal government sought to ensure that repeat violent offenders were adequately punished when convicted and sentenced in the federal system. Since the first guidelines were promulgated in 1987, the Commission has joined in this goal. Despite this shared purpose, it has proven difficult to formulate an appropriate and practical definition of what prior offenses should be classified as "violent" for purposes of recidivist provisions. The different definitions and tests (*e.g.*, the "categorical approach") that currently exist have resulted in unnecessary confusion and inefficient use of court resources.

After years of consultation with stakeholders, the Commission recommends the universal adoption of a single definition of qualifying violent offenses for all federal recidivist sentencing purposes. As detailed in this section, the Commission recently revised the "crime of violence" definition at §4B1.2 of the guidelines. The recently revised guideline definition consists of an "elements clause," which includes any offense under federal or state law, punishable by imprisonment for a term exceeding one year, and that has as an element the use, or attempted use, or threatened use of physical force against the person of another. It also includes a tailored list of enumerated offenses, some of which are defined in the guideline. The revised definition does not include a catchall "residual clause."[59]

This new definition can serve as a model for a uniform definition of crime of violence for all federal criminal law purposes. Adoption of this proposal will promote an important goal of Congress: that those offenders already found by prior sentencing courts to have committed serious, violent offenses be justly punished for their new federal crime. It will also maximize the use of judicial and prosecutorial resources, reduce confusion and potential unfairness, and better focus on those offenders with the most serious violent criminal backgrounds.

## Federal Statutes Presently Contain Multiple Definitions

Federal statutes and the sentencing guidelines currently contain a patchwork of definitions attempting to make clear which prior offenses are crimes of violence or violent felonies for purposes of recidivist enhancements.[60]

The "crime of violence" definition most widely used throughout Title 18 of the United States Code had its origin in the Comprehensive Crime Control Act of 1984 ("CCA"), which repealed a previous definition of the term "crime of violence." Legislative history to the CCA observed that, while the term "crime of violence" was "occasionally used in law, it is not defined, and no body of case law has arisen with respect to it."[61] The CCA definition focused on the use of force, and was codified at 18 U.S.C. § 16:

The term 'crime of violence' means —

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of

48

another may be used in the course of committing the offense.[62]

Various statutes, both criminal and civil, incorporate the definition of crime of violence found in section 16. For example, 18 U.S.C. § 1956 (Money Laundering) lists "crime of violence" as one of the "specified unlawful activities" that may form the basis for a money laundering offense. The same term also appears in 8 U.S.C. § 1101(a)(43)(F) (listing "crime of violence" as a form of aggravated felony but excluding "purely political" offenses from the definition). In 42 U.S.C. § 13981(d)(2), an act of violence not resulting in criminal charges may form the basis of a cause of action for gender-motivated crimes of violence if the criminal act meets section 16's definition.

Other federal statutes use section 16 as a basis for defining crime of violence, but nonetheless alter the definition in some way. For instance, 18 U.S.C. § 924(c) prohibits the possession or use of a firearm during and in relation to a crime of violence, which is defined in section 16, but only so long as the offense is a felony. Other statutes use section 16's definition but also add a list of enumerated offenses. For instance, in the Bail Reform Act, pretrial detention is authorized for persons charged with a crime of violence, which includes not only crimes meeting section 16's definition, but also sexual abuse crimes in Chapter 109(a) (18 U.S.C. §§ 2241-2248), sexual exploitation of children under Chapter 110, and transportation for illegal sexual activity in Chapter 117.

In the Armed Career Criminal Act, Congress made no reference to section 16. Instead, it imposed a fifteen-year mandatory minimum sentence on felon in possession offenders who had previously sustained three or more convictions for either a "violent felony" or a "drug trafficking offense." Congress defined violent felony with a list, including a felony offense that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

This definition does not include crimes involving force against property, differentiating it from section 16.

## The Need to Reform Recidivist Enhancement Definitions

*Stakeholder Views*

Stakeholders have suggested a variety of ways in which the Commission could improve the administration of recidivist enhancements, both working on its own and through recommendations to Congress. While the specifics of these suggestions vary, there has been virtual consensus that a single definition applicable to the term "crime of violence" in the guidelines and statutes, as well as the term "violent felony" in the Armed Career Criminal Act, would be a major step towards simplification of the current system.

Several courts have noted the problems caused by multiple definitions of the same (or similar) terms. For

example, the Ninth Circuit has pointed out that there are at least four different definitions of the term "crime of violence" in the guidelines and statutes.[63] Nor does using slightly different terms relieve the potential for confusion. The Commission drafted the (pre-2016) definition of "crime of violence" largely to parallel the statutory definition of "violent felony" used by the Armed Career Criminal Act. Yet courts have grappled with the fact that those two terms continued to mean slightly different things due to subsequent judicial interpretations of the statute and guideline.[64]

These judges have called for the Commission to address these issues, even if it cannot fully resolve them on its own. For example, Judge Sutton of the Sixth Circuit has urged the Commission to "lead by example,"[65] perhaps by amending the definitions of the relevant terms in the guidelines to alleviate the complexity, burden, and perceived disparities caused by varying definitions. Judge Tallman of the Ninth Circuit has recommended that the Commission consider "clarifying the guidelines or seeking action from Congress to clarify and address recidivism enhancements."[66]

The Commission heard similar comments at its October 2014 roundtable discussion on the topic of amending the definition of crime of violence. Participants represented a wide spectrum of backgrounds and views, from the federal judiciary, the Department of Justice, the federal criminal defense bar, probation officers, and academics, as well as those experienced in applying the categorical approach within the context of immigration law.

Roundtable participants discussed how to harmonize the definitions of crime of violence used throughout the guidelines and whether those definitions should reference a certain statutory definition (such as the definition in 18 U.S.C. § 16) or should be structured differently. Participants debated such questions as: whether the definition of crime of violence should continue to be elements-based, or whether there are benefits to a conduct-based inquiry; the purpose and function of a residual clause; whether reckless conduct should ever qualify as a crime of violence; which enumerated offenses, if any, should be included in the crime of violence definition; and whether additional documents in the record should be deemed reliable sources under the modified categorical approach.

While stakeholders differed on the preferred content and structure of the definition, the primary theme that emerged from the roundtable discussion was the desire to have one definition of "crime of violence" that would apply throughout criminal law. Additionally, all participants agreed that changes to the definition should be accompanied by recommendations to Congress for legislative reform.

*Having Different Definitions Is Further Complicated by the Categorical Approach*

There is widespread agreement that multiple definitions of the same or similar terms has made it unnecessarily complex to apply sentencing enhancements that rely on them. Applying the varying definitions is further complicated by the application principles of the "categorical approach" mandated by the Supreme Court in *Taylor v. United States*.[67] The scope and requirements of the categorical approach have resulted in significant litigation and over a dozen Supreme Court opinions over the last 26 years, including an opinion as recently as this term.[68]

*50*

Under the categorical approach, courts must look to the statutory elements of an offense, rather than the defendant's conduct, when determining the nature of a prior conviction. This form of analysis permits a federal sentencing court to examine only the statute under which the defendant sustained a conviction (and, in certain cases, judicial documents surrounding that conviction) in determining whether the prior conviction fits within a federal predicate definition.

Federal probation officers, who are charged with determining whether prior convictions qualify as federal predicates in preparing presentence reports for the court, have expressed particular frustration with the categorical approach, which requires a legalistic assessment of a vast universe of potential statutes of conviction that are as varied as the states that enacted them. The categorical approach also requires, in some cases, that sentencing documents related to prior convictions be obtained from the original sentencing court, a process that is particularly difficult for older convictions or those arising from certain jurisdictions.

Many judges and practitioners, including the Department of Justice, have also criticized the categorical approach as leading to unjustifiably disparate results based on the availability of records documenting the particularities of the prior statute of conviction. Judges have long criticized the so-called "residual clause" found in several definitions of violent offenses as particularly difficult to apply using the categorical approach. A similar concern has arisen with respect to determining the "generic" meaning of offenses, which can differ in each recidivist provision.

*Impact of Johnson v. United States*

Retaining different definitions of the term "crime of violence" is further complicated by the Supreme Court's recent decision in *Johnson v. United States*.[69] In that case, the Court considered the constitutionality of the statutory definition of "violent felony" in the Armed Career Criminal Act.[70] As noted above, that provision defined the term "violent felony" to include any felony offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another" — commonly referred to as the "residual clause." In an 8-1 decision, the Court concluded that using the "residual clause" to classify an offense as a "violent felony" violates due process because the clause was unconstitutionally vague.[71]

While the Supreme Court in *Johnson* did not expressly consider or address other federal recidivist provisions, courts have begun considering whether residual clauses found in other federal recidivist statutes are also unconstitutional based on the Court's reasoning in *Johnson*. For example, since *Johnson* was decided, at least two circuits have held that the residual clause of section 16 itself is similarly unconstitutional.[72] Additionally, there is also ongoing litigation regarding the impact of the *Johnson* decision on the guidelines, an issue the Supreme Court is now slated to consider during its next term.[73] As a result, if Congress itself doesn't act to make the definition of the term "crime of violence" clear and uniform, it is likely that courts will be required to do so on their own. Such a scenario risks continued inconsistency and complexity, and could lead to a definition that does not fully reflect the will of Congress.

## The Commission's Crime of Violence Definition

Throughout its multi-year study, the Commission devoted considerable resources to formulating a definition that advanced the goals of judicial efficiency, targeting of recidivism risk, and just punishment. Moved in part by the longstanding policy concerns of many stakeholders about the career offender guideline, together with confusion in the lower courts about the applicability of *Johnson* to the sentencing guidelines, the Commission recently voted to amend the definition of "crime of violence" in the career offender guideline, and submitted a final version to Congress in January 2016.[74]

Having fully considered the views of outside groups and its own assessment of the issues, the Commission ultimately concluded that the most appropriate definition was one that hewed closely to the definition already found in the career offender guideline, while eliminating the residual clause. Accordingly, the Commission's definition continues to include prior offenses that include as an element the use, threatened use, or attempted use of physical force against the person, and identifies a short list of enumerated offenses targeted to reach the most serious predicate offenses without regard to whether it includes a use-of-force element.

With its adoption of the January 2016 career offender amendment, the Commission sought to achieve many of the goals advanced by judges and other stakeholders with respect to the guidelines. The Commission now recommends that Congress also take action to alleviate lingering inconsistency in other federal recidivist statutes. In this regard, the Commission's definition provides a relatively straightforward framework that Congress could adopt for these other recidivist enhancements.

*Residual Clause*

The Commission's revised definition of crime of violence no longer includes a "residual clause." Prior to the amendment, the term "crime of violence" in §4B1.2 included any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." In *Johnson v. United States*, the Supreme Court considered an identical residual clause relating to the statutory definition of "violent felony" in the Armed Career Criminal Act.[75] In that decision, the Court held that using the "residual clause" to classify an offense as a "violent felony" violates due process because the clause was unconstitutionally vague. While the Supreme Court in *Johnson* did not consider or address the sentencing guidelines, significant litigation has ensued regarding whether the Supreme Court's decision in *Johnson* should also apply to the guidelines.[76]

The Commission determined, as a matter of policy, that the residual clause at §4B1.2 implicated many of the same concerns cited by the Supreme Court in *Johnson* and has given rise to significant litigation both before and after *Johnson*. Removing the residual clause alleviates the considerable application difficulties associated with that clause, as expressed by judges, probation officers, and litigants. Furthermore, removing the clause will alleviate some of the ongoing litigation and uncertainty resulting from the *Johnson* decision.

*List of Enumerated Offenses*

With the deletion of the residual clause under subsection (a)(2), there are two remaining components of the "crime of violence" definition — the "elements clause" and the "enumerated offense clause." The "elements clause" under subsection (a)(1) remains unchanged. Thus, any offense under federal or state law, punishable by imprisonment for a term exceeding one year, qualifies as a "crime of violence" if it has as an element the use, attempted use, or threatened use of physical force against the person of another. The "enumerated offense clause" lists specific offenses that qualify as crimes of violence. In applying this clause, courts compare the elements of the prior offense of conviction with the elements of the enumerated offense in its "generic, contemporary definition." While most of the offenses on the enumerated list under §4B1.2(a)(2) remain the same, the amendment did revise the list in a number of ways to focus on the most dangerous repeat offenders.

The revised list is based on the Commission's consideration of the testimony received at a public hearing, a review of the extensive public comment, and an examination of the data relating to the recidivism rates and the risk of violence in these cases. As before, an enumerated offense qualifies as a "crime of violence" regardless of whether the prior offense expressly has as an element the use, attempted use, or threatened use of physical force against the person of another. Conversely, a prior offense need not be listed in subsection (a)(2) to qualify as a crime of violence if the offense otherwise qualifies under subsection (a)(1) because that offense has as an element the use, attempted use, or threatened use of physical force against the person of another.

As revised, the enumerated offenses in the Commission's definition include murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).[77] These offenses, in conjunction with the "elements clause," target the most serious predicate offenses, ensuring that certain high-risk convictions (often — as with offenses covered by the former residual clause — inherently involving some level of violent or dangerous behavior against the person of another) will be adequately punished.

This list captures each of the offenses currently enumerated in the Armed Career Criminal Act,[78] with one exception. The Commission's definition deletes "burglary of a dwelling" from the list of enumerated offenses. In implementing this change, the Commission considered that (1) burglary offenses rarely result in physical violence, (2) "burglary of a dwelling" is rarely the instant offense of conviction or the determinative triggering predicate for purposes of applying the career offender guideline, and (3) historically, career offenders have rarely been rearrested for a burglary offense after release.

First, several recent studies demonstrate that most burglaries rarely involve physical violence. For example, the *National Crime Victimization Survey, Victimization During Household Burglary* (Sept. 2010) prepared by the Bureau of Justice Statistics found that a household member experienced some form of violent victimization in 7.0 percent of all household burglaries from 2003 to 2007.[79] Similarly, other

*53*

researchers have concluded that 7.6 percent of burglaries between 1998 and 2007 resulted in actual violence or threats of violence, while actual physical injury was reported in only 2.7 percent of all burglaries.[80]   Second, based upon an analysis of offenders sentenced in fiscal year 2014, the Commission estimates that removing "burglary of a dwelling" as an enumerated offense will not impact most offenders sentenced pursuant to the most commonly applied recidivist provisions. The Commission estimates that the overall proportion of offenders who qualify as a career offender will be reduced by about five percentage points, while an estimated 15 percent of offenders currently sentenced pursuant to ACCA would no longer qualify.  This is consistent with the Commission's analysis of recidivism rates for career offenders released during calendar years 2004 through 2006, which indicates that about five percent of such offenders were rearrested for a burglary offense during the eight years after their release.

In reaching this conclusion, the Commission also considered that courts have struggled with identifying a uniform contemporary, generic definition of "burglary of dwelling."  In particular, circuits have disagreed regarding whether the requirement in *Taylor v. United States*, 495 U.S. 575, 598 (1990), that the burglary be of a "building or other structure" applies in addition to the guidelines' requirement that the burglary be of a "dwelling."[81]

Although "burglary of a dwelling" is deleted as an enumerated offense, courts will remain free to depart upward to address a case in which the instant offense or a prior felony conviction was any burglary offense involving violence that did not otherwise qualify as a "crime of violence."[82]

*Enumerated Offense Definitions*

The Commission also added specific definitions for the enumerated offenses of forcible sex offense and extortion. While definitions are provided for these select enumerated offenses, the Commission's crime of violence definition continues to rely on long-existing case law for purposes of defining the remaining enumerated offenses.  The Commission determined that adding several new definitions could result in new litigation, and that it was best not to disturb the case law that has developed over the years.

As defined by the Commission, "forcible sex offense" includes offenses where consent to the conduct is not given or is not legally valid, such as where consent to the conduct is involuntary, incompetent, or coerced.  Following a similar approach to that adopted by Congress in the referenced statutes, the Commission's definition provides that the offenses of sexual abuse of a minor and statutory rape are included only if the sexual abuse of a minor or statutory rape was (A) an offense described in 18 U.S.C. § 2241(c) or (B) an offense under state law that would have been an offense under section 2241(c) if the offense had occurred within the special maritime and territorial jurisdiction of the United States.  Consistent with the definition in §2L1.2 (Unlawfully Entering or Remaining in the United States), this addition reflects the Commission's determination that certain forcible sex offenses that do not expressly include as an element the use, attempted use, or threatened use of physical force against the person of another should nevertheless constitute "crimes of violence."

"Extortion" is defined as "obtaining something of value from another by the wrongful use of (i) force, (ii) fear of

*54*

physical injury, or (iii) threat of physical injury." Under current case law, courts generally define extortion as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats" based on the Supreme Court's holding in *United States v. Nardello*.[83] Consistent with the Commission's overall goal of focusing the career offender and related enhancements on the most dangerous offenders, the amendment narrows the generic definition of extortion by limiting it to those offenses having an element of force or an element of fear or threats "of physical injury," as opposed to non-violent threats of reputational injury, such as a threat to reveal embarrassing personal information.

### Takeaways and Recommendations

There is no shortage of views on the appropriate scope of recidivist enhancements, particularly those seeking to ensure that repeat violent offenders are adequately punished. Both Congress and the Commission have shared in this goal, repeatedly adopting new definitions and revising existing ones to adapt to perceived challenges. **Through outreach and research in recent years, the Commission has concluded that a single definition applicable to the term "crime of violence" in the guidelines and other federal recidivist provisions is necessary to address increasing complexity, and to avoid unnecessary confusion and inefficient use of court resources. Recognizing that the guideline's criminal history rules already take into account an individual's increased culpability and likelihood of recidivism, this uniform definition should be tailored to include only the most serious prior offenses, focusing on those offenses that inherently involve some level of violent or dangerous behavior against the person of another. Congress should avoid an over-inclusive definition given the substantially enhanced penalties provided by recidivist provisions.**

Throughout its multi-year study, the Commission devoted considerable resources to formulating a definition that advanced the goals of judicial efficiency, targeting of recidivism risk, and just punishment. By targeting the most serious predicate offenses, the Commission's definition contributes to a more efficient use of prison resources while ensuring that certain high-risk offenders will be adequately punished. **The Commission, therefore, recommends that Congress use the Commission's recently adopted definition as a basis for a new statutory definition for the term "violent felony" in the Armed Career Criminal Act (18 U.S.C. § 924(e)), and the definitions of "crime of violence" in 18 U.S.C. § 16 and 18 U.S.C. § 924(c).**

## RECOMMENDATIONS

- **Congress should adopt a single definition applicable to the term "crime of violence" in the guidelines and other federal recidivist provisions to address increasing complexity and to avoid unnecessary confusion and inefficient use of resources on the part of both litigants and courts.**

- **Congress should use the Commission's definition as a basis for the new statutory definition, including amending the term "violent felony" in the Armed Career Criminal Act (18 U.S.C. § 924(e)) and the definitions of "crime of violence" in 18 U.S.C. § 16 and 18 U.S.C. § 924(c).**

*56*

ENDNOTES

[1] Title II, Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473 (1984).

[2] 18 U.S.C. § 3553(a)(1).

[3] *See id.*

[4] *See* 28 U.S.C. § 994(d)(10).

[5] The United States Sentencing Commission ("Commission") is an independent agency in the judicial branch of government. Established by the Sentencing Reform Act of 1984, its principal purposes are (1) to establish sentencing policies and practices for the federal courts, including guidelines regarding the appropriate form and severity of punishment for offenders convicted of federal crimes; (2) to advise and assist Congress, the federal judiciary, and the executive branch in the development of effective and efficient crime policy; and (3) to collect, analyze, research, and distribute a broad array of information on federal crime and sentencing issues. *See* 28 U.S.C. §§ 995(a)(14), (15), (20).

[6] *See* USSG Ch.4, Pt.A, intro. comment. ("A defendant's record of past criminal conduct is directly relevant to those purposes. ... The specific factors included in §4A1.1 and §4A1.3 are consistent with the extant empirical research assessing correlates of recidivism and patterns of career criminal behavior.").

[7] The provision applies to federal offenders convicted of a "crime of violence" or a "controlled substance offense" if the offender has prior convictions for two or more "crimes of violence" or "controlled substance offenses." *See* 28 U.S.C. § 994(h).

[8] As discussed in more detail in Part V of this report, the "categorical approach" is the method endorsed by the Supreme Court for determining whether a prior conviction meets the relevant definition of a recidivist enhancement. Under this approach, courts are limited to examining the statutory definition of the prior offense, and not the underlying conduct, to determine whether it substantially corresponds to the generic crime covered by the recidivist enhancement.

[9] The Commission maintains a comprehensive, computerized data collection system and acts as the clearinghouse of federal sentencing information pursuant to 28 U.S.C. §§ 995(a)(14), (15). The Commission relies on this database for its ongoing monitoring and evaluation of the guidelines, many of its reports and research projects, and for responding to hundreds of data requests received from Congress and other criminal justice entities each year. Pursuant to 28 U.S.C. § 994(w), within 30 days of entry of judgment in every felony and class A misdemeanor case, the Commission receives: (1) the judgment and commitment order; (2) the statement of reasons form; (3) the plea agreement, if any; (4) the indictment or other charging information; and (5) the presentence report (unless waived by the sentencing court). For each such case, the Commission routinely collects hundreds of pieces of information, including defendant demographics, statute(s) of conviction, sentencing guideline application(s), and sentence(s) imposed.

[10] *See* U.S. SENTENCING COMM'N, *Quick Facts: Career Offenders* (Nov. 2015), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Career_Offender_FY14.pdf.

[11] For example, the Commission chose to delete the enumerated offense of "burglary" after reviewing a number of published studies indicating that burglaries typically present a low risk of violence against persons. *See* BUREAU OF JUSTICE STATISTICS, *National Crime Victimization Survey, Victimization During Household Burglary* (Sept. 2010) (finding that a household member experienced some form of violent victimization in 7% of all household burglaries from 2003 to 2007); RICHARD S. CULP, ET AL., *Is Burglary a Crime of Violence? An Analysis of National Data 1998-2007*, at 29 (2015), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/248651.pdf (concluding that 7.6% of burglaries between 1998 and 2007 resulted in actual violence or threats of violence, while actual physical injury was reported in only 2.7% of all burglaries); *see also* U.S. DEP'T OF JUSTICE, FED. BUREAU OF INVESTIGATION, UNIFORM CRIME REPORT, CRIME IN THE UNITED STATES (2014), *available at* https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2014/crime-in-the-u.s.-2014/offenses-known-to-law-enforcement/main (classifying burglary as a "property crime" rather than a "violent crime").

58

[12] *See* S. Rep. No. 98–225, at 175 (1983) *reprinted in* 1984 U.S.C.C.A.N. 3182.

[13] *Id.*

[14] S. 668, 98th Cong. (1983).

[15] *See* Pub. L. 98–473, Title II, § 1001(a), 98 Stat. 2316 (1984).

[16] 28 U.S.C. § 994(h).

[17] 18 U.S.C. § 3553(a) provides that in imposing a sentence, the court shall consider … (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

[18] *See* Mistretta v. United States, 488 U.S. 361, 377 (1989).

[19] 520 U.S. 751 (1997).

[20] *See* USSG App. C, amend. 506 (effective Nov. 1, 1994).

[21] *LaBonte*, 520 U.S. at 751.

[22] *Id.* at 762.

[23] *Id.* at 757 (quoting Mistretta v. United States, 488 U.S. 361 (1989)).

[24] *Id.* at 761 n.5.

[25] *Id.* at 761.

[26] This revised commentary was added in 1995 in response to cases in a number of circuits considering whether the Commission's authority to promulgate the career offender guideline derived only from § 994(h), or also from additional sections of the Commission's organic statute conferring broader authority. Some circuits had held that the Commission's decision to add inchoate offenses to the list of offenses that may serve as career offender predicates was invalid, because inchoate offenses were not mentioned in § 994(h), while other circuits rejected that reasoning and held that the Commission's authority derived from other parts of its organic statute. *See* USSG App. C, amend 528 (effective Nov. 1, 1995).

[27] *Id.*

[28] For purposes of the guideline, "Offense Statutory Maximum" refers to the maximum term of imprisonment authorized for the offense of conviction that is a crime of violence or controlled substance offense, including any increase in that maximum term under a sentencing enhancement provision that applies because of the defendant's prior criminal record (such sentencing enhancement provisions are contained, for example, in 21 U.S.C. § 841(b)(1)(A), (B), (C), and (D)).

[29] For further discussion of the January 2016 amendment, *see infra* Pt. V.

[30] Appendix B of this report discusses the procedures employed by the Commission in collecting information used for the analysis of fiscal year 2014 data in this section and the "Current Sentencing" analysis in Part IV of this report.

[31] The "Other" category includes 29 other primary sentencing guidelines, including, for example, §2A2.2 (Aggravated Assault) (1.6%; n=36), §2A1.1 (First Degree Murder) (0.8%; n=17), §2A2.4 (Obstructing or Impeding Officers) ((0.4%; n=8), §2A2.1 (Assault with Intent to Commit Murder; Attempted Murder) (0.4%; n=8), §2B3.2 (Extortion by Force or Threat of Injury or Serious Damage) (0.1%; n=3), and §2A4.1 (Kidnapping, Abduction, Unlawful Restraint) (0.1%; n=2). In addition, there are 18 offenders (0.8%) who were only convicted of 18 U.S.C. § 924(c), and thus had no primary sentencing guideline.

[32] *See supra*, Figure 3.

[33] In fiscal year 2014, 15% of these 254 offenders received a within range sentence, 27.6% received a government sponsored below range sentence based on substantial assistance, 20.5% received an other government sponsored below range sentence, 36.2% received a non-government sponsored below range sentence, and 0.8% received an above range sentence.

[34] *See* 18 U.S.C. § 3553(e); USSG §5K1.1. In fiscal year 2014, these offenders received an average reduction in their sentence of 47.6 percent.

[35] Offenders who received non-government sponsored below range sentences in fiscal year 2014 received an average reduction in their sentence of 37.0 percent.

[36] Of the 210,567 offenders in the custody of the Federal Bureau of Prisons on December 27, 2014, 185,644 offenders were serving a sentence for a federal conviction, while the other 24,923 offenders in BOP custody are pre-trial offenders, offenders sentenced in the courts of the District of Columbia, or military offenders. Of the 185,644 offenders, Commission records could be matched to 178,911 of those offenders and were used for this analysis.

[37] These offenders were also included in the more in-depth recidivism study recently released by the Commission. *See* U.S. SENTENCING COMM'N, *RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW* (March 2016), available at http://www.ussc.gov/research-and-publications/research-publications/2016/recidivism-among-federal-offenders-comprehensive-overview [hereinafter *2016 RECIDIVISM OVERVIEW*].

[38] *See supra* note 30 for discussion of the data collection methods used for the analysis in this section.

[39] For purpose of this analysis, a criminal history event is a sentencing summarized in the presentence report that included complete information on arrest date, jurisdiction, and the offense of conviction. A single criminal history event could be comprised of any number of individual offenses.

[40] The independent research organization NORC at the University of Chicago distilled the unique state-specific offenses from RAP sheets from 25,000 criminal justice agencies nationwide into 100 standardized offense codes that describe offenses in a common format that allows comparison of offense types and severity across jurisdictions.

[41] For purposes of this analysis, violent prior offenses include those offenses classified as: murder, unspecified manslaughter, non-negligent manslaughter, kidnapping, rape, fondling, other/unspecified sexual assault, armed robbery, unspecified robbery, unarmed robbery, sodomy, aggravated assault, assaulting a police officer, simple assault, unspecified assault, intimidation, blackmail/extortion, hit and run with bodily injury, child abuse, other violent offenses, arson, and rioting.

[42] *See supra* Pt. III, *Offense Characteristics* (examining the primary Chapter Two guideline for career offenders in fiscal year 2014). As noted in that section, excluding those sentenced for a drug trafficking offense, career offenders were sentenced under USSG §§2A1.1 (First Degree Murder), 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder), 2A2.2 (Aggravated Assault), 2A3.4 (Abusive Sexual Contact or Attempt to Commit Abusive Sexual Contact), 2A4.1 (Kidnapping, Abduction, Unlawful Restraint), 2A6.1 (Threatening or Harassing Communications; Hoaxes; False Liens), 2B3.1 (Robbery), 2G1.3 (Promoting a Commercial Sex Act or Prohibited Sexual Conduct with a Minor; Transportation of Minors to Engage in a Commercial Sex Act or Prohibited Sexual Conduct; Travel to Engage in Commercial Sex Act or Prohibited Sexual Conduct with a Minor; Sex Trafficking of Children; Use of Interstate Facilities to Transport Information about a Minor), 2K1.4 (Arson; Property Damage by Use of Explosives), 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), and 2P1.1 (Escape, Instigating or Assisting Escape).

[43] Of the 457 career offenders in the sample, eight were excluded because their prior offenses were not defined as a violent offense for this analysis.

[44] *See* 21 U.S.C. § 841(b).

[45] Pursuant to 21 U.S.C. § 841(b), offenders face statutory maximum penalties of 1, 5, 10, 20, 30, or 40 years, or life imprisonment depending upon the type and quantity of controlled substance, as well as whether the offender has a prior conviction for a felony drug offense.

[46] Of the offenders in the drug trafficking category for whom both the final offense level and criminal history category were increased by the career offender guideline, 29.0 percent received a departure under USSG §5K1.1, 19.7 percent received other government sponsored departures, and 35.5 percent received a non-government sponsored below range sentence.

[47] *See 2016 RECIDIVISM OVERVIEW*, *supra* note 37.

[48] *See id.* at App. B.

[49] Appendix C of this report includes a discussion of the procedures employed by the Commission in collecting information used for the recidivism analysis in this section. Appendix C largely mirrors Appendix B of the Commission's *2016 RECIDIVISM OVERVIEW*.

[50] After collecting RAP sheet records on study group offenders, the Commission contracted with NORC to consolidate all records on each offender, organize the records chronologically, and remove duplicative or extraneous material. Minor traffic offenses (*e.g.*, speeding) were removed from the analysis, but serious traffic-related offenses (*e.g.*, driving while intoxicated) were not removed from the analysis. Following these preliminary process steps, NORC researched state and federal criminal codes and repository data definitions to assign each unique state offense and disposition description to a single uniform description. Using research on each repository, NORC created separate offense "crosswalks" for every state and the District of Columbia, as well as a separate crosswalk for federal repository records. These crosswalks translate any given jurisdiction's arrest and court records into standardized arrest and court codes. Through this standardization, all records, regardless of originating source, were brought into a common framework. *See* App. C.

[51] Arrests are used in lieu of convictions due to recent Government Accountability Office (USGAO) findings regarding the limitations of state reporting on prior convictions. *See* USGAO, *Criminal History Records: Additional Actions Could Enhance the Completeness of Records Used for Employment-Related Background Checks* (2015), *available at* http://www.gao.gov/assets/670/668505.pdf. According to this report, only twenty states had criminal history records reporting disposition at a rate of more than 75 percent of their arrest records.

[52] These include homicide, kidnapping, sexual assault, robbery, assault, blackmail/extortion, child abuse, arson, and rioting. Also included were a small number of "other" violent offenses with limited RAP sheet information which allowed classification as violent but did not allow more refined classification.

[53] All Homicides (excepting Vehicular and Negligent Manslaughter), Kidnapping, Sexual Assault, Robbery, and Aggravated/Felony Assault.

[54] Rearrest is one of the three common measures of recidivism. *See 2016 RECIDIVISM OVERVIEW*, *supra* note 37, at 8. Rearrest classifies a person as a recidivist if he or she has been arrested for a new crime after being released into the community directly on probation or after serving a term of imprisonment. Rearrest also includes arrests for alleged violations of supervised release, probation, or state parole. The number of rearrests in the Commission's analysis is based on the number of unique arrest dates, regardless of the number of individual charges arising from a single arrest event. Thus, if an offender was arrested on a single occasion for both driving under the influence and possession of cocaine, that arrest date would constitute a single rearrest event.

[55] *See 2016 RECIDIVISM OVERVIEW*, *supra* note 37, at 23.

[56] *See 2016 RECIDIVISM OVERVIEW*, *supra* note 37, at 18.

*61*

[57] *See* USSG, Ch.4, Pt. A, intro. comment.; *see also* U.S. SENTENCING COMM'N, SUPPLEMENTARY REPORT ON THE INITIAL SENTENCING GUIDELINES AND POLICY STATEMENTS, 41-44 (1987), *available at* http://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf.

[58] *See 2016 RECIDIVISM OVERVIEW*, *supra* note 37, at 18-19.

[59] Before the amendment, the term "crime of violence" in §4B1.2 included any offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *See* USSG §4B1.2(a)(2) (2015).

[60] *See* Appendix D.

[61] S. Rep. No 98–225, at 307 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3486; *see also* S. 1630, 97th Cong. § 111 (1st Session 1981); S. Rep. No. 97–307 (1981).

[62] Pub. L. 98–473, tit. II, § 1001(a), 98 Stat. 1976, 2136 (1984).

[63] *See, e.g.,* United States v. Gomez-Leon, 545 F.3d 777, 786 & n.7 (9th Cir. 2008) (noting the existence of "four different ways to determine whether an offense constitutes a 'crime of violence'").

[64] *See, e.g.,* United States v. Hall, 714 F.3d 1270, 1272-74 (11th Cir. 2013) (finding that possession of a short-barreled shotgun was a "crime of violence" under §4B1.2, but was not a "violent felony" under ACCA, even though the two definitions were "substantially the same").

[65] *J. Sutton 25th Anniversary Testimony.*

[66] *See, e.g., R. Tallman 25th Anniversary Testimony.*

[67] Taylor v. United States, 495 U.S. 575 (1990).

[68] *See* Mathis v. United States, __ S.Ct. __, 2016 WL 3434400 (June 23, 2016) (holding that the "categorical approach" requires that a sentencing court look only to the elements of the statute of conviction, and therefore that courts may not decide whether to count a conviction by determining which of multiple alternative "means of commission" a defendant used to commit an offense, even if those means are listed explicitly in the statute of conviction). In his concurring opinion, Justice Kennedy specifically discussed his concerns regarding the operation of the categorical approach, and suggested that Congress could amend the statutory provisions to address some of the ongoing concerns. *See id.* at *13 (Kennedy concurrence).

[69] Johnson v. United States, 135 S. Ct. 2551 (2015).

[70] 18 U.S.C. § 924(e)(2)(B)(ii).

[71] *See Johnson*, 135 S. Ct. at 2557.

[72] *See, e.g.,* United States v. Vivas-Ceja, 808 F.3d 719, 723 (7th Cir. 2015) (applying *Johnson* to invalidate the § 16(b) residual clause in a case arising under §2L1.2); Dimaya v. Lynch, 803 F.3d 1110, 1118-19 (9th Cir. 2015) (invalidating the § 16(b) residual clause in an administrative immigration case); United States v. Hernandez-Lara, No. 13-10637, 2016 WL 1239199, at *1 (9th Cir. Mar. 29, 2016) (extending *Dimaya* to the criminal context). *But see* United States v. Taylor, 814 F.3d 340, 379 (6th Cir. 2016) (declining to invalidate the residual clause at 18 U.S.C. § 924(c)(3)(B), while noting that it "appears identical . . . in all material respects" to the § 16(b) clause). A panel of the Fifth Circuit invalidated the § 16(b) residual clause, but that court subsequently granted rehearing *en banc*, vacating the panel decision. *See* United States v. Gonzalez-Longoria, 813 F.3d 225 (5th Cir. 2016), *vacated & reh'g en banc granted*, 815 F.3d 189 (2016). The case remains pending before the *en banc* court.

*62*

[73] *See* Beckles v. United States, 616 Fed.Appx. 415 (11th Cir. 2015, *cert. granted*, 2016 WL 1029080, at *1 (June 27, 2016).

[74] Amendment on "Crime of Violence" and Related Issues, submitted to Congress on Jan. 21, 2016, 81 Fed. Reg. 4741 (Jan. 27, 2016). The "crime of violence" definition at §4B1.2 also triggers increased sentences under several other provisions in the *Guidelines Manual. See* §§2K1.3 (Unlawful Receipt, Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), 2S1.1 (Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity), 4A1.1(e) (Criminal History Category), 7B1.1 (Classification of Violations (Policy Statement)).

[75] *See supra* note 69.

[76] *Compare* United States v. Matchett, 802 F.3d 1185 (11th Cir. 2015) (rejecting the argument that the residual clause in §4B1.2 is unconstitutionally vague in light of *Johnson*) and United States v. Wilson, 622 F. App'x 393, 405 n.51 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 992 (2016) (in considering the applicability of *Johnson*, noting "[o]ur case law indicates that a defendant cannot bring a vagueness challenge against a Sentencing Guideline"), *with* United States v. Taylor, 803 F.3d 931 (8th Cir. 2015) (finding that previous circuit precedent holding that the guidelines cannot be unconstitutionally vague because they do not proscribe conduct is doubtful after *Johnson*); United States v. Madrid, 805 F.3d 1204, 1211 (10th Cir. 2015) (holding that that the residual clause of §4B1.2(a)(2) is void for vagueness); United States v. Harbin, 610 F. App'x 562 (6th Cir. 2015) (finding that defendant is entitled to the same relief as offenders sentenced under the residual clause of the ACCA); United States v. Townsend, __ F.3d __, 2015 WL 9311394, at *4 (3d Cir. Dec. 23, 2015) (remanding for resentencing in light of the government's concession that, pursuant to *Johnson*, the defendant should not have been sentenced as a career offender); and United States v. Hudson, __ F.3d __, 2016 WL 2621093, at *6 (1st Cir. May 9, 2016) (noting the government's concession that the residual clause in §4B1.2 is invalid in light of the holding in *Johnson*).

[77] Including offenses involving the "use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or an explosive material as defined in 18 U.S.C. § 841(c)" is consistent with long-standing commentary in §4B1.2 categorically identifying possession of a firearm described in 26 U.S.C. § 5845(a) as a "crime of violence," and therefore maintains the status quo. Possession of these types of weapons (*e.g.*, a sawed-off shotgun or sawed-off rifle, silencer, bomb, or machine gun) inherently presents a serious potential risk of physical injury to another person, and classifying them as crimes of violence reflects Congress's determination that such weapons are inherently dangerous and, when possessed unlawfully, serve only violent purposes. *See also* USSG App. C, amend. 674 (eff. Nov. 1, 2004) (expanding the definition of "crime of violence" in Application Note 1 to §4B1.2 to include unlawful possession of any firearm described in 26 U.S.C. § 5845(a)).

[78] *See* 18 U.S.C. § 924(e)(2)(B)(ii) (enumerating burglary, arson, extortion, and offenses that involves the use of explosives).

[79] *See* BUREAU OF JUSTICE STATISTICS, *supra* note 11.

[80] CULP, ET AL., *supra* note 11.

[81] *Compare* United States v. Henriquez, 757 F.3d 144, 148-49 (4th Cir. 2014); United States v. McFalls, 592 F.3d 707 (6th Cir. 2010); United States v. Wenner, 351 F.3d 969 (9th Cir. 2003) *with* United States v. Ramirez, 708 F.3d 295, 301 (1st Cir. 2013); United States v. Murillo-Lopez, 444 F.3d 337, 340 (5th Cir. 2006); United States v. Rivera-Oros, 590 F.3d 1123 (10th Cir. 2009); United States v. McClenton, 53 F.3d 584 (3d Cir. 1995); United States v. Graham, 982 F.2d 315 (8th Cir. 1992).

[82] The Commission included such a departure provision in the revised career offender definition. The amendment adds an upward departure provision to §4B1.2 to address the unusual case in which the instant offense or a prior felony conviction was any burglary offense involving violence that did not otherwise qualify as a "crime of violence." This departure provision allows courts to consider all burglary offenses, as opposed to just burglaries of a dwelling, and reflects the Commission's determination that courts should consider an upward departure where a defendant would have received a higher offense level, higher Criminal History Category, or both (*e.g.*, where the defendant would have been a career offender) if such burglary had qualified as a "crime of violence."

63

[83] 393 U.S. 286, 290 (1969) (defining "extortion" for purposes of the Hobbs Act).

## APPENDIX A

### HISTORY OF THE CAREER OFFENDER GUIDELINE

*Appendix A-2*

## Promulgation of the Career Offender Guideline

Although the career offender guideline is most directly a result of the directive in 28 U.S.C. § 994(h), Congress contemplated that the Commission in implementing the directive would perform its institutional policy-making role as outlined in other provisions of the Sentencing Reform Act of 1984 (SRA). On March 26, 1987, the Commission's Office of General Counsel authored a memorandum discussing the legislative history of § 994(h) and construing the meaning of the statute for implementation purposes.[1] That memorandum concluded:

> [T]he effect of changing the provision to a directive to the Sentencing Commission is to leave it [to] the Commission to construe this directive as consistently as it can with the numerous other Congressional directives in the Commission's governing statute. . . . Reasonably construing the provision in its present context and in light of the total legislative history, it is sensible to conclude that Congress did not intend a purely mechanical application which would be unduly harsh in some instances and inconsistent with the overall instructions to the Sentencing Commission. Counsel further doubts that Congress would desire the Commission to adopt a strict, literalistic reading which exacerbates prison impact. Most members of the legislative body would probably appreciate a less extreme, more flexible approach, so long as it clearly achieved the fundamental objective of severely punishing career criminals.[2]

In order to achieve this objective, the Commission promulgated §4B1.1 (Career Offender) and §4B1.2 (Definitions). As initially promulgated (effective November, 1987), these guidelines provided as follows:

### §4B1.1    Career Offender

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense is a crime of violence or trafficking in a controlled substance, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply. A career offender's criminal history category in every case shall be Category VI.

| Offense Statutory Maximum | Offense Level |
|---|---|
| (A) Life | 37 |
| (B) 20 years or more | 34 |
| (C) 10 years, but less than 20 years | 26 |
| (D) 5 years, but less than 10 years | 19 |
| (E) 1 year & 1 day, but less than 5 years | 12 |
| (F) 1 year or less | 4 |

*Appendix A-3*

§4B1.2        Definitions

(1)    The term "crime of violence" as used in this provision is defined under 18 U.S.C. § 16.

(2)    The term "controlled substance offense" as used in this provision means an offense identified in 21 U.S.C. §§ 841, 952(a), 955, 955a, 959; §§ 405B and 416 of the Controlled Substance Act as amended in 1986, and similar offenses.

(3)    The term "two prior felony convictions" means (A) the defendant committed the instant offense subsequent to sustaining at least two felony convictions for either a crime of violence or a controlled substance offense (i.e., two crimes of violence, two controlled substance offenses, or one crime of violence and one controlled substance offense), and (B) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of Part A of this Chapter. The date that a defendant sustained a conviction shall be the date the judgment of conviction was entered.[3]

The Commission also promulgated Commentary explaining the career offender guidelines. In relevant part, it read as follows:

28 U.S.C. § 994(h) mandates that the Commission assure that certain "career" or special offenders, as defined in the statute, receive a sentence of imprisonment "at or near the maximum term authorized." Section 4B1.1 implements this mandate. The legislative history of this provision suggests that the phrase "maximum term authorized" should be construed as the maximum term authorized by statute. See S. Rep. 98-225, 98th Cong., 1st Sess. 175 (1983), 128 Cong. Rec. 12792, 97th Cong., 2d Sess. (1982) ("Career Criminals" amendment No. 13 by Senator Kennedy), 12796 (explanation of amendment), and 12798 (remarks by Senator Kennedy).

The guideline levels for career criminals were established by using the statutory maximum for the offense of conviction to determine the class of felony provided in 18 U.S.C. § 3559. Then the maximum authorized sentence of imprisonment for each class of felony was determined as provided by 18 U.S.C. § 3581. A guideline range for each class of felony was then chosen so that the maximum of the guideline range was at or near the maximum provided in 18 U.S.C. § 3581.

Section 4B1.2 provides the definitions for §4B1.1. The definition of the term "crime of violence", as that term is used in 28 U.S.C. § 994(h), is taken from Section 1001 of the

Comprehensive Crime Control Act of 1984, which defined the term for purposes of all of Title 18, United States Code. See S. Rep. 98-225, 98th Cong., 1st Sess. 307 (1983).

The term "controlled substance offense" is defined to include the offenses described in 28 U.S.C. § 994(h), as these offenses have been modified by amendments to the Controlled Substances Act made by the Anti-Drug Abuse Act of 1986, Pub. L. 99—570.

In the *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements*, the Commission discussed the development process, the guidelines generally, and the anticipated prison impact of implementation of the guidelines. The first express mention of §4B1.1 in the Supplementary Report occurs in the section on Criminal History and Criminal Livelihood discussing the rate of increase in the guideline range provided from one criminal history category to the next. The Commission noted that although "the rate of increase and the maximum increase in the Sentencing Table attributable to the defendant's criminal history roughly parallels that increase in the parole guidelines. . . [i]t is to be noted . . . that under §4B1.1 (Career Offenders) much larger relative increases are provided for certain repeat offenders, consistent with legislative direction."[4]

## Evolution of the Career Offender Guideline

The career offender guideline has undergone a number of significant amendments since its promulgation. This section will provide a chronological history of the changes the Commission has made to §§4B1.1 and 4B1.2.

*1988 Guideline Amendments*

Shortly after the initial promulgation of the guidelines, which took effect on November 1, 1987, the Commission made several changes to commentary in response to "extensive clinical testing of the guidelines," which "produced useful suggestions for clarifying and reorganizing the commentary."[5] The Commission published these amendments in the Federal Register on November 20, 1987, including some changes to the career offender guidelines.[6] The commentary was split between parts applicable to §§4B1.1 and 4B1.2, and an Application Note was added to §4B1.1 explicitly referencing the definitions in §4B1.2.[7] Additionally, §4B1.1 was amended to provide that qualifying prior offenses were limited to felony crimes of violence or drug trafficking offenses.[8] The Commission solicited additional comment on these amendments, noting that they were not intended to represent substantive changes, but instead to correct clerical errors and to clarify the guidelines.[9] These changes included an amendment to the table contained in §4B1.1 used to determine the offense level.[10] The amended version of the career offender guidelines (effective January 15, 1988) was as follows:

### §4B1.1        Career Offender

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance

*Appendix A-5*

offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. If the offense level for a career criminal from the table below is greater than the offense level otherwise applicable, the offense level from the table below shall apply. A career offender's criminal history category in every case shall be Category VI.

| Offense Statutory Maximum | Offense Level |
|---|---|
| (A) Life | 37 |
| (B) 25 years or more | 34 |
| (C) 20 years or more, but less than 25 years | 32 |
| (D) 15 years or more, but less than 20 years | 29 |
| (E) 10 years or more, but less than 15 | 24 |
| (F) 5 years or more, but less than 10 years | 17 |
| (G) More than 1 year, but less than 5 years | 12 |

*Commentary*

*Application Note:*

1.      *"Crime of violence," "controlled substance offense," and "felony conviction" are defined in §4B1.2.*

*Background: 28 U.S.C. § 994(h) mandates that the Commission assure that certain "career" offenders, as defined in the statute, receive a sentence of*

*imprisonment "at or near the maximum term authorized." Section 4B1.1 implements this mandate. The legislative history of this provision suggests that the phrase "maximum term authorized" should be construed as the maximum term authorized by statute. See S. Rep. 98-225, 98th Cong., 1st Sess. 175 (1983), 128 Cong. Rec. 12792, 97th Cong., 2d Sess. (1982) ("Career Criminals" amendment No. 13 by Senator Kennedy), 12796 (explanation of amendment), and 12798 (remarks by Senator Kennedy).*

**§4B1.2**      **Definitions**

(1)      The term "crime of violence" as used in this provision is defined under 18 U.S.C. § 16.

(2)      The term "controlled substance offense" as used in this provision means an offense identified in 21 U.S.C. §§ 841, 845b, 856, 952(a), 955, 955a, 959, and similar offenses.

(3)      The term "two prior felony convictions" means (A) the defendant committed the instant offense subsequent to sustaining at least two felony convictions for either a crime of violence or a controlled substance offense (i.e., two crimes of violence, two controlled substance offenses, or one crime of violence and one controlled substance offense), and (B) the sentences for at least two of the

*Appendix A-6*

aforementioned felony convictions are counted separately under the provisions of Part A of this Chapter. The date that a defendant sustained a conviction shall be the date the judgment of conviction was entered.

### Commentary

*Application Notes:*

1. "Crime of violence" is defined in 18 U.S.C. § 16 to mean an offense hat has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or any other offense that is a felony and that by its nature involves a substantial risk that physical force against that person or property of another may be used in committing the offense. The Commission interprets this as follows: murder, manslaughter, kidnapping, aggravated assault, extortionate extension of credit, forcible sex offenses, arson, or robbery are covered by this provision. Other offenses are covered only if the conduct for which the defendant was specifically convicted meets the above definition. For example, conviction for an escape accomplished by force or threat of injury would be covered; conviction for an escape by stealth would not be covered. Conviction for burglary of a dwelling would be covered; conviction for burglary of other structures would not be covered.

2. "Controlled substance offense" includes any federal or state offense that is substantially similar to any of those listed in subsection (2) of the guideline. These offenses include manufacturing, importing, distributing, dispensing, or possessing with intent to manufacture, import, distribute, or dispense, a controlled substance (or a counterfeit substance). This definition also includes aiding and abetting, conspiring, or attempting to commit such offenses, and other offenses that are substantially equivalent to the offenses listed.

3. "Prior felony conviction" means a prior adult federal or state conviction for an offense punishable by death or imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony and regardless of the actual sentence imposed.

4. The provisions of §4A1.2(e) (Applicable Time Period), §4A1.2(h) (Foreign Sentences), and §4A1.2(j) (Expunged Convictions) are applicable to the counting of convictions under §4B1.1. Also applicable is the Commentary to §4A1.2 pertaining to invalid convictions.

On January 15, 1998, these amendments took temporary effect and were published in the Federal Register.[11] Several changes that had not been part of the November publication were included in the January version of the

guidelines; these changes were promulgated under the Commission's emergency authority under 28 U.S.C. § 994(p).[12] All of the changes were re-promulgated in the Commission's April 29, 1988 submission to Congress.[13] Amendments 47, 48 and 49 implemented these changes.

Amendment 47 altered the explanation of which offenses, as the instant offense of conviction, would qualify the defendant as a career offender. Prior to the amendment, a qualifying instant offense was "a crime of violence or trafficking in a controlled substance;" after the amendment, it was "a felony that is either a crime of violence or a controlled substance offense."[14] Amendment 48 contained the new offense table, which was designed "to correct the guideline so that the table relating offense statutory maxima to offense levels is consistent with the current authorized statutory maximum terms."[15] Amendment 49 contained several modifications to §4B1.2, including non-substantive changes to the list of statutes referenced in the definition of "controlled substance offense."[16]

*1989 Guideline Amendments*

Several important amendments followed in 1989, when the Commission considered how it should respond to Congress's enactment of the Armed Career Criminal Act (ACCA), including any impact on the career offender guidelines. The ACCA provides enhanced sentences, including a 15-year mandatory minimum, for certain offenders convicted under 18 U.S.C. § 922(g), which prohibits convicted felons from possessing firearms. Specifically, the ACCA imposes additional incarceration on offenders who have three prior convictions "for a violent felony or a serious drug

offense."[17] The Commission, in considering its response to this legislation, consulted literature reviews, reports from judges and probation officers collected through training and help line calls, legislative history and case law reviews.

As noted above, the career offender guideline as initially promulgated defined the term "crime of violence" by reference to 18 U.S.C. § 16, which had been added to the Code in 1984 and which defines the term "crime of violence" as:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (b) any other offense that is a felony and that, by its nature, involved a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.[18]

The term "controlled substance offense" had been defined by listing the particular provisions of Title 21 that criminalized such offenses.

Effective November 1, 1989, the Commission changed the definitions of the terms "crime of violence" and "controlled substance offense" from the definitions originally used to new definitions based on the definitions of the terms "violent felony" and "serious drug offense" in the ACCA.[19] The Commission made this change in response to research that concluded that "[the definition in § 924(e)] is more specific than the definition of a 'crime of violence' in 18 U.S.C. § 16, and more narrowly drawn" and "that . . . linking the definitions of predicate crimes to those already approved, defined and

joined together by Congress for the heavy sanction of § 924(e) would facilitate both the acceptance of the guideline and its proper application."[20]

With respect to the term "controlled substance offense," the Commission sought a definition that was well-established in legislative history and that had the prospect of cohesive case law development. The Commission concluded that the definition from 18 U.S.C. § 924(e) would be preferable to the previous definition because the previous definition "introduces a new offense description into the drug law, one which will have no legislative history and less interpretive case law than would a term already adopted by Congress."[21] Additionally, practical concerns led the Commission to note that "the listing of offenses by section number will necessitate the continuous review of new drug laws, both in terms of their substantive similarity to those already listed in the guideline and simply in terms of the revised section numbers."[22]

The Commission further amended the Application Notes to §4B1.2 in two ways. First, the Commission explained that "[t]he terms 'crime of violence' and 'controlled substance offense' include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."[23] The Commission also deleted the existing commentary clarifying the definition of "crime of violence" and replaced it with the following text:

> *"Crime of violence" includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included where (A) that offense has as an element the use,*

> *attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth in the count of which the defendant was convicted involved use of explosives or, by its nature, presented a serious potential risk of physical injury to another.*[24]

Second, the Commission also amended §4B1.1 to permit the application of an adjustment from §3E1.1 (Acceptance of Responsibility) to the offense level of those sentenced as career offenders.[25]

*1991 Guideline Amendments*

In 1991, the Commission amended the commentary to §4B1.2 to resolve a circuit conflict regarding whether the offense of unlawful possession of a firearm was a "crime of violence" under the guideline. The Commission concluded that felon-in-possession offenses generally were *not* crimes of violence under §4B1.2.[26] The Commission, in ratifying the amendment, explained:

> The previous amendment clarified that application of §4B1.2 is governed by the offense of conviction, and that the offense of being a felon in possession of a firearm is not a crime of violence within the meaning of this guideline. As a clarifying and conforming change, the previous commentary amendment reflected Commission intent that the term "crime of violence," as that term is used in §§4B1.1-4B1.2, be interpreted consistently with that term as used in other provisions of the Guidelines

Manual. For example, §4B1.4, as promulgated by amendment 355, effective November 1, 1990, provides an increased offense level for a "felon-in-possession" defendant who is subject to an enhanced sentence under 18 U.S.C. § 924(e) and who used or possessed the firearm in connection with a crime of violence.[27]

The validity of this amendment was appealed to the Supreme Court, which upheld the amendment in *Stinson v. United States*.[28]  In that ruling, the Supreme Court held that, as a general matter, valid commentary was binding on all courts applying the guidelines.  The Court noted its previous explanation that, in delegating authority to the Commission, "'Congress necessarily contemplated that the Commission would periodically review the work of the courts, and would make whatever clarifying revisions to the Guidelines conflicting judicial decisions might suggest.'"[29]  In upholding the binding nature of the commentary, the Supreme Court held that "[the amendment] does not run afoul of the Constitution or a federal statute, and it is not plainly erroneous or inconsistent with §4B1.2."[30]  As a result of this finding, the Court concluded that the amendment was a proper exercise of the Commission's authority under the SRA to explain "how . . . the guidelines should be applied to be consistent with the Guidelines Manual as a whole as well as the authorizing statute."[31]

*1994 Guideline Amendments*

Another significant revision, effective November 1, 1994, addressed the issue of which maximum term was to be used in calculating a career offender's guideline range when federal law establishes both a basic statutory maximum for a person convicted of a particular offense and an enhanced maximum penalty for repeat offenders convicted of that same offense.  Prior to the November 1, 1994 amendment, courts generally concluded that the enhanced maximum penalty should be used in determining the offense level for a career offender; in response, the Commission amended the career offender guideline commentary at §4B1.1 to preclude consideration of statutory enhancements in calculating the "offense statutory maximum."[32]  The Commission defined the phrase "offense statutory maximum" as:

> the maximum term of imprisonment authorized for the offense of conviction that is a crime of violence or controlled substance offense, not including any increase in that maximum term under a sentencing enhancement provision that applies because of a defendant's prior criminal record.

The reason for amendment explained that "[t]his rule avoids unwarranted double counting as well as unwarranted disparity associated with variations in the exercise of prosecutorial discretion in seeking enhanced penalties based on prior convictions."[33]

After this amendment took effect, a circuit split developed and the Supreme Court granted certiorari in *United States v. LaBonte*[34] to resolve the issue of whether the Commission's implementation of amendment 506 conflicted with its obligation in § 994(h) to "assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of [career offenders]."

The *LaBonte* majority concluded that the amendment conflicted with the plain, unambiguous language of § 994(h) and that the Commission therefore lacked authority to promulgate it.[35] Although the majority acknowledged that "Congress has delegated to the Commission 'significant discretion in formulating guidelines' for sentencing convicted federal offenders," it emphasized that such discretion "must bow to the specific directives of Congress."[36] The Supreme Court rejected the Commission's amendment of the guideline, noting that "Congress surely did not establish enhanced penalties for repeat offenders only to have the Commission render them a virtual nullity."[37]

The *LaBonte* Court acknowledged that § 994(h) itself does provide some discretion to the Commission in promulgating guidelines for career offenders.[38] However, the Court held that "[w]hatever latitude § 994(h) affords the Commission in deciding how close a sentence must come to the maximum to be 'near' it, the statute does not license the Commission to select as the relevant 'maximum term' a sentence that is different from the congressionally authorized maximum term."[39] As a result, the Court invalidated Amendment 506. In response, the Commission amended the guideline to remove the definition.[40]

*1995 Guideline Amendments*

Effective November 1, 1995, the Commission amended the background commentary to §4B1.1 by "insert[ing] additional background commentary . . . explaining the Commission's rationale and authority for its implementation of [the Career Offender] guideline."[41] The amended commentary

is as follows, with the portions added by this amendment in bold:

> Section 994(h) of title 28, United States Code, mandates that the Commission assure that certain 'career' offenders receive a sentence of imprisonment 'at or near the maximum term authorized.' Section 4B1.1 implements this **directive, with the definition of a career offender tracking in large part the criteria set forth in 28 U.S.C. 994(h). However, in accord with its general guideline promulgation authority under 28 U.S.C. 994(a)-(f), and its amendment authority under 28 U.S.C. 994 (o) and (p), the Commission has modified this definition in several respects to focus more precisely on the class of recidivist offenders for whom a lengthy term of imprisonment is appropriate and avoid 'unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct ... .' 28 U.S.C. 991(b)(1)(B). The Commission's refinement of this definition over time is consistent with Congress' choice of a directive to the Commission rather than a mandatory minimum sentencing statute ('The [Senate Judiciary] Committee believes that such a directive to the Commission will be more effective; the guidelines development process can assure consistent and rational implementation for the Committee's view that substantial prison terms should be imposed on**

**repeat violent offenders and repeat drug traffickers.' S. Rep. No. 225, 98th Cong., 1st Sess. 175 (1983)).**

The legislative history of this provision suggests that the phrase 'maximum term authorized' should be construed as the maximum term authorized by statute. See S. Rep. No. 225, 98th Cong., 1st Sess. 175 (1983), 128 Cong. Rec. 26, 511-12 (1982) (text of 'Career Criminals' amendment by Senator Kennedy) id. at 26, 515 (brief summary of amendment) id. at 26, 517-18 (statement of Senator Kennedy).[42]

The Commission explained its reasoning for including this additional commentary as follows:

The amendment responds to a decision by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Price*, 990 F.2d 1367 (D.C. Cir. 1993). In *Price*, the court invalidated application of the career offender guideline to a defendant convicted of a drug conspiracy because 28 U.S.C. 994(h), which the Commission cites as the mandating authority for the career offender guideline, does not expressly refer to inchoate offenses. The court indicated that it did not foreclose Commission authority to include conspiracy offenses under the career offender guideline by drawing upon its broader guideline promulgation authority in 28 U.S.C. 994(a). See also *United States v. Mendoza-Figueroa*, 28 F.3d 766 (8th Cir. 1994), *vacated*

(Sept. 2, 1994); *United States v. Bellazerius*, 24 F.3d 698 (5th Cir.), *cert. denied*, 115 S. Ct. 375 (1994). Other circuits have rejected the *Price* analysis and upheld the Commission's definition of "controlled substance offense." For example, the Ninth Circuit considered the legislative history to 994(h) and determined that the Senate Report clearly indicated that 994(h) was not the sole enabling statute for the career offender guidelines. *United States v. Heim*, 15 F.3d 830 (9th Cir.), *cert. denied*, 115 S. Ct. 55 (1994). *See also United States v. Hightower*, 25 F.3d 182 (3d Cir.), *cert. denied*, 115 S. Ct. 370 (1994); *United States v. Damerville*, 27 F.3d 254 (7th Cir.), *cert. denied*, 115 S. Ct. 445 (1994); *United States v. Allen*, 24 F.3d 1180 (10th Cir.), *cert. denied*, 115 S. Ct. 493 (1994); *United States v. Baker*, 16 F.3d 854 (8th Cir. 1994); *United States v. Linnear*, 40 F.3d 215 (7th Cir. 1994); *United States v. Kennedy*, 32 F.3d 876 (4th Cir. 1994), *cert. denied*, 115 S. Ct. 939 (1995); *United States v. Piper*, 35 F.3d 611 (1st Cir. 1994), *cert. denied*, 115 S. Ct. 1118 (1995).[43]

*1997 Guideline Amendments*

The Commission addressed another circuit conflict in 1997 regarding the offense of possessing certain chemicals or prohibited flasks or other equipment with intent to manufacture a controlled substance. The Commission concluded that such offenses should qualify as predicate "controlled substance offenses" for career offender purposes, and amended the

commentary to explicitly provide that such offenses qualify. In so doing, the Commission explained:

> This amendment addresses a circuit court conflict regarding whether the offenses of possessing a listed chemical with intent to manufacture a controlled substance or possessing a prohibited flask or equipment with intent to manufacture a controlled substance are "controlled substance offenses" under the career offender guideline. Compare *United States v. Calverley*, 11 F.3d 505 (5th Cir. 1993) (possession of a listed chemical with intent to manufacture a controlled substance is a controlled substance offense under §4B1.2) with *United States v. Wagner*, 994 F.2d 1467, 1475 (10th Cir. 1993) (possession of a listed chemical with intent to manufacture a controlled substance is not a controlled substance offense). This amendment makes each of these offenses a "controlled substance offense" under the career offender guideline. This decision is based on the Commission's view that there is such a close connection between possession of a listed chemical or prohibited flask or equipment with intent to manufacture a controlled substance and actually manufacturing a controlled substance that the former offenses are fairly considered as controlled substance trafficking offenses.

Practically speaking, the circuit conflict appears to have largely been triggered by the 1989 deletion from the §4B1.2 commentary of language stating that "substantially similar"

and "substantially equivalent" offenses were themselves controlled substances offenses.[44] The 1997 amendment largely restored the effect, if not the wording, of the language that was deleted in 1989.

*2000 and 2002 Guideline Amendments*

In 2000 and 2002, the Commission again returned to the relationship between career offenders and the five-year mandatory consecutive sentences required by 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a crime of violence or drug trafficking crime) or § 929(a) (possession of armor piercing ammunition during and in relation to a crime of violence or drug trafficking crime).

In 2000, the Commission determined that a defendant's prior convictions under §§ 924(c) or 929(a) would count as prior felony convictions for purposes of the career offender guideline. In 2002, violations of 18 U.S.C. §§ 924(c) or 929(a) would also count as the underlying offense of eligibility under §4B1.2. To accomplish these goals, the commentary to §4B1.2 was amended to include the following, in Application Note 1:

> *A violation of 18 U.S.C. § 924(c) or § 929(a) is a "crime of violence" or a "controlled substance offense' if the offense of conviction established that the underlying offense was a "crime of violence" or a "controlled substance offense." (Note that in the case of a prior 18 U.S.C. § 924(c) or § 929(a) conviction, if the defendant also was convicted of the underlying offense, the two prior convictions will be treated as related*

*cases under §4A1.2 (Definitions and Instructions for Computing Criminal History).)*[45]

The Commission explained at some length the reasons for the changes it made:

> This amendment is intended to comply with the statutory directive in 28 U.S.C. § 994(h) by providing a guideline sentence at or near the statutory maximum of life imprisonment for cases in which certain serious firearm offenses establish the defendant as a career offender.
>
> This amendment provides special rules in §§4B1.1 (Career Offender) and 5G1.2 (Sentencing on Multiple Counts of Conviction) for determining and imposing a guideline sentence in a case in which the defendant is convicted of an offense under 18 U.S.C. § 924(c) or § 929(a) and, as a result of that conviction, is determined to be a career offender under §§4B1.1 and 4B1.2 (Definitions of Terms Used in Section 4B1.1). The amendment supplements Amendment 600 (effective November 1, 2000) in which the Commission first addressed implementation of the statutory changes in penalties for 18 U.S.C. §§ 924(c) and 929(a) offenses made by the Act to Throttle the Criminal Use of Guns, Pub. L. 105—386. At that time, the Commission deferred addressing the more complicated issues of whether convictions under 18 U.S.C. §§ 924(c) and 929(a) can qualify as instant offenses for purposes of §4B1.1, and if they do so qualify, how the sentence would be imposed. Promulgation of this amendment reflects the Commission's decision that the amendment, while somewhat complex, is necessary to comply appropriately with 28 U.S.C. § 994(h).
>
> Operationally, this amendment achieves two goals. First, it permits 18 U.S.C. § 924(c) or § 929(a) offenses, whether as the instant or prior offense of conviction, to qualify for career offender purposes. Second, it ensures that, in a case in which such an instant offense establishes the defendant as a career offender, the resulting guideline sentence is determined under §4B1.1 using a count of conviction that has a statutory maximum of life imprisonment. The special rule necessarily is somewhat more complex because of the need to address certain anomalies that infrequently would occur in the absence of such a rule, *i.e.,* that a very serious offender could receive a lower sentence by virtue of the application of §4B1.1 than that which would otherwise be received by imposing the statutorily required minimum sentence consecutively to the otherwise applicable guideline range.[46]

### 2004 Guideline Amendments

In 2004, the Commission once again addressed the issue of felon-in-possession convictions as career offender predicates, this time in response to firearms legislation related to possessing certain dangerous weapons. The Commission created an exception to the general rule that felon-in-possession

convictions do not constitute predicate offenses, declaring such offenses to count as predicates when they involve such dangerous weapons. Accordingly, the commentary to §4B1.2 provided that "[u]nlawfully possessing a firearm described in 26 U.S.C. § 5845(a) (e.g., a sawed-off shotgun or sawed-off rifle, silencer, bomb or machine gun) is a 'crime of violence.'"[47] The Reason for Amendment explained: "Congress has determined that those firearms ... are inherently dangerous and when possessed unlawfully, serve only violent purposes."[48] The Commission also noted that some courts applying the guidelines had already reached this conclusion.[49]

### 2016 Guideline Amendment

As part of its multi-year study, the Commission promulgated an amendment to the career offender guideline in January 2016, and submitted a final version of the amendment to Congress in January 2016.[50] As discussed in more detail in Part V of this report, the amendment adopted several changes to the definition of "crime of violence" at §4B1.2 (Definitions of Terms Used in Section 4B1.1), including deletion of the "residual clause" at §4B1.2(a)(2). With the deletion of the residual clause under subsection (a)(2), the amendment revises the list of specific enumerated offenses that qualify as a prior crime of violence in a number of ways to focus on the most dangerous repeat offenders. As revised, the enumerated offenses include murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c). The Commission also added specific definitions for the enumerated offenses of forcible sex offense and extortion.

[1] The memorandum was incorporated into the March 25, 1988, report to the Commission from the Career Offender Working Group; some of the proposals contained therein were ultimately adopted as Amendment 268. The report is available at the GPO's Regional Depository Libraries or at the Commission.

[2] *Id.*

[3] USSG §§4B1.1, 4B1.2 (Nov. 1, 1987).

[4] *See* U.S. SENTENCING COMM'N, SUPPLEMENTARY REPORT ON THE INITIAL SENTENCING GUIDELINES AND POLICY STATEMENTS, 44 (1987), available at http://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf.

[5] Sentencing Guidelines for United States Courts, 52 Fed. Reg. 44674 (Nov. 20, 1987).

[6] *Id.* at 44728-29.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 1291-92.

[10] *Id.*

[11] Sentencing Guidelines for United States Courts, 53 Fed. Reg. 1286 (Jan. 15, 1988).

[12] *Id.* at 1286.

[13] Sentencing Guidelines for United States Courts, 53 Fed. Reg. 15530 (Apr. 29, 1988).

[14] USSG App. C, amend. 47 (Jan 15, 1988).

[15] USSG App. C, amend. 48 (Jan 15, 1988).

[16] USSG App. C, amend. 49 (Jan 15, 1988).

[17] 18 U.S.C. § 924(e)(1).

[18] Pub. L. No. 98—473, Title II, § 1001(a), 98 Stat. 2136 (1984).

[19] USSG App. C, amend. 268 (Nov. 1, 1989).

[20] Memorandum from Gary J. Peters presenting the report of the career offender working group, March 25, 1988, at 23-24.

[21] *Id.* at 22.

[22] *Id.* at 22-23.

[23] USSG App. C, amend. 268. The original version of §4B1.2 had clarified that "aiding and abetting, conspiring, or attempting to commit" controlled substance offenses were included as career offender predicates, but had not so specified for crimes of violence. *See* 4B1.2 comment. (n.2) (1987).

*Appendix A-16*

[24] *Id.*

[25] USSG App. C, amend. 266 (Nov. 1, 1989). This provision was again amended to conform with §3E1.1 when the additional 1-level decrease was provided in that guideline. *Id.* at amendment 459.

[26] USSG App. C., amend. 433 (Nov. 1, 1991).

[27] Amendments to the Sentencing Guidelines for United States Courts, 57 Fed. Reg. 20148, 20157 (May 11, 1992).

[28] 508 U.S. 36 (1993).

[29] *Id.* at 46, quoting *Braxton v. United States*, 500 U.S. 344, 348 (1991).

[30] *Id.* at 47.

[31] *Id.* at 45.

[32] USSG App. C, amend. 506 (November 1, 1994).

[33] *Id.*

[34] 520 U.S. 751 (1997).

[35] *Id.* at 762.

[36] *Id.* at 757 (quoting *Mistretta v. United States*, 488 U.S. 361 (1989)).

[37] *Id.* at 760.

[38] In a footnote, the *LaBonte* court stated that ". . . [Section] 994(h) is designed to cabin the Commission's discretion in the promulgation of guidelines for career offenders. . .." *Id.* at 761, n. 5.

[39] *Id.*

[40] USSG App. C, amend. 567 (November 1, 1997).

[41] Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25074, 25086-87 (May 10, 1995).

[42] USSG App. C, amend. 528 (November 1, 1995).

[43] USSG App. C, amend. 568 (November 1, 1997).

[44] *See* USSG App. C, amend. 268 (Nov. 1, 1989); *Baker*, 16 F.3d at 857 (relying on the removal of this language); *Calverley*, 11 F.3d at 511 & n.14 (calling for the court to reconsider its precedents *en banc* given the Commission's deletion of the "substantially equivalent" language).

[45] USSG App. C, amend. 642 (Nov. 1, 2002).

[46] USSG App. C, amend. 642 (November 1, 2002).

[47] USSG App. C, amend. 674 (November 1, 2004).

[48] *Id.*

*Appendix A-17*

[49] The career offender guideline has not been substantially revised since 2004. A 2007 amendment altering the way multiple prior sentences are counted for criminal history purposes had some impact on the counting of multiple 18 U.S.C. § 924(c) convictions for career offender purposes. USSG App. C, amend. 709 (Nov. 1, 2007) (amending §4B1.2 comment. (n.1)).

[50] Amendment on "Crime of Violence" and Related Issues, submitted to Congress on Jan. 21, 2016, 81 FR 4741 (Jan. 27, 2016).

*Appendix A-18*

# APPENDIX B

## CURRENT SENTENCING PRACTICES:  DATA COLLECTION AND ANALYSIS PROCESS

*Appendix B-2*

## Records Collection

Pursuant to 28 U.S.C. § 994(w), a district court is directed to submit to the Commission the following sentencing documents in each felony or Class A misdemeanor case: the presentence report (PSR), the judgment (J&C), the statement of reasons form (SOR), the indictment or other charging instrument, and any plea agreement.[1] The data reported in the "Current Sentencing Practices" section of Part IV is derived by analyzing the Commission's electronic database of information that is routinely collected by the Commission on an annual basis, for all federal cases for which the Commission receives full documentation in accordance with 28 U.S.C. § 994(w).

The Commission collects information only on criminal cases involving at least one felony or Class A misdemeanor conviction, with the exception that death penalty case information is not submitted to the Commission because these cases are considered non-guidelines cases.[2] Records of any federal criminal case involving petty offenses only, in which the defendant was acquitted of all charges, or where all charges were dismissed are not maintained by the Commission. Cases where a diversionary sentence was imposed also are not kept in the Commission's individual offender datafile. Finally, cases are not included if all of the offense conduct occurred before the guidelines were promulgated.

Upon receipt, the electronic documents are reviewed to determine if they are missing critical documents (the Commission considers the PSR, J&C, and SOR to be the three critical documents for data collection) or if the documents provided do not match the document status information submitted by the district (*e.g.*, if the document status states that

a PSR was attached but the Commission did not receive a PSR, the case is rejected). If a case is rejected, an e-mail describing the problem is sent to the district that submitted the case. If the case is accepted, it proceeds into an analytical queue for processing.

At the analytic phase of case processing, Commission staff review each of the documents and extract demographic, sentencing, and guideline application information for each case. First, the PSR is reviewed and demographic information is entered. Additional identifiers are also taken from the PSR to help the Commission match its data to other federal criminal datafiles.[3] Next, the Commission enters the case disposition (guilty plea or trial), statutes for each count of conviction, statutory ranges for each count of conviction, and offense type. The statutes of conviction are coded from the J&C and the statutory ranges are coded from the PSR. The offense type and the disposition are entered based on information taken from both documents. The J&C is also reviewed for sentence length information and financial aspects of the offender's sentence.[4] Guideline application information is then extracted from the PSR, adjusting for any factual determinations that the court has documented on the SOR.[5] The SOR is then further reviewed to determine the final sentencing range and information about the sentence relative to the guideline range.[6] Finally, for any case involving a sentence outside of the guideline range, information is collected about the reasons why the sentence is outside of the range.

## Data Analysis

In fiscal year 2014, the Commission's individual datafile included 75,836 cases. Of the 75,836 cases, the

Commission received complete guideline application information for 67,672 cases. Of these, a total of 2,269 (3.4%) involved career offenders sentenced pursuant to §4B1.1.

For these 2,269 cases, the Commission was able to analyze and provide data describing the career offender population in fiscal year 2014. Specifically, the Commission gathered and analyzed relevant offender and offense characteristics, including demographic, the types of underlying offenses, and basic criminal history information. Additionally, the Commission used the available information to analyze the overall impact of the career offender guideline, as well as the complete range of sentencing information. This information is set forth in Part III of the report.

In order to examine additional relevant data, it was also necessary for the Commission to conduct a "special coding project," in which the relevant sentencing documents (particularly the PSRs) were individually reexamined, and the desired information was collected ("coded") and entered into a database. In particular, a special coding project was necessary to further supplement the criminal history data in its offender datafile. The Commission conducted this special coding project by examining a representative 20 percent random sample (457 offenders) of all 2,269 federal offenders sentenced using the career offender provision (and for which the Commission received full documentation) in fiscal year 2014.

As part of this special coding project, the Commission extracted information on offenders' prior criminal history events from submitted PSRs. Criminal history events were defined as sentencings summarized in the PSR that included complete information on arrest date, jurisdiction, and offense

of conviction. Single criminal history events can be comprised of any number of individual offenses; the number and types of those offenses were extracted for each case.

Prior offenses were then categorized into one of 100 standardized offense codes developed by the independent research organization NORC at the University of Chicago. As discussed in more detail in Appendix C, as part of other independent research projects, NORC has conducted extensive research regarding state and federal criminal codes and repository data definitions to distill the unique state specific offenses from RAP sheets from 25,000 criminal justice agencies nationwide into 100 standardized offense codes that describe offenses in a common format to allow comparison of offense types and severity across jurisdictions. Using a list of consolidated codes is necessary because criminal records repositories are primarily designed to store their records in ways that accurately reflect the requirements of each state or federal repository, such as the criminal code for that jurisdiction. As a result, any two repositories are likely to use many unique text strings to indicate the nature of the criminal charges and actions taken in response to those charges.

For purposes of its analysis, the Commission further consolidated these 100 codes into 32 more general offense types.[7] In making these classifications we were not bound by the "categorical approach" used to analyze whether an offense is a crime of violence under the guidelines. Such an analysis would have required delving into the elements of each statute of conviction, an impractical approach. These 32 offense types are: Murder, Unspecified Manslaughter, Non-negligent Manslaughter, Negligent Manslaughter, Kidnapping, Statutory Rape, Forcible Sex Offense, Robbery, Aggravated Assault,

*Appendix B-4*

Simple Assault, Unspecified Assault, Intimidation, Hit and Run with Injury, Extortion, Child Abuse, Other Violent Offense, Drug Trafficking, Burglary, Arson, Fraud, Larceny, Other Property Offense, Drug Possession, Unspecified Drug Offense, Escape or Flight, Weapons Offense, Court Violation, Rioting, Traffic Offense, DUI/DWI, Public Order Offense,

Immigration, and All Other Offenses. A more detailed discussion of this standardization process is available from the public data briefing presented by the Commission during the public comment period on the published amendment to the career offender guideline.[8]

*Appendix B-5*

[1] 28 U.S.C. § 994(w) (requiring the chief judge of each federal judicial district to ensure that these documents are submitted within 30 days of entry of judgment in a criminal case).

[2] The *Guidelines Manual* specifies that the sentencing guidelines do not apply to Class B or C misdemeanors at USSG §1B1.2(a). Additionally, the sentencing guidelines do not specifically contain any provisions that include the death penalty. If a statute of conviction includes a provision for the death penalty and the offender is ultimately sentenced to death, then this statutory punishment "trumps" the guideline sentence.

[3] Identifiers include social security number, Federal Bureau of Investigation number, U.S. Marshals Service number, Probation and Pretrial Services Automated Case Tracking Electronic Case Management System (PACTS/ECM) identification number, Bureau of Immigration and Customs Enforcement (ICE) number, and probation office. Twice each year, the Commission matches its data to data maintained by the Administrative Office of the U.S. Courts and notifies districts of any cases that have not been received by the Commission. The Commission undertakes this effort to assess the completeness of its datafile and to make efforts to improve it. The Commission will also request any documents missing from cases that have been received. Additionally, the Commission may match its data against these and other datafiles for special projects.

[4] The J&C details all aspects of the offender's sentence. The Commission collects many pieces of information about the sentence, including the length of the sentence, whether all or part of the sentence is time served, if any credit is given under USSG §5G1.3 (Imposition of a Sentence on a Defendant Subject to an Undischarged Term of Imprisonment), months of alternative confinement, months of probation or supervised release, hours of community service, amount of special assessment, fine amount, cost of supervision, and restitution amount.

[5] This includes the amendment year of the guidelines manual used to determine the base offense level (BOL), the specific offense characteristics (SOCs), the Chapter Three adjustments, criminal history points, multiple count levels, drug/chemical types and weights, and loss amounts.

[6] The SOR is part of the same form as the J&C (AO245B). The SOR details information about final court findings with respect to any changes made at sentencing to information documented in the PSR as well as information about whether the sentence falls inside or outside of the guideline range and why. The Commission collects much of this information, including the final offense level, criminal history category, un-trumped (i.e., statutory constraints not taken into account) guideline range, changes to guideline application from the PSR, court findings on the mandatory minimum status, whether the sentence is within/outside the guideline range, the reasons why the sentence is outside the range, and the attribution of the origin of the departure/sentence outside the guideline system.

[7] These 32 consolidated offense categories do not coincide with the 32 federal offenses reported annually in the Commission's *Sourcebook on Federal Sentencing Statistics*.

[8] *See* U.S. SENTENCING COMM'N, *PUBLIC DATA BRIEFING: "Crime of Violence" and Related Issues*, available at http://www.ussc.gov/videos/crime-violence-data-briefing. As noted during that briefing, the most common type of offense comprising all of the adult prior criminal history events for the career offender sample was drug trafficking, followed by traffic offenses, drug possession, public order offenses, and larceny.

*Appendix B-6*

# APPENDIX C

## RECIDIVISM: DATA COLLECTION AND ANALYSIS PROCESS

*Appendix C-2*

## Overview

Previous Commission recidivism studies required manual coding of criminal records from state and federal criminal history records (*i.e.*, RAP sheets). The Commission's current recidivism study has used technological advances to greatly expand the number of federal offender records analyzed as compared to previous Commission studies by collecting RAP sheets electronically. This appendix describes this data collection and analysis process.

The Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts (AO) to provide the Commission with secure electronic access to criminal history records through the CJIS's Interstate Identification Index (III) and the International Justice and Public Safety Network (NLETS). Results received using this system provided an individual's criminal history record maintained by all U.S. states, the District of Columbia, and federal agencies.[1] Once automated records were obtained, the Commission went through an extensive process to organize and standardize offense and court disposition descriptions across all reporting agencies with the assistance of NORC at the University of Chicago (NORC). The resulting database contained 30,182 offenders who had valid identifying information and were released during the study period, which included primarily calendar year 2005 (25,431 offenders), but was extended before and after this year to expand the sample for certain subgroups of offenders (4,751 offenders). This process, described below, began in 2014 and the database was completed in August 2015.

## Collecting the Study Group from Commission and Other Records

The Commission identified and processed the criminal records of more than 35,000 offenders who had a valid FBI number in either Commission or Bureau of Prisons (BOP) records and were released during the study period. Relevant to this report, the extended study group included U.S. citizen offenders sentenced under USSG §4B1.1 (Career Offenders) re-entering the community in calendar years 2004 and 2006 (in addition to those already included in the 2005 cohort). These offenders included only those:

- who are citizens;
- who re-entered the community after discharging their sentences of incarceration or by commencing a term of probation from 2004 through 2006;
- whose pre-sentence investigation report was submitted to the Commission;
- who have valid FBI numbers which could be located in criminal history repositories (in at least one of the 50 states, DC, or federal records);
- who were not reported dead, escaped, or detained; and
- whose federal sentence was not vacated.

For offenders released from prison, the BOP provided release dates, identifying information, some reincarceration information, and other relevant information which allowed the Commission to identify offenders who could not be reliably studied (*e.g.*, those who died while incarcerated). For

Case 1:17-cr-00159-EAW-JJM    Document 218-1    Filed 08/20/19    Page 122 of 132

offenders placed on probation, the AO provided identifying information, some revocation information, and other relevant information (*e.g.*, death while under supervision).

## Processing the Criminal Records

Following a practice pioneered by the U.S. Department of Justice's Bureau of Justice Statistics (BJS),[2] the Commission entered into a data sharing agreement with the FBI's CJIS Division and the Administrative Office of the United States Courts to provide the Commission with electronic access to criminal history records through the CJIS's Interstate Identification Index (III) using secure data exchange, which protected these confidential records from inadvertent disclosure. The CJIS's III allows authorized agencies to determine whether any federal or state repository has criminal history records on an individual. When an offender's records were found, each central criminal records repository, responding to III requests over the NLETS network, provided the records via the Administrative Office's Access to Law Enforcement System (ATLAS) secure interface to the Commission. As a result, offender criminal history records were collected from all state and federal agencies in which those records resided.

The ATLAS system returns the literal text in the RAP sheets in the format in which the original records appear: dates of criminal justice system actions (*e.g.*, arrests); offense categories which indicate the charges in the terminology used by that agency (*e.g.*, text strings or numeric categories); subsequent action tied to arrest charges (*e.g.*, charges filed by prosecutors, court findings of guilt, etc.); and sentencing and

corrections information. All of these records are subject to availability from the originating source.

The ATLAS system also "parses" records from RAP sheets received from all the states, the District of Columbia, and federal agencies. Parsing records involves organizing key data elements into logical components: sorting into separate criminal justice system stages (arrest, court, and correctional events); organizing all records by date; and linking related elements (such as court action taken in response to an arrest) into a single cycle. Key data elements include offender identifiers, dates of key actions (such as arrests and convictions), the criminal charges, and outcomes such as convictions and sentencing information. The parsing process collates the multi-state records into a uniform structure, regardless of the state, and produces a database for all individuals with a valid FBI number who were found in one or more repositories across the country.

The initial extraction process began in September 2014 and was completed in April 2015. Commission staff examined the raw RAP sheet information and compared it to the parsed records, looking for missing or erroneous translation of information from its raw form to the parsed record. This step is important because criminal history record repositories are continually updating and improving their information systems in ways that change the location or format of key text strings, making software written for an earlier computer platform obsolete for purposes of accurately parsing the data in its intended format and detail. Commission staff worked with ATLAS staff to resolve possible issues in about one-half of the repositories, and as a result records for several state

repositories had to be reprocessed after changes to the parsing procedures. In April 2015, this process was complete.

## Standardizing the Criminal Records

Following the collection of the RAP sheet records on study group offenders, the Commission contracted with NORC to consolidate all records on each offender, organize the records chronologically, and remove duplicative or extraneous material.[3] Minor traffic offenses (*e.g.*, speeding) were removed, but serious traffic-related offenses (*e.g.*, driving while intoxicated) were not removed from the analysis. Following these preliminary process steps, NORC researched state and federal criminal codes and repository data definitions to assign each unique state offense and disposition description to a single uniform description. This step was needed because criminal records repositories are primarily designed to store their records in ways that accurately reflect the requirements of each state or federal repository, such as the criminal code for that jurisdiction. As a result, any two repositories are likely to use many unique text strings to indicate the nature of the criminal charges and actions taken in response to those charges. Each jurisdiction's information was standardized by NORC for national-level analysis that reflected common definitions.

Using research on each repository, NORC created separate offense "crosswalks" for every state and the District of Columbia, as well as a separate crosswalk for federal repository records. These crosswalks translate any given jurisdiction's arrest and court records into standardized arrest and court codes. Through this standardization, all records, regardless of originating source, were brought into a common framework.

Within each arrest and court cycle, arrest and disposition of charges were categorized using standardized coding which generally follows the BJS model.[4] A charge severity index was created which incorporates both criminal law classification (*e.g.*, felony or misdemeanor) and offense severity. Offense severity was first separated into four broad categories (violent, property, drug, and public order), and then into 16 major arrest charge codes[5] and 98 detailed arrest charge codes used by BJS.[6] The charge severity index ranks murder of a public officer as the most serious charge, followed by 26 other detailed violent charge codes. These detailed violent charge codes are followed in order of severity by five drug trafficking, 16 property, 10 other drug, and 40 public order detailed charge codes. Additionally, court events are coded for charge disposition. After ordering, each charge is assigned a sequence number, and the top three for each event are retained.

Finally, by assembling all federal and state records, the database provides a complete criminal record for each individual for which valid records could be found, across any jurisdiction maintaining data on that individual. After the receipt of data from NORC, the Commission again reviewed all records for completeness and questionable entries. From the 36,007 offender records initially processed through ATLAS, 1,812 records were eliminated for reasons including apparent death during the study period, missing criminal history records, and missing or suspect information as to United States citizenship. Additionally, 4,013 offenders were released from BOP on detainer, which ordinarily indicates transfer of custody to state court or transfer to a state

*Appendix C-5*

correctional facility following completion of their federal sentence. These detained offenders were not released into the community during the study period, and their whereabouts are not recorded in the data; therefore, they were also withheld from the study.

[1] Of the 262,284 arrest records processed for 2005 releases, these records were almost entirely U.S. state and federal records. However, also included are 345 (0.1%) territorial (non-federal) arrests provided by U.S. territories, primarily by Puerto Rico and the U.S. Virgin Islands.

[2] See Matthew Durose, Alexia Cooper, and Howard Snyder, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*, at 16 (April 2014), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.

[3] Instances of arrest or sentencing that appeared to be duplicates of existing events were removed by NORC. Certain administrative records were removed after review of each state's procedures demonstrated that some entries were likely to be either reports of non-offending contact with law enforcement (*e.g.*, registration as a sex offender) or other information that pertained to the offender but was not a criminal justice event. Some states included historical data within cycles which caused issues with correct parsing of criminal history information; in these cases, the first court disposition for that cycle was retained and all others removed. Arrest entries that occurred outside of the eight-year follow-up period were removed from the datafiles and were not used to ascertain recidivism.

[4] See *Durose et al.*, *supra* note 2, at 22.

[5] The major arrest charge codes, as ranked by the Commission beginning with the most serious, were homicide, rape or sexual assault, robbery, assault, other violent offense, drug trafficking, burglary, larceny, motor vehicle theft, fraud, other property offense, drug possession, other drug offense, weapons offense (*e.g.*, unlawful sale, etc.), driving under the influence, and other public order offense.

[6] However, unlike the BJS major and detailed charge code rankings, the Commission chose to rank drug trafficking offenses immediately behind violent offenses in order of severity.

*Appendix C-6*

# APPENDIX D

## STATUTORY DEFINITIONS

*Appendix D-1*

*Appendix D-2*

## "Crime of Violence" in the Commission's Organic Statute

### 28 U.S.C. § 994 (Duties of the Commission)

(h) The Commission shall assure that the guidelines specify a sentence to a term of imprisonment at or near the maximum term authorized for categories of defendants in which the defendant is eighteen years old or older and

    (1) has been convicted of a felony that is—

        (A) a crime of violence; or

        (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46; and

    (2) has previously been convicted of two or more prior felonies, each of which is—

        (A) a crime of violence; or

        (B) an offense described in section 401 of the Controlled Substances Act (21 U.S.C. 841), sections 1002(a), 1005, and 1009 of the Controlled Substances Import and Export Act (21 U.S.C. 952(a), 955, and 959), and chapter 705 of title 46.

(i) The Commission shall assure that the guidelines specify a sentence to a substantial term of imprisonment for categories of defendants in which the defendant—

    (1) has a history of two or more prior Federal, State, or local felony convictions for offenses committed on different occasions;

    (2) committed the offense as part of a pattern of criminal conduct from which the defendant derived a substantial portion of the defendant's income;

    (3) committed the offense in furtherance of a conspiracy with three or more persons engaging in a pattern of racketeering activity in which the defendant participated in a managerial or supervisory capacity;

    (4) committed a crime of violence that constitutes a felony while on release pending trial, sentence, or appeal from a Federal, State, or local felony for which he was ultimately convicted; or

    (5) committed a felony that is set forth in section 401 or 1010 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 841 and 960), and that involved trafficking in a substantial quantity of a controlled substance.

(ii) The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

*Appendix D-3*

## RELEVANT STATUTORY CRIME OF VIOLENCE DEFINITIONS

### Crimes: 18 U.S.C. § 16

The term "crime of violence" means—

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

### Firearms: 18 U.S.C. § 924(c)(3)

For purposes of this subsection the term "crime of violence" means an offense that is a felony and—

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

### Bail Reform Act: 18 U.S.C. § 3156(a)(4)

[T]he term "crime of violence" means—

(A) an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another;

(B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or

(C) any felony under chapter 109A, 110, or 117[.]

## AGGRAVATED FELONY DEFINITION

### Immigration and Nationality: 8 U.S.C. § 1101(a)(43)

The term "aggravated felony" means—

\*\*\*

(F) a *crime of violence* (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment at least one year;

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996.

*Appendix D-4*

## VIOLENT FELONY AND SERIOUS VIOLENT FELONY DEFINITIONS

### Armed Career Criminal Act: 18 U.S.C. § 924(e)(2)(B)

[T]he term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another[.]

### "Three Strikes" Enhancement: 18 U.S.C. § 3559(c)(2)(F)

[T]he term "serious violent felony" means—

(i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111); manslaughter other than involuntary manslaughter (as described in section 1112); assault with intent to commit murder (as described in section 113(a)); assault with intent to commit rape; aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242); abusive sexual contact (as described in sections 2244 (a)(1) and (a)(2)); kidnapping; aircraft piracy (as described in section 46502 of Title 49); robbery (as described in section 2111, 2113, or 2118); carjacking (as described in section 2119); extortion; arson; firearms use; firearms possession (as described in section 924(c)); or attempt, conspiracy, or solicitation to commit any of the above offenses; and

(ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense[.]

**Average Sentences of Drug Trafficking Offenders
(Career Offender and Non-Career Offender)
FY2005-2014**

The data shown in these tables were extracted from the U.S. Sentencing Commission's 2005-2014 Monitoring Datasets by Paul J. Hofer, Policy Analyst, Sentencing Resource Counsel Project, Federal Public and Community Defenders, and former Special Projects Director, U.S. Sentencing Commission. For a description of the Monitoring Datasets, see U.S. Sent'g Comm'n, *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* app. D at 1 (2004). Although these particular analyses are not published by the Commission, the data underlying the tables are the same as the data used in the Commission's annual Sourcebook of Federal Sentencing Statistics. The data are publicly available at the Commission's website: http://www.ussc.gov/research-and-publications/commission-datafiles. Using standard statistical software, such as SAS or SPSS, the Monitoring Dataset can be used to generate a wide variety of tables and graphs beyond those published by the Commission.

# Average Sentences of Drug Trafficking Offenders
## (Career Offender and Non-Career Offender)*
FY2005-2014

SENTTOT0

| Year | CAROFFAP | Mean | Median | N |
|------|----------|------|--------|---|
| 2005 | Not Car Off | 74.34 | 60.00 | 21208 |
|      | Car Offender | 184.40 | 168.00 | 1460 |
|      | Total | 81.43 | 60.00 | 22668 |
| 2006 | Not Car Off | 75.48 | 60.00 | 22488 |
|      | Car Offender | 187.43 | 180.00 | 1567 |
|      | Total | 82.77 | 60.00 | 24055 |
| 2007 | Not Car Off | 75.31 | 60.00 | 22162 |
|      | Car Offender | 189.47 | 182.00 | 1762 |
|      | Total | 83.72 | 60.00 | 23924 |
| 2008 | Not Car Off | 71.59 | 59.00 | 22271 |
|      | Car Offender | 182.85 | 172.50 | 1782 |
|      | Total | 79.83 | 60.00 | 24053 |
| 2009 | Not Car Off | 69.18 | 57.00 | 22007 |
|      | Car Offender | 177.30 | 165.00 | 1823 |
|      | Total | 77.45 | 60.00 | 23830 |
| 2010 | Not Car Off | 66.75 | 52.00 | 21657 |
|      | Car Offender | 165.16 | 151.00 | 1773 |
|      | Total | 74.20 | 60.00 | 23430 |
| 2011 | Not Car Off | 63.42 | 48.00 | 22874 |
|      | Car Offender | 160.84 | 151.00 | 1666 |
|      | Total | 70.04 | 52.00 | 24540 |
| 2012 | Not Car Off | 62.46 | 48.00 | 22845 |
|      | Car Offender | 153.20 | 144.00 | 1704 |
|      | Total | 68.76 | 51.00 | 24549 |
| 2013 | Not Car Off | 66.10 | 51.00 | 20496 |
|      | Car Offender | 148.54 | 136.50 | 1708 |
|      | Total | 72.44 | 60.00 | 22204 |
| 2014 | Not Car Off | 62.23 | 48.00 | 19382 |
|      | Car Offender | 138.47 | 130.00 | 1702 |
|      | Total | 68.38 | 52.00 | 21084 |
| Total | Not Car Off | 68.74 | 55.00 | 217390 |
|      | Car Offender | 168.59 | 151.00 | 16947 |
|      | Total | 75.96 | 60.00 | 234337 |

*Defendants sentenced under guidelines 2D1.1, 2D1.2, 2D1.5, 2D1.6, 2D1.8

2

| Year | | Placement of Sentence | | | | |
|---|---|---|---|---|---|---|
| | | Within range | Above Range | Gov-Spon Below | Other Below | Total |
| 2005 | Not Car Off | 8590 | 109 | 5357 | 1953 | 16009 |
| | | 53.7% | 0.7% | 33.5% | 12.2% | 100.0% |
| | Car Offender | 444 | 4 | 438 | 257 | 1143 |
| | | 38.8% | 0.3% | 38.3% | 22.5% | 100.0% |
| | Total | 9034 | 113 | 5795 | 2210 | 17152 |
| | | 52.7% | 0.7% | 33.8% | 12.9% | 100.0% |
| 2006 | Not Car Off | 12358 | 112 | 7622 | 2426 | 22510 |
| | | 54.9% | 0.5% | 33.9% | 10.8% | 100.0% |
| | Car Offender | 639 | 6 | 614 | 310 | 1569 |
| | | 40.7% | 0.4% | 39.1% | 19.8% | 100.0% |
| | Total | 12989 | 118 | 8236 | 2736 | 24079 |
| | | 53.9% | 0.5% | 34.2% | 11.4% | 100.0% |
| 2007 | Not Car Off | 12279 | 99 | 7397 | 2407 | 22182 |
| | | 55.4% | 0.4% | 33.3% | 10.9% | 100.0% |
| | Car Offender | 749 | 3 | 683 | 327 | 1762 |
| | | 42.5% | 0.2% | 38.8% | 18.6% | 100.0% |
| | Total | 13028 | 102 | 8080 | 2734 | 23944 |
| | | 54.4% | 0.4% | 33.7% | 11.4% | 100.0% |
| 2008 | Not Car Off | 11854 | 145 | 7522 | 2769 | 22290 |
| | | 53.2% | 0.7% | 33.7% | 12.4% | 100.0% |
| | Car Offender | 699 | 8 | 668 | 407 | 1782 |
| | | 39.2% | 0.4% | 37.5% | 22.8% | 100.0% |
| | Total | 12553 | 153 | 8190 | 3176 | 24072 |
| | | 52.1% | 0.6% | 34.0% | 13.2% | 100.0% |
| 2009 | Not Car Off | 10634 | 184 | 7551 | 3649 | 22018 |
| | | 48.3% | 0.8% | 34.3% | 16.6% | 100.0% |
| | Car Offender | 580 | 6 | 734 | 503 | 1823 |
| | | 31.8% | 0.3% | 40.3% | 27.6% | 100.0% |
| | Total | 11214 | 190 | 8285 | 4152 | 23841 |
| | | 47.0% | 0.8% | 34.8% | 17.4% | 100.0% |
| 2010 | Not Car Off | 10152 | 202 | 7141 | 4169 | 21664 |
| | | 46.9% | 0.9% | 33.0% | 19.2% | 100.0% |
| | Car Offender | 508 | 10 | 745 | 511 | 1774 |
| | | 28.6% | 0.6% | 42.0% | 28.8% | 100.0% |
| | Total | 10660 | 212 | 7886 | 4680 | 23438 |
| | | 45.5% | 0.9% | 33.6% | 20.0% | 100.0% |
| 2011 | Not Car Off | 11096 | 234 | 7464 | 4085 | 22879 |
| | | 48.5% | 1.0% | 32.6% | 17.9% | 100.0% |
| | Car Offender | 491 | 9 | 704 | 462 | 1666 |
| | | 29.5% | 0.5% | 42.3% | 27.7% | 100.0% |
| | Total | 11587 | 243 | 8168 | 4547 | 24545 |
| | | 47.2% | 1.0% | 33.3% | 18.5% | 100.0% |
| 2012 | Not Car Off | 10262 | 230 | 8128 | 4233 | 22853 |
| | | 44.9% | 1.0% | 35.6% | 18.5% | 100.0% |
| | Car Offender | 434 | 9 | 765 | 496 | 1704 |
| | | 25.5% | 0.5% | 44.9% | 29.1% | 100.0% |
| | Total | 10696 | 239 | 8893 | 4729 | 24557 |
| | | 43.6% | 1.0% | 36.2% | 19.3% | 100.0% |
| 2013 | Not Car Off | 8387 | 238 | 7777 | 4102 | 20504 |
| | | 40.9% | 1.2% | 37.9% | 20.0% | 100.0% |
| | Car Offender | 426 | 10 | 777 | 495 | 1708 |
| | | 24.9% | 0.6% | 45.5% | 29.0% | 100.0% |
| | Total | 8813 | 248 | 8554 | 4597 | 22212 |
| | | 39.7% | 1.1% | 38.5% | 20.7% | 100.0% |
| 2014 | Not Car Off | 5527 | 184 | 8947 | 4728 | 19386 |
| | | 28.5% | 0.9% | 46.2% | 24.4% | 100.0% |
| | Car Offender | 384 | 8 | 841 | 469 | 1702 |
| | | 22.6% | 0.5% | 49.4% | 27.6% | 100.0% |
| | Total | 5911 | 192 | 9788 | 5197 | 21088 |
| | | 28.0% | 0.9% | 46.4% | 24.6% | 100.0% |
| Total | Not Car Off | 101131 | 1737 | 74906 | 34521 | 212295 |
| | | 47.6% | 0.8% | 35.3% | 16.3% | 100.0% |
| | Car Offender | 5354 | 73 | 6969 | 4237 | 16633 |
| | | 32.2% | 0.4% | 41.9% | 25.5% | 100.0% |
| | Total | 106485 | 1810 | 81875 | 38758 | 228928 |
| | | 46.5% | 0.8% | 35.8% | 16.9% | 100.0% |

## Placement of Sentences
## Drug Trafficking Offenders
### FY2005-2014

## Average Percent Reduction Below
## Guideline Minimum for Offenders
## Receiving a Below-Range Sentence*
*Life sentences and sentences over 470 months
capped at 470

PERCENTBLOW

| Year | CAROFFAP | Mean | Median | N |
|---|---|---|---|---|
| 2005 | Not Car Off | 42.817 | 37.500 | 7299 |
| | Car Offender | 39.667 | 37.234 | 695 |
| | Total | 42.543 | 37.500 | 7994 |
| 2006 | Not Car Off | 43.302 | 40.000 | 10037 |
| | Car Offender | 39.320 | 36.424 | 923 |
| | Total | 42.966 | 40.000 | 10960 |
| 2007 | Not Car Off | 41.595 | 36.170 | 9791 |
| | Car Offender | 38.829 | 36.170 | 1010 |
| | Total | 41.337 | 36.170 | 10801 |
| 2008 | Not Car Off | 42.645 | 36.842 | 10279 |
| | Car Offender | 38.889 | 36.424 | 1075 |
| | Total | 42.289 | 36.667 | 11354 |
| 2009 | Not Car Off | 43.581 | 37.778 | 11190 |
| | Car Offender | 39.910 | 36.170 | 1237 |
| | Total | 43.215 | 37.766 | 12427 |
| 2010 | Not Car Off | 43.552 | 37.778 | 11303 |
| | Car Offender | 40.535 | 38.931 | 1255 |
| | Total | 43.251 | 37.931 | 12558 |
| 2011 | Not Car Off | 43.820 | 37.500 | 11546 |
| | Car Offender | 40.270 | 37.977 | 1166 |
| | Total | 43.495 | 37.500 | 12712 |
| 2012 | Not Car Off | 43.414 | 37.500 | 12354 |
| | Car Offender | 40.246 | 37.023 | 1261 |
| | Total | 43.121 | 37.500 | 13615 |
| 2013 | Not Car Off | 43.782 | 37.952 | 11873 |
| | Car Offender | 40.569 | 38.480 | 1272 |
| | Total | 43.471 | 38.095 | 13145 |
| 2014 | Not Car Off | 45.192 | 40.476 | 13671 |
| | Car Offender | 42.635 | 42.366 | 1310 |
| | Total | 44.968 | 40.496 | 14981 |
| Total | Not Car Off | 43.465 | 38.095 | 109343 |
| | Car Offender | 40.190 | 38.168 | 11204 |
| | Total | 43.161 | 38.095 | 120547 |

3